**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF NEW MEXICO**

**UNITED STATES OF AMERICA,**

**Plaintiff,**

**v. No. 1:21-CR-00562-001 JB**

**JAIME VALDEZ,**

**Defendant.**

# MOTION TO SUPPRESS EVIDENCE AND STATEMENTS

Defendant Jaime Valdez, through undersigned counsel, Assistant Federal Public Defender Devon M. Fooks, respectfully moves this Court to suppress all evidence and statements obtained as a result of the illegal seizure and search of Mr. Valdez and his personal property on February 20, 2021 in Albuquerque, New Mexico. This motion is based on the Fourth and Fifth Amendments to the United States Constitution and Rules 12(b) and 41(h) of the Federal Rules of Criminal Procedure.

## I. Factual Background

**Mr. Valdez bases his factual recitation on the discovery materials he has received from the government. He requests permission to supplement this motion and to raise any other motions and arguments based on the facts and evidence that may be revealed during any pretrial hearing and trial held in this case.**

Around noon, on February 20, 2021, officers went to 1700 Bonaguidi Road, SW looking for a Hispanic man in his early 20s. A resident on that street reported that earlier that morning a man rang her doorbell asking if he could get back a bag he had thrown into the yard. Apparently, someone had been chasing him and he threw the bag over her wall. The resident said she would get it for him. After he was given his back bag, the man walked towards Iselta Boulevard. The officers did not see this man when they drove up and down the road.

They then drove across Iselata Boulevard and stationed themselves in the parking lot of Shadyside park. Approximately two minutes later they saw a man allegedly fitting the description of the one seen walking around Bonaguidi Road. This man placed his bag in front of a car listed for sale on the northwest corner of Bonaguidi and Isleta. He looked into the driver's side window of the car, then went back to his bag and looked in it. The officers drove towards the man using their vehicles' emergency equipment. They then confronted him with their vehicles to prevent him from leaving. Both got out, one approaching him from the front, the other from behind. The officer behind the man told him to stop "reaching in the bag" and the man put it on the ground. He was then told to get his hands out of his pocket. He did as he was told. He was asked if he had any weapons to which he replied no. The officer in front of him demanded his name. The man said, Jaime Valdez. The officer behind him, who was at least a head taller, then directed him to put his hands on top of his head. Mr. Valdez asked why, he had done nothing wrong. The officer grabbed his right arm and then his left and pulled them behind his back.

The officer in front told Mr. Valdez if he didn't "relax" he would get "dumped on the ground." Mr. Valdez told the officer behind him not to twist his hands and wrists because he has "pins in his hands." That officer told Mr. Valdez he would be handcuffed. The officer squeezed Mr. Valdez's hands so hard he dropped to his knees in pain. After the handcuffs were on, the officer directed him to stand up. Then he searched Mr. Valdez while the other officer again demanded his name as well as his date of birth and social security number. The officer searching seized a magazine from his waistband and a pistol from his front left pants' pocket. During the search, the other officer continued interrogating Mr. Valdez and then he picked up his bag. He walked it over to his vehicle approximately 10 feet away where he placed it on the hood. Mr. Valdez then was told he would be put in the back of the patrol car. When Mr. Valdez asked what he had done wrong, the officer said he had been "walking around."

The officer escorted Mr. Valdez to his vehicle, 25 to 30 feet from where his bag lay on the hood of the other officer's vehicle. Once he had put Mr. Valdez in the back of the vehicle he read the *Miranda* warnings to him. The officer asked Mr. Valdez if he understood what he had read to him. Mr. Valdez said no. He then asked him again and Mr. Valdez was silent. The officer said, "yes? okay, having these rights in mind do you wish to talk to us?" Mr. Valdez replied, "I will talk to you." Mr. Valdez rambled on about detectives, his brother's death from fentanyl, telling his mother not to buy that for him and that he was trying to stay away from all that. The officer interrupted and asked from which house he had left and Mr. Valdez said he could not say. The officer said "I am trying to help you out but you are not telling me anything . . . I want to help you out but you have already lied to us." Later, Mr. Valdez said he no longer wanted to talk on camera.

During the interrogation the other officer took Mr. Valdez's bag into his vehicle and then drove close to the officer's vehicle. The two officers spoke while Mr. Valdez was locked inside the patrol vehicle.

