IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

Plaintiff,

vs. NO. 21-CR-00562-JB

JAIME VALDEZ,

Defendant.

UNITED STATES' RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION TO SUPPRESS EVIDENCE AND STATEMENTS

The United States respectfully requests that the Court deny Defendant Jaime Valdez's "Motion to Suppress Evidence and Statements" (hereinafter "Motion to Suppress"). Doc. 22. This case involves reasonable suspicion to detain the Defendant, a valid pat-down for safety, and a valid search of Defendant's bag after he was arrested on active felony warrants. Suppression of the evidence in this case is not warranted.

## I. Issues

1. Whether deputies had reasonable suspicion to detain Defendant;
2. Whether deputies had reasonable suspicion to justify the pat-down;
3. Whether, after Defendant was arrested on active felony warrants, a search of the bag he was carrying was lawful; and
4. Whether Defendant is entitled to the suppression of statements he made.

## II. Factual Background

On February 20, 2021, at approximately 8:30 a.m., J.B. heard her doorbell ring.[1] J.B. lives on Bonaguidi Road SW, in Albuquerque, New Mexico. When J.B. went to answer, there was a Hispanic male at the gate. He was wearing a grey shirt, dark pants, and had dark hair and tattoos. This male asked J.B. to retrieve his bag from the northeast corner of J.B.'s front yard. The male said he had tossed it the night before when he was "running from someone." J.B. asked him not to do that again and gave him his bag. J.B. noted that she had not seen this male in the area before. After J.B. gave the bag to this male, he loitered in the area for hours. That is when J.B. called the Sheriff's Department. J.B. also noted that the male seemed agitated as he loitered, causing J.B. concern.

J.B. called BCSO at 12:03 p.m. When J.B. called the Sheriff's Department, J.B. informed dispatch that the male had been around the neighborhood all day and provided the male's description. At approximately 12:03 p.m., Deputies Anthony McLeod and Bradley Denger were dispatched to 1700 Bonaguidi Rd SW in regards to this suspicious person call. This is a high crime area. J.B. provided the above information to dispatch, which was relayed to deputies. Deputy Denger attempted to find this individual but did not at that time. Deputy Denger then made contact with J.B. J.B. said that several hours before she called 911, the subject rang her doorbell and informed her that "he was running from someone last night and threw his duffle bag over her fence into her back yard."[2] The subject then asked if he could retrieve his bag from J.B.'s back yard. J.B. told him no and that she would get it for him. After giving the duffle bag back to the subject, she

[1] Information taken from USA Exhibit 1, J.B. written witness statement.
[2] Information gleaned from Deputy Denger's report.

saw the subject walking east towards Isleta Blvd SW. A short time later when she was leaving her house, she noticed the male was still in the area walking up and down the dead-end street. She then pulled back into her driveway and called 911.

Deputies were not able to locate the subject matching the description at that time. Deputy Anthony McLeod and Deputy Denger cleared the call for service after not locating the subject in the area and parked down the street at Shadyside Park located at 2920 Isleta Blvd SW. After approximately two minutes, Deputy McLeod observed a subject, later identified as Jaime Valdez (Defendant), matching the description of the suspicious person in the northwest corner of Bonaguidi Rd SW and Isleta Blvd SW.

Deputy Denger observed the male put his duffle bag down in front of a vehicle that was marked for sale. Defendant then peered into the driver's side window before looking around nervously. Defendant then went back to his duffle bag and put his back to deputies before looking through his bag.

Deputies then engaged their emergency equipment to exit the Shadyside Park parking lot and get across the street to make contact with Defendant. Defendant then saw the deputies' vehicles exiting the Shadyside Park parking lot with their emergency lights engaged and began shoving his hands in his pockets, looking around nervously, and shifting his body away from deputies as if he was going to try and run onto Bonaguidi.[3] Deputy Denger, with his lights still engaged, drove onto

[3] This portion of the incident is not captured on video. The video begins as deputies began driving their vehicle across the street to make contact with Defendant. See USA Exhibit 2, Deputy McLeod video depicting approximately 24 seconds of the steering wheel of Deputy McLeod's vehicle as he drives over.