Minutes later the officer took the bag out of the vehicle, placed it again on the hood and searched it. He first took out some clothes. Then he took out an item wrapped in light brown paper and packing tape. He tore at the paper and pulled off the tape to see what was inside. Satisfied it was what he believed to be methamphetamine, he put all the items back in the bag, closed it and put it back in his vehicle.

As a result of this illegal seizure and search, the government charged Mr. Valdez with possession with intent to distribute 50 grams or more of methamphetamine; possession a firearm in furtherance of a drug trafficking crime; and possession of a firearm and ammunition by a prohibited person.

## II. Argument

The moment the officers confronted Mr. Valdez, they illegally seized him. No objective facts indicated criminal activity was afoot. Based on reports provided by the government and the officers' video recordings, the officers did not have information that a crime was being committed. Thus, when the officers turned on the marked patrol vehicles' emergency equipment and then used the vehicles to keep Mr. Valdez from walking away they seized him as a matter of law. When they then put him in handcuffs they arrested him without probable cause. The search of his person and his belonging also was illegal. As a result of the illegal search and seizure, the firearm, ammunition, drugs and all statements must be suppressed.

### A. The officers illegally detained and seized Mr. Valdez.

From the moment the officers turned on their vehicles' emergency equipment and drove at Mr. Valdez, he was detained. *United States v. Hernandez*, 847 F.3d 1257, 1263-64 (10th Cir. 2017). A person is seized for Fourth Amendment purposes if, under the circumstances, the officer's conduct "would have communicated to a reasonable person that he was not at liberty to ignore the police presence and go about his business." *Hernandez*, 847 F.3d at 1263 (internal quotation marks, citation omitted). "Whenever an officer restrains the freedom of a person to walk away, he has seized that person." *Tennessee v. Garner*, 471 U.S. 1, 7 (1985) (internal citation omitted). In other words, an encounter is not consensual "when, by means of physical force or a show of authority," an officer restrains that person's "freedom of movement." *Fogarty v. Gallegos*, 523 F.3d 1147, 1155 (10th Cir. 2008). Even in the absence of physical force, a person has been seized if he submits to an officer's assertion of authority. *Hernandez*, 847 F.3d at 1266.

Mr. Valdez submitted to the show of authority. He stood where he was the moment the officers descended on him. No one else was in the space where he stood so it was evident that the officers were focused on him. Bearing down on him in marked patrol cars with emergency lights

engaged indicted the officers expected him to remain where he stood. *United States v. Salazar*, 609 F.3d 1059, 1066 (10th Cir. 2010). With officers and their cars around him, Mr. Valdez was not free to walk away. *See United States v. Gaines*, 918 F.3d 793, 796-99 (10th Cir. 2019) (police arriving in marked cars with flashing lights would cast doubt on reasonable person's belief that he was free to leave). They ordered him to stop what he was doing and keep his hands out of his pockets. Immediately after the officer told him to put his hands on his head and then he grabbed Mr. Valdez's right arm. Any reasonable person would have understood that he was not at liberty to ignore them and go about his business. *See Brown v. Texas*, 443 U.S. 47, 50 (1979) (when officer accosts someone without reasonable suspicion and restrains the freedom to walk away, he has unlawfully seized that person). The totality of the circumstances demonstrate that the officers "crossed the coercive line and a seizure had occurred." *Hernandez*, 847 F.3d at 1264.

**1. The officers did not have reasonable suspicion to detain Mr. Valdez**.

The government has the burden of establishing the reasonableness of the officers' suspicion at every stage of the detention. *United States v. De La Cruz*, 703 F.3d 1193, 1198 (10th Cir. 2013). When the officers first saw Mr. Valdez, they had no reason to suspect he had done, or was doing, anything illegal. They admitted as much: when Mr. Valdez asked what he had done wrong, the officer told him he had been "walking around." As discussed above, the officers' initial approach was an effective detention. Thus, Mr. Valdez argues he was detained without reasonable suspicion.