Bonaguidi to prevent Defendant from running while Deputy McLeod attempted to make contact with Defendant.

During this same time, Deputy McLeod was driving over to make contact with Defendant. Deputy McLeod exited his vehicle[4] and immediately told Defendant to "quit reaching in the bag."[5] At that time, Defendant was bent over and reaching into the duffle bag that was sitting on the sidewalk. Defendant then picked up the duffle bag and put the strap over his shoulder. During this time Defendant was looking around nervously. This was an indication to both deputies that the subject was possibly looking for an avenue of escape. Deputy Denger's marked unit can be seen pulling into the dirt lot behind Defendant at this time. Deputy McLeod said again "quit reaching in the bag."[6] Defendant dropped the bag back on the sidewalk and placed his hands in his pocket/waistline area. Deputy McLeod said "Keep your hands" and gestured upward with his own hand. Deputy McLeod said "Get your hands out of your pocket."[7] Defendant began gesturing with his hands toward the vehicle for sale, talked about trying to buy a car, and said he was doing nothing wrong. Deputy McLeod asked Defendant if he had any weapons on him. Defendant said "no sir."[8]

At that point Deputy McLeod had reached Defendant. Deputy McLeod then instructed Defendant to put his hands on top of his head. Defendant said "For what, sir? I didn't do nothing wrong."[9] Defendant repeated himself and kept his arms down by his sides. Defendant began saying

---

[4] USA Exhibit 2 (Deputy McLeod video) at 00:25. The United States will provide a copy of this video to the Court along with a Notice of Lodging.
[5] USA Exhibit 2, Deputy McLeod video at 00:31.
[6] USA Exhibit 2, Deputy McLeod video at 00:35.
[7] USA Exhibit 2, Deputy McLeod video at 00:39.
[8] USA Exhibit 2, Deputy McLeod video at 00:49.
[9] USA Exhibit 2, Deputy McLeod video at 00:51.

repeatedly that he had not done anything wrong and continued to pull away from Deputy McLeod. Defendant began to tense his arms and shifted his weighted and turned his body. Deputy Denger described Defendant's behavior as consistent with someone under the influence of drugs. During this time Defendant said his name was Jaime Valdez. Defendant was shouting about pins in his hand and crouching down, so Deputy McLeod determined to put handcuffs on Defendant to avoid any further conflict.[10] The deputies then explained why they were there (neighbor calling about bag and running from someone). Defendant then said "I threw it in their yard because—" Deputy McLeod then said "you were running from somebody." Defendant provided Deputy Denger with his date of birth and Social Security Number (SSN). Deputy McLeod then stood Defendant up and lifted his shirt and began a pat-down. Deputy Denger moved the duffle bag from the sidewalk to the hood of Deputy Denger's vehicle.[11]

Deputy McLeod was able to see a magazine protruding out of Defendant's front right pants pocket as he began the pat-down.[12] Deputy McLeod removed a loaded magazine with seven rounds of ammunition from Defendant's front right pocket. Deputy Denger asked Defendant if he had a gun on him. Defendant stated he did not. Deputy McLeod then located and removed a loaded Ruger EC9s 9mm pistol from Defendant's front left pocket.[13] The firearm had a round in the chamber and the magazine had six rounds of ammunition. All the ammunition found on Defendant's person was 9mm caliber. Defendant also had approximately $2,560.00 dollars in cash in his right pocket. Deputy McLeod walked Defendant back to his patrol vehicle, told Defendant that at that time he

[10] USA Exhibit 2, Deputy McLeod video at 01:50.
[11] USA Exhibit 3 (Deputy Denger dashcam video) at 02:52. The United States will provide a copy of this video to the Court along with a Notice of Lodging.
[12] USA Exhibit 2, Deputy McLeod video at approximately 02:35.
[13] USA Exhibit 2, Deputy McLeod video at 02:55.

was not in trouble, that he was going to read him "some stuff," and that at that time he was being detained for an investigation.[14] Deputy McLeod then read Defendant his Miranda rights.[15]