A person "may not be detained even momentarily" without reasonable suspicion. *Florida v. Royer*, 460 U.S. 491, 498 (1983). In their reports the officers present no particular and objective evidence that crime was afoot. Sundry subjective hunches and generalized concerns do not establish reasonable suspicion. *United States v. Wood*, 106 F.3d 942, 946 (10th Cir. 1997). It requires "'a particularized and objective basis for suspecting the particular person stopped of criminal activity.'" *Vasquez v. Lewis*, 834 F.3d 1132, 1137 n. 2 (10th Cir. 2016) (quoting *United States v. Lambert*, 46 F.3d

1064, 1069 (10th Cir. 1995)). As the reports indicate, the particular person here did not say or do anything unlawful. The Fourth Amendment demands that police action be "predicated" on "specificity." *United States v. Cortez*, 449 U.S. 411, 418 (1981). It is missing here.

**B. The officers arrested Mr. Valdez without probable cause**.

Whether Mr. Valdez's seizure was an investigatory detention or arrest, the officers seized him in violation of the Fourth Amendment. To protect the right afforded to a person under the Fourth Amendment, a formal arrest or a seizure that resembles a formal arrest must be supported by probable cause to believe that a crime has been or is being committed. *See Michigan v. Summers*, 452 U.S. 692, 700 (1981). A person has been arrested when officers by a show of authority prevent a person from taking his leave. *United States v. Edwards*, 632 F.3d 633, 639 (10th Cir. 2001); *see also Florida v. Royer*, 460 U.S. 491, 503 (1983) (finding objectively, individual under arrest because officers had his plane ticket and luggage and he was not told he could board the plane if he wanted); *Cortez v. McCauley*, 478 F.3d 1108, 1116 (10th Cir. 2007) ("highly intrusive" encounter an arrest, likewise one where police use "firearms, handcuffs, and other forceful techniques"). Probable cause "means facts and circumstances within the officer's knowledge that are sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown, that [the person] has committed, is committing, or is about to commit an offense." *Michigan v. DeFillippo*, 443 U.S. 31, 37 (1979).

Objectively, Mr. Valdez was under arrest when officers handcuffed him. The officers converged on Mr. Valdez and put him in handcuffs. As he stood there one officer guarded him while the other searched him. Every action they took presented an objective barrier to being free to leave or go about his business. *See, e.g., Royer*, 460 U.S. at 503 n.3 (person effectively seized when officer retained his identification and ticket because he could not, as a practical matter, leave the airport without them). A reasonable person in this situation would have understood that the level of restraint the officers imposed in his "freedom of movement" was "to a degree associated with a formal

arrest." *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004). As a matter of law, these facts establish that Mr. Valdez was under arrest. *See Cortez*, 478 F.3d at 1116 (individual arrested when he was taken from doorway of home, handcuffed, given *Miranda* warnings, placed in back of locked patrol car and interrogated).

The arrest was illegal because it was made without probable cause. The officers did not have evidence that Mr. Valdez had committed or was committing an offense when they arrested him. *See Beck v. Ohio*, 379 U.S. 89, 91 (1964) (at moment of arrest officers must have knowledge of facts and circumstances that are reasonably trustworthy to warrant a prudent person in believing that a specific individual had committed or was committing an offense). They handcuffed him and searched him because a neighborhood resident had reported a man walking along her street after asking her for his bag that he had tossed into her yard. This did not give the officials adequate cause to believe Mr. Valdez had done something wrong. Mr. Valdez was walking down a public street where he had a right to be. He stopped along the way to look at a car for sale parked on the side of the road. He then returned to his bag that he had left in front of the car and looked inside. Nothing in the officers' reports or videos demonstrate anything illegal was happening. Therefore, the officers' arrest of Mr. Valdez was without probable cause and violated the Fourth Amendment.

**1. The officers did not have cause to search Mr. Valdez or remove items from his clothing.**

Not only was the stop and detention unlawful, the officers' search of Mr. Valdez was unlawful because there was no objective indication that he was armed or dangerous.

A pat-down search is a "serious intrusion upon the sanctity of the person, which may inflict great indignity and arouse strong resentment, and it is not to be undertaken lightly." *Terry v. Ohio*, 392 U.S. 1, 17–18 (1968). In order to justify a pat-down search, there must be reasonable suspicion, grounded in specific and articulable facts, that the suspect may be presently armed and dangerous. *See Arizona v. Johnson*, 555 U.S. 323, 332 (2009). Notably, the purpose of this pat-down, "is not to

discover evidence of a crime, 'but to allow the officer to pursue his investigation without fear of violence.' " *United States v. Hammond*, 890 F.3d 901, 905 (10th Cir. 2018). "Nothing in *Terry* can be understood to allow a generalized 'cursory search for weapons' or, indeed, any search whatever for anything but weapons." *Ybarra v. Illinois*, 444 U.S. 85, 93–94 (1979). Here, the pat-down was not justified because there was no objective indication that Mr. Valdez was armed *and* dangerous.