When Deputy McLeod first asked whether Defendant understood these rights, Defendant said "No, because it's not right. I was not doing nothing wrong."[16] This response indicated that Defendant was not responding to the question that Deputy McLeod asked. Deputy McLeod then asked again whether Defendant understood the rights he had explained to him. Defendant lowered his head, then brought it up and nodded indicating he understood his rights. Deputy McLeod then asked "Having these rights in mind, do you wish to talk to us?" Defendant responded by saying "I will talk to you."[17] When asked why he lied about having a gun on him, Defendant stated he was scared and that is why he lied about having the firearm on him. Defendant stated he bought the firearm for $60 dollars in the Kinney Brick area. Defendant stated he knew it was not right to have a gun and lie to a police officer. Defendant advised Deputy McLeod he would like to speak to detectives.

While Deputy McLeod was taking Defendant to his patrol car, Deputy Denger returned to his patrol vehicle and checked the information provided by Defendant through NCIC and found he had three confirmed outstanding felony warrants for his arrest out of the state of New Mexico. Deputy Denger called out "29!" (10-code for warrant) to Deputy McLeod as Deputy McLeod was walking Defendant to his patrol vehicle.[18] Approximately 3.5 minutes later, dispatch stated that Defendant was listed as armed and dangerous and stated that Defendant had felony warrants in

---

[14] USA Exhibit 2, McLeod video at 04:00.
[15] USA Exhibit 2, McLeod video at 04:59.
[16] USA Exhibit 2, McLeod video at 05:25.
[17] USA Exhibit 2, McLeod video at 05:36.
[18] USA Exhibit 3, Deputy Denger dashcam video at 04:13.

Bernalillo County and Colorado.[19] About three minutes after that, Deputy Denger informed Deputy McLeod that Defendant had warrants.[20] A couple moments later, dispatch stated over the radio that there were two confirmed local felonies and that they were still waiting on Montezuma (Colorado).

Approximately fourteen minutes after initially making contact with Defendant, Deputy Denger began searching the duffle bag Defendant had been carrying.[21] Deputy Denger located two plastic bags wrapped in brown packing tape. Upon further inspection, Deputy Denger observed the packages to contain a crystal-like substance that he recognized as methamphetamine. Deputy Denger also located a large amount of unused sandwich size plastic bags and a black digital scale with white residue consistent with methamphetamine.

Deputy McLeod transported Defendant to the South Valley substation. DEA TFO Erick Castaneda went to the South Valley substation and spoke with Defendant. During this time, Defendant appeared to be under the influence of drugs as he was having a hard time keeping his eyes open. His speech was slurred and he appeared to be falling asleep as he talked to TFO Castaneda. TFO Castaneda asked Defendant about the methamphetamine in his duffle bag and he stated he has had it for approximately two months. When asked where he got it from he stated he got it in Arizona. Defendant was not able to provide any other information. Defendant was booked at the Metropolitan Detention Center for his state court warrants.

Deputy Denger tagged all the evidence into APD/BCSO evidence. On March 1st, 2021, DEA TFO Castaneda and SA Queen arrived at APD Evidence and took custody of all the evidence. TFO Castaneda prepared a federal criminal complaint and arrest warrant. Defendant was later taken

---

[19] USA Exhibit 3, Deputy Denger dashcam video at 07:36.
[20] USA Exhibit 3, Deputy Denger dashcam video at 10:40.
[21] USA Exhibit 3, Deputy Denger dashcam video at 14:00.

into custody on the federal arrest warrant. DEA South Central Laboratory report states that the crystal-like substance is indeed methamphetamine hydrochloride and the amount of pure substance is 859.8 grams +/- 52.0 grams.

## III. Argument

The Supreme Court has repeatedly reaffirmed that exclusion should be a court's "last resort[,]" not its "first impulse[.]" *Herring v. United States*, 555 U.S. 135, 140 (2009). This inquiry requires the Court to balance the "substantial social costs" that the exclusionary rule brings about. *Davis*, 564 U.S. 229, 237 (2011). As the Supreme Court has explained:

> Exclusion exacts a heavy toll on both the judicial system and society at large. It almost always requires courts to ignore reliable, trustworthy evidence bearing on guilt or innocence. And its bottom-line effect, in many cases, is to suppress the truth and set the criminal loose in the community without punishment. Our cases hold that society must swallow this bitter pill when necessary, but only as a "last resort." For exclusion to be appropriate, the deterrence benefits of suppression must outweigh its heavy costs.