Whether there is reasonable suspicion that a person is armed and presently dangerous is an objective test based on the totality of the circumstances. *See United States v. Garcia*, 751 F.3d 1139, 1147(10th Cir. 2014). In addition to any reasonably suspicious factors actually relied upon by the officer, the court must also consider any factors that would objectively tend to dispel any suspicion that the person was armed and dangerous. *Id.* Factors that are often considered in determining the propriety of a frisk include the nature of the suspected crime being investigated, whether there are bulges in clothing that may indicate a concealed weapon, whether the suspect is cooperative, and whether the suspect displays furtive behavior that indicates he is armed. *See United States v. Moorefield*, 111 F.3d 10, 13–14 (3d Cir. 1997).

The pat-down search of Mr. Valdez was unlawful because the officers did not have reasonable suspicion to believe he had or was about to commit a crime. Similarly, neither had an objective reason to believe he was armed and dangerous. Mr. Valdez had been engaged in nothing more menacing than walking on a public street during the middle of the day in an area with homes and commercial and retail businesses. The officers did not report seeing any bulges in his clothing. As they converged on him, Mr. Valdez did not run away. When he was told to stop reaching into the bag, he did and put it on the ground. When he was told to take his hands out of his pockets, he did.

When the officer put him in handcuffs, Mr. Valdez was alone guarded by two uniformed and armed police officers, both of whom were larger in stature than him. Clearly, the officers were neither outnumbered, nor outsized. *Compare United States v. Sanchez*, 519 F.3d 1208, 1216 (10th Cir.

2008) ("[Officers] were outnumbered by the three occupants of the sedan and had a valid concern for their safety. Their decision to conduct a limited pat-down search of the occupants was reasonable.") *with United States v. Powell*, 666 F.3d 180, 187 (4th Cir. 2011) (no reasonable suspicion where officers outnumbered the car's occupants). The officers did not have cause to believe Mr. Valdez had done anything illegal. And nothing they had seen him do when they moved in on him was suspicious. Throughout the confrontation they were in complete control of the situation. Accordingly, under the totality of the circumstances, the officers did not have reasonable suspicion that Mr. Valdez was armed and dangerous, and the pat-down search violated Mr. Valdez's Fourth Amendment rights.

### C. The officers did not have probable cause to search Mr. Valdez's bag or anything inside the bag.

Once the officer handcuffed Mr. Valdez, his arms remained braced behind his back. The officer searched Mr. Valdez and then put him in the back of his patrol vehicle where he interrogated him. When Mr. Valdez said he did not want to talk further, the officer closed the door and locked him inside. The other officer had custody and control over Mr. Valdez's bag throughout the encounter. While Mr. Valdez was secured inside the other patrol vehicle, he took the bag out of his vehicle and searched the bag on the vehicle's hood. Without a warrant or probable cause, the officer had no authority to do so because the bag was not in Mr. Valdez's immediate control. *Edwards*, 632 F.3d 643-44; *United States v. Knapp*, 917 F.3d 1161, 1168-69 (10th Cir. 2019).

In *Knapp*, the court said examining whether a search truly is incident to an arrest depends on whether an area searched is "within the arrestee's grab area." *Id.* at 1169. The four factors the court looked at there, weigh in favor of Mr. Valdez here. Together they demonstrate it is unreasonable to believe he would have gained possession of anything inside the bag. First, he was handcuffed, locked in the back of a patrol car. *Id.* Second, Mr. Valdez was the only arrestee and there were several officers watching over him. *Id.* Third, with Mr. Valdez secured in the patrol car, the officers "maintained exclusive possession of [the bag] since placing [him] in handcuffs." *Id.* Fourth, it is

inconceivable that Mr. Valdez would free himself, run from the locked patrol vehicle and then grab the bag and open it, let alone do so without an officer intervening. *Id.* As in *Knapp*, the Court should find that the officers' search of the bag was not incident to arrest and therefore, was unlawful.