*Id*. (internal citations omitted). The evidence in this case was gathered pursuant to reasonable suspicion for detention and an arrest on active felony warrants. The extreme remedy of exclusion is not warranted.

### a. <u>Deputies had reasonable suspicion to stop and detain Defendant.</u>

Individuals are protected from unreasonable searches and seizures by the Fourth Amendment. U.S. Const. amend. IV. A person is seized when they submit to a police officer's show of authority. *California v. Hodari D.*, 499 U.S. 621 (1991). The Tenth Circuit neatly summarized the relevant law in *United States v. Briggs*, 720 F.3d 1281, 1284-85 (10th Cir. 2013):

> An investigative, non-consensual detention constitutes a seizure under the Fourth Amendment. An officer may constitutionally "stop and briefly detain a person for

> investigative purposes if the officer has a reasonable suspicion supported by articulable facts that criminal activity 'may be afoot,' even if the officer lacks probable cause."
>
> An investigative detention is based on reasonable suspicion if the detaining officer has "a particularized and objective basis for suspecting the person stopped of criminal activity." This requires the officer's detention to be based on "something more than an inchoate and unparticularized suspicion or hunch." Nevertheless, "the level of suspicion required for reasonable suspicion is 'considerably less' than proof by a preponderance of the evidence or that required for probable cause." Even if it is more likely that an individual is not involved in criminal activity, an officer still may have reasonable suspicion to stop and detain the individual. The detaining officer needs only to articulate "some minimal level of objective justification" for the detention.

*United States v. Briggs*, 720 F.3d 1281, 1284-85 (10th Cir. 2013) (internal citations omitted). Finally, courts look to the totality of the circumstances known to the detaining officer "rather than assessing each factor or piece of evidence in isolation." *United States v. McHugh*, 639 F.3d 1250, 1256 (10th Cir. 2011). Courts also must "defer to the ability of a trained law enforcement officer to distinguish between innocent and suspicious actions." *United States v. Zubia-Melendez*, 263 F.3d 1155, 1162 (10th Cir. 2001) (quotations omitted). The question is "whether 'the facts available' to the detaining officer, at the time, warranted an officer of 'reasonable caution' in believing the action taken was appropriate.'" *Id.* (quoting *Terry v. Ohio*, 392 U.S. 1, 21-22 (1968)).

In this case the deputies had a particularized and objective basis for suspecting that Defendant was engaged in criminal activity. He had thrown a bag in a stranger's yard while running from someone. Even after retrieving the bag, he remained in the neighborhood for several more hours. He appeared agitated as he loitered in the neighborhood. The calling party was concerned enough about his behavior to pull back into her driveway and to call police. Once deputies located Defendant, they observed behaviors that further contributed to their suspicion. Defendant was peering into the window of an unoccupied vehicle and looking around nervously.

This is behavior consistent with someone who is about to steal a vehicle. Once Defendant saw the deputies turn on their emergency equipment and approach Defendant, he began to put his hands in his bag and in and around his pockets. He also appeared to be looking for an avenue of escape. All of these factors considered together establish reasonable suspicion that Defendant was engaged in some sort of criminal activity and provided far more than the minimal level of objective justification required for an investigative detention.