Additionally, Mr. Valdez had a constitutionally protected expectation of privacy in the bag and its contents. He also maintained a right to exclude others from looking through and ripping apart sealed packages to see what otherwise was unknowable to them. *See United States v. Padilla*, 508 U.S. 77, 81 (1993) ("Expectations of privacy and property interests govern the analysis of Fourth Amendment search and seizure claims."). When the officer seized the bag, it was closed. Inside the bag at least one item had been wrapped in light brown paper and sealed with tape. By closing the bag and sealing contents within it, Mr. Valdez expected his property would remain "inviolable." *United States v. Ackerman*, 831 F.3d 1292, 1307 (10th Cir. 2016). When, like here, "the Government obtains information by physically intruding" on a person's "effect," a "search within the original meaning of the Fourth Amendment has undoubtedly occurred." *Florida v. Jardines*, 569 U.S. 1, 5, 11 (2013). Given that the officer's purpose was to "gather evidence," which he "learned only by physically intruding" on Mr. Valdez's bag and the contents within, it was a search for which a warrant or probable cause was required. *Jardines*, 569 U.S. at 8, 11; *Smith v. Ohio*, 494 U.S. 541, 542 (1990); *United States v. Hill*, 805 F.3d 935, 938-39 (10th Cir. 2015); *United States v. Hall*, 978 F.2d 616, 620-21 (10th Cir. 1992). Since the officer had neither, the search was illegal. *United States v. Saulsberry*, 878 F.3d 946, 952-53 (10th Cir. 2017) (while detention lawful, no probable cause to seize individual's paper bags and examine contents).

**D. Mr. Valdez's statements were tainted by the illegal detention**

Statements to law enforcement obtained after an illegal arrest are presumptively invalid, because they are tainted by the illegal conduct. *See Brown v. Illinois*, 422 U.S. 590, 601–02 (1975) (discussing valid *Miranda* waivers). "To demonstrate that the taint of an illegal seizure has dissipated,

the government must prove, from the totality of the circumstances, a sufficient attenuation or break in the causal connection between the illegal detention and the statements." *United States v. Fox*, 600 F.3d 1253, 1259 (10th Cir. 2010) (internal citations and quotation marks omitted).

The government cannot show a viable attenuation made Mr. Valdez's statements voluntary, and thus his statements must be suppressed as well. To begin with, Mr. Valdez's alleged statements were made directly after he was illegally seized, detained, arrested and searched. The temporal connections between the statements and the illegalities are comparable to other cases where the time factors weighed against the government. *See Kaupp v. Texas*, 538 U.S. 626, 633 (2003) ("no substantial time passed" where accused was arrested in his home and taken to the police station and confessed after 10 to 15 minutes of interrogation); *Taylor v. Alabama*, 457 U.S. 687, 691 (1982) (six hours from illegal detention); *Brown*, 422 U.S. at 604 (less than two hours from illegal detention); *United States v. Restrepo*, 890 F.Supp. 180, 199 (E.D.N.Y. 1995) (two days). As in those cases, the temporal proximity here, weighs heavily against the government.

So too does the lack of intervening circumstances. A reviewing court looks "only from the defendant's perspective to determine whether any intervening event occurred which isolates the defendant from the coercive effects of the original illegal stop . . ." *United States v. Gregory*, 79 F.3d 973, 980 (10th Cir. 1996). To break the casual chain the events must create "a discontinuity" that weakens and attenuates the original illegality. *Id.* It is evident from the totality of the circumstances that no intervening circumstances broke the casual chain between the illegal detention, arrest and search and Mr. Valdez's statements.

Mr. Valdez's statements followed swiftly and inexorably after the illegal detention, arrest and search. The atmosphere the officers created did not isolate Mr. Valdez from the effects of the misconduct. They seized his statements only by first illicitly detaining him, arresting him and then searching him. What followed after that was just a continuation of what preceded it. From Mr.

Valdez's perspective the detention and arrest had not ended. *See Kaupp*, 538 U.S. at 633 (casual connection between officers' illicit conduct and statement not broken wen accused was in the same physical state as when he was taken from his house and was still in the custody of a number of officers). No event intervened that helped Mr. Valdez carefully and objectively consider his options and exercise his free will.

The taint of the officers' unreasonable actions on the voluntariness of Mr. Valdez's statements is further exacerbated by the purposefulness and flagrancy of their misconduct. Their conduct was flagrant - they detained, arrested and searched Mr. Valdez without reasonable suspicion or probable cause. It also was purposeful - they were looking for evidence with which they could continue to hold and then charge Mr. Valdez.