The instant case shares some factual similarities with the *Briggs* case. Both defendants looked around nervously after they noticed law enforcement approaching them. Both defendants put their hands near their waistlines after law enforcement approached. In both cases the officer detained the defendant and discovered a handgun. The instant case has additional facts that were not present in *Briggs*. As mentioned above, Defendant had tossed his bag into a stranger's yard while running from someone and remained in the area even after getting his bag back. In addition, officer observed Defendant peering into the window of an unoccupied vehicle and looking around nervously before law enforcement even made contact. Furthermore, both law enforcement vehicles in this case were marked, making it very clear to Defendant that law enforcement was approaching him. All of these factors demonstrate would have heightened a reasonable officer's suspicion of criminal activity.

b. <u>Deputies had reasonable suspicion to justify a pat-down.</u>

"During the course of a valid investigative detention, an officer may conduct a limited protective search ('frisk') if the officer harbors an articulable and reasonable suspicion that the person is armed and dangerous." *United States v. Hammond*, 890 F.3d 901, 905 (10th Cir. 2018) (citation and quotation marks omitted). A pat-down search is justified when "a reasonably prudent

[officer] in the circumstances would be warranted in the belief that his safety or that of others was in danger." *United States v. Salas-Garcia*, 698 F.3d 1242, 1248 (10th Cir. 2012) (citation and quotation marks omitted); see also *United States v. Torres*, 987 F.3d 893, 904 (10th Cir. 2021).

The facts mentioned above also support reasonable suspicion for the pat-down. At the time of deciding to do the pat-down, deputies had information regarding suspicious behavior earlier that day, including throwing a duffle bag into a stranger's yard while running from someone. Deputies did not know from whom Defendant was running, but knew that he felt the need to ditch or hide the bag, indicating that he did not want to be found with it. Deputies also knew that he had remained in the area for hours, potentially casing the neighborhood for a vehicle to steal or break into or a home to break into. Deputies also knew that he appeared agitated to the calling party. Deputies also observed what appeared to be preparation to break into and/or steal an unoccupied vehicle. As mentioned above, he reached into his bag and put his hands near/into his pockets when deputies first made their presence known and appeared to be looking for an avenue of escape. Defendant did not immediately submit to the deputies' show of authority. He continued to reach into the bag and picked the bag up off the ground after being told not to. He kept his arms near his waistline/pockets after being told to keep his hands out of his pockets. All of these factors support the deputies' belief that his safety or his partner's safety was in danger. The pat-down was justified and the firearm, magazine, and ammunition discovered during the pat-down should not be suppressed.

i. <u>Discovery of the firearm was inevitable because Defendant had active arrest warrants, and the arrest warrants acted as an intervening circumstance.</u>

"[T]he inevitable discovery doctrine allows for the admission of evidence that would have been discovered even without the unconstitutional source." *Utah v. Strieff*, 579 U.S. 232, 136

S. Ct. 2056, 2061 (2016). Valdez was lawfully detained with reasonable suspicion. The deputies had his identifiers and were checking for warrants. Even if the deputies had not performed a pat-down at that time, deputies would still have discovered the felony warrants for Defendant's arrest when they ran his name and identifiers through law enforcement databases. At that point, Defendant would have been arrested and searched incident to arrest. The magazine, firearm, and cash that were in Defendant's pockets would have been discovered before Defendant was booked into jail.

The Supreme Court in *Utah v. Strieff* did an in-depth analysis on the law of attenuation as it relates to the discovery of active warrants. The Court's analysis is helpful in determining the effect of the warrants in the instant case. In *Strieff* and in the instant case, the warrant was valid, it predated the officer's investigation, and it was entirely unconnected with the stop. And once the officer discovered the warrant, he had an obligation to arrest the defendant. *Id.* at 2062. "A warrant is a judicial mandate to an officer to conduct a search or make an arrest, and the officer has a sworn duty to carry out its provisions." *United States v. Leon*, 468 U. S. 897, 920, n. 21, 104 S. Ct. 3405, 82 L. Ed. 2d 677 (1984) (internal quotation marks omitted). In *Strieff* and in the instant case, the officer's arrest of the defendant was "a ministerial act that was independently compelled by the pre-existing warrant." *Utah v. Strieff*, 579 U.S. 232, 136 S. Ct. 2056, 2062-63 (2016). Finally, once the officer was authorized to arrest the defendant, it was undisputedly lawful to search the defendant as an incident of his arrest to protect the officer's safety. *Id.* at 2063. As to the other two prongs of the attenuation analysis, the *Strieff* Court found that the temporal proximity weighed in favor of the defendant and the purpose and flagrancy of the misconduct weighed heavily in favor of the government. *Id.* at 2062-63. The same analysis would apply here if the Court found any misconduct

and engaged in an attenuation analysis. The firearm was located within minutes of the initial stop. The purpose of the stop is well-discussed above and there was no flagrant misconduct here.