Their conduct is an example of a "fishing expedition" to see if "something turns up" which the Supreme Court and the Tenth Circuit have held weighs conclusively against the government in this analysis. In *Taylor*, 457 U.S. at 691, and *Brown*, 422 U.S. at 605, the Supreme Court found the officers' misconduct flagrant where they willfully arrested the defendant "in the hopes that something wold turn up." In determine the level of flagrancy of misconduct it does not matter whether the officers actually believed their detention, arrest and search of Mr. Valdez were warranted based on a feeling that something was off. *See United States v. Sandoval*, 29 F.3d 537, 544 (10th Cir. 1994) ("It is of course irrelevant that [the officer] may have regarding his own actions as somehow justified. 'Reasonable suspicion' [or probable cause are] question[s] of law for the court, and where it is absent law enforcement officers can only be said to be acting on an impermissible hunch."). Instead, the most important feature of their actions is the quality of purposefulness; the fact that it was a pure and simple "fishing expedition" for evidence of criminal wrongdoing which deliberately and necessarily trampled on Mr. Valdez's constitutional right to be "secure in his person and effects against unreasonable searches and seizures." U.S. Const. Amend. 4 (cleaned up). The officers' reports and

videos and the Supreme Court and Tenth Circuit precedent should convince this Court that the officers' violation of the Fourth Amendment was purposeful and flagrant. Consequently, this third *Brown* factor weighs heavily against the government.

**E. Any post-*Miranda* waivers and statements were involuntary.**

One officer interrogated Mr. Valdez after advising him of his *Miranda* rights. When a defendant talks to police after being advised of his right to remain silent, the government bears the burden of proving by a preponderance of the evidence that the waiver of the right was voluntary. *See Colorado v. Connelly*, 479 U.S. 157, 168 (1986). The question whether an individual waived his rights "is not one of form, but rather whether the defendant in fact knowingly and voluntarily waived the rights delineated in the *Miranda* case." *North Carolina v. Butler*, 441 U.S. 369, 373 (1979).

For post-*Miranda* statements to be admissible at trial, the government has the burden of proving that the waiver of *Miranda* rights was knowing and voluntary. *See Moran v. Burbine*, 475 U.S. 412, 421 (1986); *Edwards v. Arizona*, 451 U.S. 477, 483 (1981); *Miranda*, 384 U.S. at 475. This is a heavy burden because courts must indulge every reasonable presumption against waiver of fundamental constitutional rights. *See Johnson v. Zerbst*, 304 U.S. 458, 464 (1938).

In determining whether an individual's rights were voluntarily waived, courts consider the following factors: the individual's age, intelligence, and education; whether the individual was informed of his or her rights; the length and nature of the individual's detention and interrogation; and the use or threat of physical force against the individual. *See United States v. Smith*, 606 F.3d 1270, 1276 (10th Cir. 2010). The Tenth Circuit has specifically found that only if the totality of the circumstances surrounding the interrogation shows both an uncoerced choice and the requisite level of comprehension, can a waiver be effective. *See Sharp v. Rohling*, 793 F.3d 1216, 1233 (10th Cir. 2015); *United States v. Hernandez*, 93 F.3d 1493, 1501 (10th Cir. 1996).

Additionally, an admission by a defendant may not be used as evidence at a criminal trial unless the statement was made voluntarily. *See Jackson v. Denno*, 378 U.S. 368, 380 (1964). "The government bears the burden of showing, by a preponderance of the evidence, that a confession is voluntary." *United States v. Lopez*, 437 F.3d 1059, 1063 (10th Cir. 2006) (citing *Missouri v. Seibert*, 542 U.S. 600, 608 n.1 (2004)). The determination of whether a statement is voluntary is based on the totality of the circumstances considering both the characteristics of the accused and the details of the interrogation where no single factor is determinative. *See Lopez*, 437 F.3d at 1063; *United States v. Lugo*, 170 F.3d 996, 1004 (10th Cir. 1999). In order to evaluate whether a statement or confession was coerced, the court is to consider the characteristics of the defendant, the circumstances surrounding the statements, and the tactics employed by the police. *See United States v. Guerro*, 983 F.2d 1001, 1004 (10th Cir. 1993).