Even if the Court determines that deputies lacked reasonable suspicion to stop Defendant initially or lacked reasonable suspicion for the pat-down, which the United States does not suggest or concede, the inevitable discovery of the arrest warrants would have led to an arrest and subsequent pat-down and would sufficiently attenuate the connection between the stop or pat-down and the evidence seized from Defendant's person. See *Utah v. Strieff*, 579 U.S. 232 (2016). Thus, the evidence discovered during the pat-down should not be suppressed.

c. The search of the duffle bag was a lawful search during an inventory process, and discovery of its contents was inevitable.

Once arrested on the warrants, Defendant's property was properly searched prior to booking. "At the station house, it is entirely proper for police to remove and list or inventory property found on the person or in the possession of an arrested person who is to be jailed. A range of governmental interests supports an inventory process." *Illinois v. Lafayette*, 462 U.S. 640, 646 (1983). "Examining all the items removed from the arrestee's person or possession and listing or inventorying them is an entirely reasonable administrative procedure. It is immaterial whether the police actually fear any particular package or container; the need to protect against such risks arises independently of a particular officer's subjective concerns." *Id.* The Supreme Court held that "every consideration of orderly police administration benefiting both police and the public points toward the appropriateness of the examination of [the defendant Lafayette's] shoulder bag prior to his incarceration." *Id.* at 647.

In *Lafayette*, the Supreme Court's analysis included a review of the *South Dakota v. Opperman* (428 U.S. 364, 369, 96 S. Ct. 3092, 49 L. Ed. 2d 1000 (1976)) case and the rationale

behind vehicle inventory searches. *See Illinois v. Lafayette*, 462 U.S. 640, 647 (1983). Similarly, the analysis in the instant case is akin to a vehicle inventory analysis. In *Opperman* the Supreme Court identified "three distinct needs" that support the reasonableness of routine post-impoundment inventory searches: "the protection of the owner's property while it remains in police custody; the protection of the police against claims or disputes over lost or stolen property; and the protection of the police from potential danger." *Id.* at 369 (citations omitted). The law is clear that law enforcement is permitted to inventory an arrestee's property before the arrestee is taken to jail.

After arrest, Bernalillo County Sheriff's Department (BCSD) deputies must document the property of an arrestee. BCSD Rules and Regulations, Section 316-1 (Booking Procedures) states "Absolutely no knives, guns, ammunition or chemical agents will be accepted by MDC, JDC, or PTC personnel to be placed in the prisoner's property. These items may be tagged into evidence for safekeeping in accordance with evidence guidelines. BCSD Rules and Regulations, Section 316-1 (Booking Procedures), subsection B. The Booking Procedures also state: "A thorough search of the prisoner will be conducted at the location of the arrest by the arresting or transporting Deputy." *Id.* at Subsection H. The policies behind this procedure are identical to that of performing an inventory of a vehicle prior to releasing it to a tow company. Documenting an arrestee's property serves the legitimate government interest of protecting the police against claims or disputes over lost or stolen property, and protecting the police from potential danger.

The issue here is not whether the search of the duffle bag was a search incident to arrest. The duffle bag had been removed from Defendant's reach and was not accessible to Defendant at the time Deputy Denger searched it. Rather, the issue is whether the search of the duffle bag was part of a valid inventory process. The duffle bag was searched because Defendant

had already been arrested on his multiple felony warrants and was going to be booked into the Metropolitan Detention Center. There is no question that the duffle bag was in Defendant's possession. He is seen reaching into the duffle bag and putting the duffle bag strap on his shoulder in the video prior to law enforcement reaching him. As such, the duffle bag was part of his property that had to be documented pre-booking. Although the search was conducted on the hood of Deputy Denger's car, it was nevertheless after the arrest was completed and Defendant was going to be transported to the substation to be booked. The analysis is the same: search an arrestee's property before they are booked into jail. The contents of the duffle bag should therefore not be suppressed.