The relevant factors are: "(1) the age, intelligence, and education of the defendant; (2) the length of detention; (3) the length and nature of the questioning; (4) whether the defendant was advised of his constitutional rights; and (5) whether the defendant was subject to physical punishment." *Lopez*, 437 F.3d at 1063–64 (citing *Schneckloth v. Bustamonte*, 412 U.S. 218, 226 (1973)). The question is whether the defendant's "will has been overborne and his capacity for self-determination critically impaired." *Schneckloth*, 412 U.S. at 225–26. Subtle psychological coercion, either by promise of leniency or indirect threat, may render a confession involuntary. *See United States v. Tingle*, 658 F.2d 1332, 1335 (9th Cir. 1981).

In *Hart v. Attorney Gen. of the State of Fla.*, 323 F.3d 884 (11th Cir. 2003), the Eleventh Circuit found that, although the defendant has been read his rights under *Miranda*, and also signed a *Miranda* waiver form, the defendant's decision to waive his rights and confess was not voluntary, knowing and intelligent. In *Hart*, the court found that the defendant's decision was the product of a law enforcement officer's deception and that statements made by the law enforcement officer was contradictory to the *Miranda* warning. *See Hart*, 323 F.3d at 894–895.

In this case, it was evident to the interrogating officer that Mr. Valdez was in distress. Earlier the officer had brought him to his knees by squeezing his hands and wrists. Besides the pain the officer inflicted, something else may have affected Mr. Valdez's mental and emotional state. The officer never asked him about it. Additionally, the video demonstrates that Mr. Valdez did not have a full awareness of the nature of the rights abandoned and the consequences of the decision to abandon them. When the officer asked if he understood his rights he said no. When he asked again, Mr. Valdez was silent. Undeterred, the officer launched into his interrogation. Mr. Valdez could not understand that the officers' aggregate behavior towards him was intended to force a statement from him. Given the circumstances, Mr. Valdez's answers were not voluntarily. As a result, Mr. Valdez's statements must be suppressed because they were obtained in violation of the Fifth Amendment.

### F. Any evidence the officers seized from Mr. Valdez, including statements must be suppressed as fruits of an illegal detention, arrest and search.

Whether evidence obtained following a Fourth Amendment violation must be suppressed depends on if it "has been come at by exploitation of [the] illegality or instead by means sufficiently distinguishable to be purged of the primary taint." *Wong Sun v. United States*, 371 U.S. 471, 488 (1963). Here, all the evidence seized by the officers was directly derived from the illegal detention and arrest and the improper searches. Consequently, all the evidence the government intends to use against Mr. Valdez in this proceeding must be suppressed as products of the officers constitutionally unreasonable conduct.

## III. Conclusion

There was no reasonable suspicion nor probable cause to believe that a crime had been, was being, or was about to be committed by Mr. Valdez. Absent such a showing, all evidence and statements obtained as a result of the unlawful seizure, search, and interrogations of Mr. Valdez must be suppressed. *See Wong Sun*, 371 U.S. at 487–88.

Although the government opposes this motion, Mr. Valdez respectfully requests an evidentiary hearing to resolve the issues he raises here.

In connection with the requested evidentiary hearing and if the government does not otherwise disclose the information, Mr. Valdez further requests, pursuant to Rule 26.2 of the Federal Rules of Criminal Procedure, that it disclose to defense counsel at least forty-eight hours before the hearing any statements, including grand jury testimony, of suppression hearing witnesses. This request is made to avoid delays in the conduct of the hearing, which necessarily will be longer if counsel has to seek recesses to review materials provided by the government at the hearing. Mr. Valdez expressly reserves the right to raise any other motions and arguments based on the facts and evidence that may arise during any evidentiary hearings in this case.

Mr. Valdez requests that the Court set this matter for evidentiary hearing and, at the conclusion thereof and after the opportunity for supplemental argument or briefing, as may be necessary, enter an order granting Mr. Valdez's Motion to Suppress Evidence and Statements and providing for such other and further relief as the Court deems just and proper.

Respectfully submitted,

FEDERAL PUBLIC DEFENDER
111 Lomas Blvd., NW, Suite 501
Albuquerque, New Mexico 87102
(505) 346-2489
(505) 346-2494 Fax
devon_fooks@fd.org

*Electronically filed on 9/10/21*
*s/ Devon M. Fooks*
Devon M. Fooks
Assistant Federal Public Defender