Defendant conflates the standard for reasonable suspicion for an investigatory detention and probable cause for an arrest. Law enforcement are permitted to detain a person while they continue their investigation if they have reasonable suspicion to believe that criminal activity is afoot. As discussed above, the deputies had ample reason to believe that criminal activity was afoot and to investigate Defendant. Part of this investigation included running Defendant's identifiers through law enforcement databases. During this process, deputies learned that Defendant had active warrants for his arrest. Defendant was subsequently arrested on the warrants. At that point, the status changed from an investigatory detention to an arrest. Defendant's property then had to be inventoried before he was booked into custody.

Defendant also argues that the officer's purpose was to gather evidence and thus a warrant or probable cause was required. Motion to Suppress, pages 10, 12. "A dual motive does not invalidate an otherwise lawful [impound and] inventory." *United States v. Sanchez*, 720 F. App'x 964, 970 (10th Cir. 2018) (unpublished); *Colorado v. Bertine*, 479 U.S. 367, 372 (1987) (an inventory search is invalid if undertaken "for the *sole* purpose of investigation" (emphasis added)).

The idea that officers may have had suspicions that there was contraband in the duffle bag does not invalidate the lawful inventory of its contents after Defendant was arrested on felony warrants.

Defendant similarly argues that this was a fishing expedition to see if something turns up. Motion to Suppress, page 12. This was not a "fishing expedition." Deputies made contact with Defendant specifically because of the call for service regarding a suspicious person. Defendant matched the description and was carrying a bag as described by the caller. Deputies also observed Defendant engage in conduct consistent with preparing to steal a motor vehicle. Deputies explained to Defendant that the call about him throwing a bag into a person's yard was the reason for their contact with Defendant. This was not a suspicionless fishing expedition "in the hope that something would turn up." Motion to Suppress, page 12 (citing *Taylor v. Alabama*, 457 U. S. 687, 691, 102 S. Ct. 2664, 73 L. Ed. 2d 314 (1982)).

i. <u>Because the duffle bag had to be inventoried, discovery was inevitable.</u>

Regardless of the precise timing of the beginning of the search or the deputy's subjective beliefs, the duffle bag was part of Defendant's property and an inventory was necessary. Inevitable discovery is a well-established exception to the exclusionary rule. The Tenth Circuit "has affirmed the inevitable discovery doctrine in the context of an illegal search which preceded lawful impoundment and inventory." *United States v. Haro-Salcedo*, 107 F.3d 769, 773 (10th Cir. 1997) (referencing *United States v. Horn*, 970 F.2d 728, 732 (10th Cir. 1992) and quoting *United States v. Ibarra*, 955 F.2d 1405, 1410 (10th Cir. 1992)). The Court in *Haro-Salcedo* also listed several other circuits who have reached the same conclusion. *Haro-Salcedo*, at 773.

Even where an initial search is somehow improper, if the evidence would have been

discovered during a subsequent proper inventory search, it should not be suppressed. *See, e.g. United States v. Horn*, 970 F.2d 728, 732 (10th Cir. 1992) (explaining that whether or not the trooper conducted a proper inventory search was moot because discovery of the evidence was inevitable during subsequent inventory); *United States v. Haro-Salcedo*, 107 F.3d 769, 771 (10th Cir. 1997) (holding that although the initial DEA search for contraband exceeded the permissible scope of an inventory search and was unreasonable, the evidence was admissible because it would have been inevitably discovered during a subsequent proper inventory search). Discovery of the contents of the duffle bag was inevitable.

d. Defendant's statements should not be suppressed because Defendant was subject to investigatory detention, he was provided with *Miranda* warnings, and his statements were voluntary.

Between the status of "free to leave" and "under arrest" is investigatory detention. *See United States v. Torres-Guevara*, 147 F.3d 1261, 1264 (10th Cir. 1998) (describing three levels of police-citizen encounters). Statements made during such detentions are admissible unless involuntary. The test is not whether Defendant would have felt free to leave. The test is whether defendant's freedom of action was curtailed "to a degree associated with formal arrest." *Berkemer v. McCarty*, 468 U.S. 420, 440 (1984) (distinguishing traffic stops from arrests); *United States v. Cortez*, 965 F.3d 827, 841 (10th Cir. 2020).

In these circumstances, Defendant was undisputedly not free to leave. This is because he was in the midst of a lawful investigative detention. Defendant was uncooperative while deputy McLeod attempted to conduct a pat-down. He refused to put his hands on his head, kept his arms at his sides, pulled away from and shifted his body away from Defendant. Defendant's resistant actions made placing the handcuffs on his wrists more difficult. Deputies repeatedly told Defendant

to relax. Even during this behavior, deputies did not shout and continued to speak to Defendant in a calm manner. Defendant attempts to portray a scene wherein Deputy McLeod intentionally inflicts injury upon Defendant. However, the video shows that Deputy McLeod is attempting to put the handcuffs on while Defendant pulls away. Defendant states he has pins in his hand and shouts in pain but still resists. Deputy McLeod held Defendant's hands only as necessary to get Defendant's hands into cuffs in order to perform a pat-down for officer safety. Deputy McLeod then asked again if Defendant had any weapons on him. Defendant lied and said he did not despite having a handgun in his pocket. As they walked to the patrol car, Deputy McLeod specifically told Defendant that he was not in trouble at that time and that he was being detained for the investigation.

Deputy McLeod then read Defendant his *Miranda* warnings. Defendant asserts that he did not understand his rights and that the deputy "launched into his interrogation" anyway. Motion to Suppress, page 15. In actuality, Deputy McLeod confirmed Defendant understood his rights and Defendant agreed to speak with Deputy McLeod. When Deputy McLeod first asked whether Defendant understood the *Miranda* rights, Defendant said "No, because it's not right. I was not doing nothing wrong." This response indicated that Defendant was not responding to the question that Deputy McLeod asked. Deputy McLeod then asked again whether Defendant understood the rights he had explained to him. Defendant lowered his head, then brought it up and nodded indicating he understood his rights. Deputy McLeod then asked "Having these rights in mind, do you wish to talk to us?" Defendant responded by saying "I will talk to you." This occurred approximately five minutes into the encounter while Defendant was sitting in the back seat of a patrol vehicle. Deputy McLeod did not in any way coerce Defendant into giving a statement. He merely read him his rights, asked if he understood, and asked if he wanted to talk to him. He spoke

in a normal tone. He did not have his weapon drawn. He did not threaten Defendant. *Miranda* warnings were given and Defendant's statements were voluntary. Therefore, even under an analysis where Defendant is deemed "in custody" for purposes of *Miranda*, Defendant's rights were not violated and none of his statements should be suppressed.

Defendant argues that Defendant's statements were tainted by the illegal detention. Motion to Suppress, pages 10-11. As discussed above, the detention was not illegal. As such, there is no requirement to prove attenuation or a break in the causal connection as Defendant asserts. The Miranda warnings were given during a continuing valid investigatory detention and thus were not tainted and should not be suppressed. Furthermore (and also discussed above), even if the Court found some misconduct and engaged in an attenuation analysis, the active felony arrest warrants attenuated the connection between the unlawful stop and the evidence seized from the defendant. This analysis similarly applies to statements Defendant made.

## IV. Conclusion

As set forth above, the Court should deny Defendant's Motion to Suppress.

Respectfully submitted,

FRED FEDERICI
Acting United States Attorney

***<u>Electronically Filed 11/19/21</u>***
Nora Wilson
Special Assistant United States Attorney
201 3rd Street NW, Suite 900
Albuquerque, NM 87102
(505) 224-1416
Nora.wilson@usdoj.gov

I HEREBY CERTIFY that I electronically
filed the foregoing with the Clerk of the Court

using the CM/ECF system which will send electronic notification to defense counsel of record on this date.

***Electronically Filed 11/19/21***
Nora Wilson
Special Assistant United States Attorney