# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

     Plaintiff,

vs.                                                                  No. CR 21-0562 JB

JAIME VALDEZ,

     Defendant.

## MEMORANDUM OPINION AND ORDER[1]

**THIS MATTER** comes before the Court on the Defendant's Motion to Suppress Evidence and Statements, filed September 10, 2021 (Doc. 22)("Motion to Suppress"), and the Defendant's Motion to Strike, filed April 28, 2022 (Doc. 84)("Motion to Strike"). The Court held an evidentiary hearing on the Motion to Suppress on February 4, 2022. See Clerk's Minutes at 1, filed February 4, 2022 (Doc. 51). The Court held a Motion Hearing on April 25, 2022, see Clerk's Minutes at 1, filed April 25, 2022 (Doc. 82), and a Pre-Trial Conference on May 2, 2022, see Clerk's Minutes at 1, filed May 2, 2022 (Doc. 86). The primary issues are: (i) whether the Court should strike the United States' Notice of Supplemental Exhibits, filed April 26, 2022 (Doc. 81)("Supplemental Notice"), and attached exhibits, where these were filed after the Court announced that it would grant in part the Motion to Suppress at the April 25, 2022, motion hearing;

---

[1] In its Sealed Memorandum Opinion and Order, filed May 4, 2022 (Doc. 87)("Sealed MOO"), the Court inquired whether the parties had any proposed redactions to protect confidential information within the Sealed MOO before the Court publishes a public version. See Sealed MOO at 1 n.1. The Court gave the parties 14 calendar days to provide notice of any proposed redactions. See Sealed MOO at 1 n.1. The parties have not contacted the Court or made any filings within CM/ECF to indicate that they have any proposed redactions. Consequently, the Court is now re-filing the Sealed MOO in an unsealed form.

(ii) whether Bernalillo County Sheriff's Office ("BCSO") deputies had reasonable suspicion to stop and detain Defendant Jaime Valdez, when he matched the description of someone who engaged in suspicious activity the prior night; (iii) whether BCSO deputies had reasonable suspicion to pat down Valdez, because Valdez was reaching into his duffel bag as the deputies approached him; (iv) whether BCSO deputies had legitimate custody of Valdez' bag after they arrested him in public on outstanding felony warrants; (v) whether BCSO deputies performed a valid search incident to arrest, where Valdez was separated from his bag at the time of the search; (vi) whether the BCSO deputies' search of Valdez' bag was a lawful inventory search; (vii) whether the United States demonstrates that the contents of Valdez' bag would have been inevitably discovered during an inventory search before Valdez was booked; and (viii) whether Valdez is entitled to the suppression of statements he made to BCSO deputies when Valdez was in pain from being handcuffed with pins in his hand, and when he was possibly under the influence of drugs.  The Court concludes that: (i) it will consider the United States' Supplemental Notice and attached exhibits, because, under United States v. Huff, 782 F.3d 1221 (10th Cir. 2015), a district court may reconsider a motion to suppress when suppressed evidence turns out to have been constitutionally obtained and where application of the exclusionary rule would provide no meaningful deterrence; (ii) BCSO deputies had reasonable suspicion to stop and detain Valdez, because, given Valdez' suspicious activity -- throwing his duffel bag into a stranger's yard -- the prior night, the BCSO deputies had an objective and particularized basis for suspecting that Valdez was engaged in criminal activity; (iii) BCSO deputies had reasonable suspicion that Valdez was armed and dangerous, because, given Valdez' behavior the prior night, BCSO deputies reasonably suspected that Valdez was armed and dangerous; (iv) BCSO deputies had legitimate custody of Valdez' bag, because they arrested him on public property and the deputies had no alternatives to

impoundment; (v) BCSO deputies' search was not a valid search incident to arrest, because the duffel bag was no longer within Valdez' reach when it was searched; (vi) BCSO deputies did not perform an inventory search, because the United States does not demonstrate that the BCSO deputies performed a search consistent with standardized police procedures; (vii) the contents of Valdez' bag would have been discovered inevitably through a valid inventory search, because, based on both BCSO and Bernalillo County Metropolitan Detention Center ("MDC") policies, Valdez' duffel bag would have been subject to an inventory search prior to booking; (viii) Valdez is not entitled to the suppression of statements he made to BCSO deputies and to Drug Enforcement Agency Task Force Officer Castaneda, because Valdez was lucid and was not in significant pain when he waived his rights under Miranda v. Arizona, 384 U.S. 436 (1966)("Miranda"), even though he was in significant pain when BCSO Deputy Anthony McLeod handled Valdez' hands and wrists to put handcuffs on Valdez.

## **FACTUAL BACKGROUND**

Rule 12(d) of the Federal Rules of Criminal Procedure requires the Court to state its essential findings on the record when deciding a motion that involves factual issues. See Fed. R. Crim. P. 12(d) ("When factual issues are involved in deciding a motion, the court must state its essential findings on the record."). The findings of fact in this Memorandum Opinion and Order shall serve as the Court's essential findings for rule 12(d) purposes. The Court makes these findings under the authority of rule 104(a) of the Federal Rules of Evidence, which requires a judge to decide preliminary questions relating to the admissibility of evidence, including the legality of a search or seizure, and the voluntariness of an individual's confession or consent to a search. See United States v. Merritt, 695 F.2d 1263, 1269-70 (10th Cir. 1982). In deciding such preliminary questions, the other rules of evidence, except those with respect to privileges, do not bind the

Court.  See Fed. R. Evid. 104(a) ("The court must decide any preliminary question about whether a witness is qualified, a privilege exists, or evidence is admissible.  In so doing, the court is not bound by evidence rules, except those on privilege.").  "[H]earsay testimony is admissible at suppression hearings . . . and should be considered by a district court[.]" United States v. Miramonted, 365 F.3d 902, 904 (10th Cir. 2004)(citing United States v. Matlock, 415 U.S. 164, 173 (1974)).[2]

---

[2]In Crawford v. Washington, 541 U.S. 36 (2004), the Supreme Court of the United States of America held that the introduction of testimonial hearsay statements from witnesses not subjected to cross examination at trial violates a defendant's Sixth Amendment confrontation right. See U.S. Const. amend. VI; Crawford v. Washington, 541 U.S. at 68-69.  There is no binding precedent from the Supreme Court or the United States Court of Appeals for the Tenth Circuit whether Crawford v. Washington applies to pretrial suppression hearings.  The Tenth Circuit has indicated in unpublished caselaw that Crawford v. Washington does not bar hearsay statements at a suppression hearing.  In United States v. Ramirez, the Tenth Circuit notes:

> It is beyond reasonable debate that Ramirez's counsel were not ineffective in failing to make a Confrontation Clause challenge to the use of the confidential informant.  The Supreme Court has not yet indicated whether the Confrontation Clause applies to hearsay statements made in suppression hearings. See United States v. Garcia, 324 Fed. App'x. 705, 708 (10th Cir. 2009), cert. denied, [558] U.S. [890] . . . (2009)(collecting cases).  Nonetheless, even if we assume that the Confrontation Clause applies to the hearings at issue here, the admission of the confidential informant's statements was harmless.

United States v. Ramirez, 388 F. App'x 807, 810 (10th Cir. 2010)(unpublished).  Moreover, based on the same reasoning as the Tenth Circuit in United States v. Ramirez, 388 F. App'x 807 (10th Cir. 2010)(unpublished), the Court has concluded that hearsay statements are admissible in a detention hearing.  See United States v. Hernandez, 778 F. Supp. 2d 1211, 1227 (D.N.M. 2011)(Browning, J.)("Before Crawford v. Washington, courts held that the Confrontation Clause did not attach to detention hearings. Nothing in the Supreme Court's opinion in Crawford v. Washington undermines those holdings.  Moreover, what authority exists after Crawford v. Washington rejects the proposition that Crawford v. Washington applies outside of trial.").  Moreover, other Courts of Appeals that have addressed this question have held that hearsay evidence's introduction at pre-trial proceedings does not violate the Confrontation Clause.  See Peterson v. California, 604 F.3d 1166 (9th Cir. 2010)(concluding that the admission of hearsay evidence at a preliminary hearing does not violate the Confrontation Clause, because the right to confrontation is a trial right).  See also United States v. Mitchell-Hunter, 664 F.3d 45, 52 (1st Cir. 2011)(holding that the defendant did not have a confrontation right in a pretrial jurisdictional

1.      **Valdez' Criminal History**.

1.      In January 2009, Valdez was charged with "False imprisonment (felony),"
"Abandonment/Abuse of a Child (felony)," the "Unlawful Taking of a Motor Vehicle (felony),"
"Resisting/Evading an Officer (misdemeanor)," "Battery Against a Household Member
(misdemeanor)," and "Possession of Marijuana One Ounce or Less (misdemeanor)." United States
Probation Office's Pretrial Services Report at 5, filed May 12, 2021 (Doc. 14)("Bail Report").

2.      Valdez pled guilty to those charges on April 3, 2012.  Bail Report at 5.

3.      In October, 2009, Valdez was charged with, among other things, with "Kidnapping
(first degree)(felony)," "Aggravated battery (great bodily harm)(household member)(felony),"
"Abuse of a Child -- negligently caused," and "Battery (household member)(misdemeanor)."  Bail
Report at 5-6.

4.      Valdez pled guilty to the October, 2009, charge of battery of a household member.
See Bail Report at 5-6.

5.      Valdez has been arrested and charged twenty-two other times.  See Bail Report at
4-10.

6.      The State of New Mexico has dismissed charges against Valdez twenty-two times.
See Bail Report at 4-10.

2.      **The Incident**.

7.      On the morning of February 20, 2021, "a Hispanic man in his early 20s" knocked
on the door of 1700 Bonaguidi Road SW, Albuquerque, New Mexico, to retrieve a bag that he had

--------

hearing).  Consequently, the Court concludes that the admission of hearsay testimony at the
suppression hearing does not violate Valdez' confrontation rights.

thrown over the wall the prior night.  Motion to Suppress at 1.  See Victim/Witness Statement at 1 (taken March 3, 2021), filed November 19, 2021 (Doc. 42-1)("Witness Statement").

8.      The resident of 1700 Bonaguidi Road later called the police and "reported that earlier that morning a man rang her doorbell asking if he could get back a bag he had thrown into the yard."  Motion to Suppress at 1.  See Witness Statement at 1.

9.      "The resident said she would get [the bag] for him."  Motion to Suppress at 1.

10.     The resident "didn't want [the young man] in her yard so she grabbed the duffel bag and gave it to him[,]" but then later decided to call the police "when she was leaving to run errands" and "noticed the same individual was still walking on the street."  Draft Transcript of Hearing at 8:9-13 (taken February 4, 2022)("Tr.")(McLeod). [3]  See Witness Statement at 1.

11.     The young man "loitered in the neighborhood for several hours" after he got his bag back.  Witness Statement at 1.

12.     That morning, BCSO Deputies Anthony McLeod and Bradley Denger were on patrol in the South Valley of Albuquerque, when McLeod "received a dispatch that there was a suspicious male that was casing the area" who "had a duffel bag and [that] he had like a gray sweater and some blue [jeans] and he was casing the area for a long period of time, which raised concern."  Tr. at 7:9-13 (McLeod).  See id. at 43:23-25 (Denger).

13.     The South Valley is a high crime area.  See Tr. at 43:10-12 (Wilson, Denger).

14.     McLeod and Denger were "driving separate units."  Tr. at 44:1-2 (Wilson).  See id. at 44:3 (Denger).

---

[3]The Court's citations to the draft transcript of the hearing refer to the court reporter's original, unedited version.  Any final transcript may contain slightly different page and/or line numbers.

15.     McLeod and Denger could not immediately locate the subject, so they went to Shadyside Park, which is close to Bonaguidi Road, "where we can visualize and see all the way down the street."  Tr. at 10:8-12 (McLeod).  See id. at 45:20-46:3 (Wilson, Denger).

16.     McLeod and Denger were writing reports in their vehicle at Shadyside Park, when McLeod "saw an individual directly across the street from the park" who "match[ed] the description carrying a duffel bag walk from the north side of the dirt lot and walk straight towards a vehicle that was for sale on the lot."  Tr. at 10:24-11:4 (McLeod).

17.     The young man, whom the deputies later identified as Valdez, see Tr. at 17:5-3 (Wilson, McLeod), "started peering into the vehicle at which point [McLeod] advised [his] partner that [they] should . . . make contact with him before anything were to happen."  Tr. at 11:4-7 (McLeod).

18.     While looking into the window of the car for sale, Valdez began "looking over his shoulder . . . nervously."  Tr. at 46:25-47:1 (Denger).

19.     The duffel bag concerned McLeod, because "we didn't know if there were burglary tools or anything like that and with already the nature of the call that we were originally out for, we just wanted to check on the subject and see if everything was okay."  Tr. at 11:11-16 (McLeod).

20.     McLeod next "drove [across] the street" and saw Valdez "reaching into his duffel" bag.  Tr. at 11:25-12:1 (McLeod).  See id. at 47:17-18 (Wilson, Denger).

21.     Denger "drove around to Isleta and Bonaguidi" to block off a potential direction of escape for Valdez, because Valdez was "shifting [his] body weight and looking around nervously," and "looking over his shoulder" in that direction, "indicat[ing] that he may attempt to flee."  Tr. at 48:16-23 (Denger).

22.     McLeod got out of his vehicle and "was asking the subject to keep his hands outside of the bag."  Tr. at 12:2-3 (McLeod).  See id. at 47:23-24 (Denger); id. at 51:5-7 (Denger).

23.     As McLeod got out of his vehicle, and started to approach Valdez, Valdez was bent over and reaching into his bag.  See McLeod Body Camera Footage at 00:30 (recorded February 20, 2021)(admitted at Hearing on February 4, 2022 as United States' Exhibit 2), filed January 14, 2022 (Doc. 47).

24.     As McLeod got out of his vehicle and approached Valdez, he told Valdez twice: "Quit reaching in the bag[!]"  McLeod Body Camera Footage at 00:31-00:35.   See Tr. at 30:14 (McLeod).

25.     After McLeod asked Valdez to stop reaching in the bag the first time, Valdez picked up his bag.  See McLeod Body Camera Footage at 00:32-33.

26.     McLeod repeated his order to stop reaching in the bag, and Valdez dropped the bag. See McLeod Body Camera Footage at 00:34.

27.      Valdez dropped his bag on the ground and was facing McLeod as McLeod approached him.  See McLeod Body Camera Footage at 00:35.

28.     McLeod told Valdez, "Keep your hands . . ." and gestured up with his hands. McLeod Body Camera Footage at 00:36.

29.     Valdez reached into his left jeans pocket with his left hand as Denger pulled up in his vehicle, and as McLeod approached him on foot from Valdez' right side.  See Denger Body Camera Footage at 00:46-00:47 (recorded February 20, 2021)(admitted at Hearing on February 4, 2022 as United States' Exhibit 3), filed January 14, 2022 (Doc. 47).  See Tr. at 30:14 (McLeod); Tr. at 47:23-24 (Denger); id. at 51:5-7 (Denger); id. at 12:3-4 (McLeod).

30.     Valdez pulled a cellular telephone out of his left pocket and gestured towards the parked car with it.  See Denger Body Camera Footage at 00:48-00:50.

31.     As McLeod walked towards Valdez, McLeod started putting on gloves.  See McLeod Body Camera Footage at 00:38-00:39; Tr. at 31:15-17 (Fooks, McLeod).

32.     McLeod "put[s] on [his] gloves before [he] make[s] contact with [suspects][,] especially if [he is] going to perform a pat-down on somebody."  Tr. at 31:15-22 (McLeod).

33.     "Once [Valdez] started placing his hands in his pocket[s,] [McLeod] went to go just do a pat-down for weapons[,] for [his] safety[,] and for [Valdez'] safety just [to] ensure that there were no weapons or anything that could harm . . . one of [them]."  Tr. at 14:22-15:1 (McLeod).

34.     Valdez stated that he had done nothing wrong.  See McLeod Body Camera Footage at 00:44-00:45.

35.     McLeod asked Valdez: "Do you have any weapons on you?"  McLeod Body Camera Footage at 00:44-00:45.

36.     Valdez responded: "No, sir."  McLeod Body Camera Footage at 00:49.

37.     McLeod said: "Ok, put your hands on top of your head."  McLeod Body Camera Footage at 00:50.

38.     Valdez responded: "For what, sir?  I didn't do nothing wrong."  McLeod Body Camera Footage at 00:51-00:53.

39.     Valdez did not put his hands on top of his hand, but kept them by his sides.  See McLeod Body Camera Footage at 00:51-00:54.

40.     Valdez turned to face Denger, who approached on foot.  See McLeod Body Camera Footage at 00:53.

41.     Valdez repeated that he had done nothing wrong.   See McLeod Body Camera Footage at 00:55-00:56.

42.     McLeod started to do a pat-down, and Valdez "began to tense up."  Tr. at 15:1-2 (McLeod).

43.     McLeod pulled Valdez' arms behind his back and told him to "relax."  McLeod Body Camera Footage at 00:59.

44.     Denger said to Valdez: "If you don't relax, man, you're gonna get dumped on the ground."  McLeod Body Camera Footage at 01:04-1:05.

45.     Valdez stated: "You can't do this, bro! My name is Jaime Valdez.  I'm not doing nothing wrong."  McLeod Body Camera Footage at 01:06-01:11.

46.     Denger asked Valdez if he had any ID on him.  See McLeod Body Camera Footage at 01:12-01:13.

47.     Because Valdez was tensing up, McLeod "decided to place him into handcuffs to detain him."  Tr. at 15:1-3 (McLeod).

48.     As McLeod was trying to put handcuffs on Valdez, Valdez became upset.  See Tr. at 15:17-18 (McLeod).

49.     As McLeod was handling Valdez' hands and wrists, Valdez called out: "I have pins in my fingers.  I have pins in there.  Please.  Don't do that, please!"  McLeod Body Camera Footage at 01:14-01:20.

50.     McLeod took the cellular telephone from Valdez' left hand and dropped it on Valdez' duffel bag.  See  McLeod Body Camera Footage at 01:24.

51.     As McLeod was handling Valdez' hands and wrists behind Valdez' back, Valdez again cried out in pain, stated that he had pins in his hands, and leaned forward.  See McLeod Body Camera Footage at 01:35-01:40.

52.     Denger stepped forward to assist McLeod, put his hand on Valdez' arm, and said to McLeod: "He's got something in his hand."  McLeod Body Camera Footage at 01:39-01:40.

53.     Valdez continued to cry out in pain as McLeod put on the handcuffs.  See McLeod Body Camera Footage at 01:41-01:46.

54.     Valdez started crying and insisted he had done nothing wrong.  See McLeod Body Camera Footage at 01:52-01:53.

55.     Once the handcuffs were on Valdez, McLeod explained that someone had called because Valdez threw his duffel bag into their yard.  See McLeod Body Camera Footage at 02:01-02:10.

56.     Valdez responded: "I threw it in their yard, because -- . . ."  McLeod Body Camera Footage at 02:10-02:13.

57.     McLeod interjected: "You were running from somebody."  McLeod Body Camera Footage at 02:14.

58.     Valdez said, "No."  McLeod Body Camera Footage at 02:14.

59.     Valdez "was saying a lot of things that didn't really make sense."  Tr. at 17:20-23 (McLeod).[4]

_____

[4]Although some of the statements that Valdez made to McLeod do not make sense, the Court declines to make a finding that Valdez was under the influence of drugs at the time of his detention and arrest.  The United States asserts in its Response that "Deputy Denger described Defendant's behavior as consistent with someone under the influence of drugs," but Denger did not testify to this observation at the Hearing and Valdez did not elicit that testimony on cross-examination.  Response at 5.  The United States also asserts in its Response that Valdez "appeared

60.     Valdez gave Denger his date of birth and social security number.  See McLeod Body Camera Footage at 02:19-02:30.

61.     During the pat-down, McLeod saw a gun magazine in Valdez' right pocket, see Tr. at 16:11-12 (McLeod), and removed it, see McLeod Body Camera Footage at 02:41; Tr. at 51:25-52:1 (Denger).

62.     McLeod asked Valdez again if he had a gun on him, and Valdez replied that he did not have any weapons on him.  See McLeod Body Camera Footage at 02:41-02:43; Tr. at 16:8-10 (McLeod); id. at 51:19-20 (Wilson, Denger).

63.     Denger took Valdez' duffel bag and placed it on the hood of Denger's car.  See Denger Body Camera Footage at 03:02.

64.     McLeod then found a pistol in Valdez' left pocket.  See Tr. at 16:15 (McLeod); McLeod Body Camera Footage at 02:54.

65.     McLeod removed Valdez' pistol from his pocket and put it on the hood of the parked car.  See McLeod Body Camera Footage at 03:03.

66.     Denger walked back to the parked car and examined the pistol.  See Denger Body Camera Footage at 03:02.

67.     During the pat-down search, McLeod also found $2,560.00 cash on Valdez' person.  See Tr. at 19:21-24 (McLeod); id. at 20:8-9 (McLeod); McLeod Body Camera Footage at 03:37.

---

to be under the influence of drugs as he was having a hard time keeping his eyes open.  His speech was slurred and he appeared to be falling asleep as he talked to [Task Force Officer ("TFO")] Castaneda."  Response at 7.  TFO Castaneda did not testify at the Hearing, however, and the United States has not lodged any video footage of Castaneda questioning Valdez with the Court.  In the absence of any testimony about Valdez' demeanor during TFO Castaneda's questioning, and in the absence of any Body Camera Footage affirming the United States' assertion, the Court declines to make a such a finding.

68.     McLeod took Valdez to the back of his car and told Valdez that he was being detained for investigation.  See McLeod Body Camera Footage at 04:00-04:06.

69.     While McLeod took Valdez to his patrol car, Denger ran Valdez' name and date of birth through the National Crime Information Center ("NCIC").  Tr. at 52:9-19 (Wilson, Denger). See id. at 17:22-24 (McLeod).

70.     Through the NCIC database search, Denger discovered that there were "three confirmed felony warrants" for Valdez' arrest.  Tr. at 53:19-20 (Denger).  See id. at 53:6-7 (Denger).

71.     Denger notified McLeod that there were outstanding warrants by calling out "29!" Denger Body Camera Footage at 04:13; Response at 6.

72.     A confirmed warrant is valid and means that a deputy is "instructed to arrest the person."  Tr. at 54:1-2 (Wilson).  See id. at 54:3 (Denger).

73.     McLeod and Denger arrested Valdez based on those warrants.  See Tr. at 54:7-9 (Wilson, Denger).

74.     Denger next ran the pistol's serial number through the NCIC.  See Denger Body Camera Footage at 05:35-06:16 (Denger).

75.     Dispatch informed Denger that Valdez is "armed and dangerous."  Denger Body Camera Footage at 07:42-07:43.

76.     While Denger was talking to dispatch, McLeod read Valdez Miranda[5] warnings from a card that McLeod keeps inside his vest pocket.  See Tr. at 18:4-11 (Wilson, McLeod).

---

[5]Miranda v. Arizona, 384 U.S. 436 (1966), "requires that procedural safeguards be administered to a criminal suspect prior to 'custodial interrogation.'"  United States v. Perdue, 8 F.3d 1455, 1463 (10th Cir. 1993)(quoting Miranda v. Arizona, 384 U.S. at 444).  The Supreme

77.     In accordance with <u>Miranda</u>, McLeod told Valdez:

> You have the right to remain silent.  Ok, I need you to pay attention.  You have the right to remain silent.  Anything you say can and will be used against you in a court of law.  You have the right to talk to a lawyer and have them present with you while you are being questioned.  If you cannot afford to hire a lawyer, one will be appointed to represent you before any questioning if you wish.  You can decide at any time to exercise these rights and not answer any questions or make any statements.  Do you understand each of these rights I've explained to you?

McLeod Body Camera Footage at 04:59-05:28 (McLeod).

78.     In response to McLeod's question, Valdez stated: "No, because it's not right, I wasn't doing nothing wrong."  McLeod Body Camera Footage at 05:27-05:28.

79.     McLeod repeated the question: "Do you understand the rights I've explained to you?"  McLeod Body Camera Footage at 05:30.

80.     Valdez nodded his head.  <u>See</u> McLeod Body Camera Footage at 05:32; Tr. at 18:14 (McLeod).

81.     McLeod asked, "Having these rights in mind, do you wish to talk to us?"  McLeod Body Camera Footage at 05:35 (McLeod).

---

Court of the United States of America provided the substance of the warning that must be given to a defendant to meet these procedural safeguard requirements:

> Prior to any questioning, the person must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed. The defendant may waive effectuation of these rights, provided the waiver is made voluntarily, knowingly and intelligently. If, however, he indicates in any manner and at any stage of the process that he wishes to consult with an attorney before speaking there can be no questioning. Likewise, if the individual is alone and indicates in any manner that he does not wish to be interrogated, the police may not question him.

<u>Miranda v. Arizona</u>, 384 U.S. at 444-45.

82.     Valdez said: "I will talk to you."  McLeod Body Camera Footage at 05:36.  See Tr. at 18:14-15 (McLeod).

83.     McLeod asked Valdez why he had a gun on him and why he lied about it, and Valdez responded, "I knew that, ok, I just know that it's not right . . . to have a gun and lie to a police officer," and explained that he was scared and that he thought someone was trying to kill him.  McLeod Body Camera Footage at 09:11-09:20.  See Tr. at 18:17-23 (McLeod).

84.     Valdez told McLeod that he got the gun "for $60 from [the] Kinney Brick [area]."  McLeod Body Camera Footage at 09:27-09:28.  See Tr. at 18:18 (McLeod).

85.     Valdez acknowledged that $60 is a cheap price for a gun.  See McLeod Body Camera Footage at 09:54-09:55.

86.     Valdez then said that he would talk, but not in front of the camera.  See McLeod Body Camera Footage at 10:09-10:10.

87.     Valdez asked to talk to an APD detective.  See McLeod Body Camera Footage at 13:53-14:27.

88.     Denger searched the duffel bag on the hood of Denger's patrol vehicle.  See Denger Body Camera Footage at 14:06-15:46; Tr. at 54:19-21 (Denger).

89.     Valdez asked McLeod to tell Denger not to search his bag, gesturing towards Denger, and stating: "Well, can you tell him not to do that? . . . What he's doing there."  McLeod Body Camera Footage at 14:45-14:48.  See McLeod Body Camera Footage at 14:48-15:00.

90.     Inside the duffel bag, Denger found a "plastic baggie wrapped in brown packing tape," which contained a "[w]hite crystal-like substance."  Tr. at 55:8-13 (Wilson, Denger). See Denger Body Camera Footage at 14:30-15:35.

91.     Denger recognized the substance as methamphetamine.  See Tr. at 55:16-17 (Denger).

92.     Denger found an additional bag of methamphetamine in the duffel bag, see Tr. at 55:21-22 (Denger); id. at 56:2-4 (Wilson), as well as "other pieces of paraphernalia," such as "[a] black scale and sandwich baggies," Tr. at 56:6-7 (Denger).

93.     McLeod took Valdez to the BCSO substation.  See Tr. at 19:8-9 (McLeod).

94.     BCSO and Albuquerque Police Department ("APD") share the same evidence unit. See Albuquerque Police Department General Orders § 1-41-1 (effective September 16, 2019), https://documents.cabq.gov/police/standard-operating-procedures/1-41-evidence-unit.pdf.

95.     Denger "tagged" the plastic baggies and paraphernalia into evidence.  Tr. at 56:11-12 (Denger).

96.     McLeod filled out an Incident Report.  See State of New Mexico Uniform Incident Report at 1-6 (taken February 20, 2021), filed April 26, 2022 (Doc. 81-4)("Incident Report").

97.     The Incident Report lists Valdez' property as: a Ruger EC9S, two rounds of magazines for the Ruger, a bag of methamphetamine, $2560.00 cash, a Swiss bag, individual clear bags, an empty bottle of methadone, a black scale, a baggie, a big gray pill bottle, and a small orange pill bottle.  See Incident Report at 2-5.

98.     Valdez was admitted to MDC at 10:47p.m. on February 20, 2022.  See Inmate Property List for Jaime Valdez at 1, filed April 26, 2022 (Doc. 81-3)("Valdez Property List").

99.     The Valdez Property List itemizes Valdez' personal property: a belt, pants, shirt, shoes, wallet, cell phone, two visa cards, $1.00 in change, two keys, and a wrap.  See Valdez Property List at 1.

3. **BCSO Rules and Regulations**.

100.    BCSO Rules and Regulations define an inventory search in general as "[a] search conducted to protect and safeguard an individual's property, provide for the safety of the deputy and others, as well as protect the Department against claims or lawsuits for loss or destruction of private property."    BCSO Rules and Regulations § 321-8 (October 19, 2021), https://public.powerdms.com/BCS/tree/documents/170767.

101.    BCSO Rules and Regulations state that, for a valid vehicle inventory search, the vehicle "must be in lawful custody," the search "[m]ust be reasonable and conducted in good faith," and the search "[w]ill be conducted by the deputies, or public safety aides in accordance with their training and Department standard operating procedures." BCSO Rules and Regulations § 321-8(B)(4).

102.    BCSO Rules and Regulations state what may be searched and opened in a vehicle inventory search:

> Inventory searches will include the entire passenger compartment, glove box, trunk and containers without damaging the property, at or near the time the vehicle was lawfully placed within police custody.  Containers found during an inventory search of a vehicle can be opened if accomplished without damage to the container and the search is conducted in accordance with the Department SOP.

BCSO Rules and Regulations § 321-8(B)(4).

103.    The BCSO Rules and Regulations also state that "[t]he inventory search will be documented and become part of the original Offense/Incident Report."  BCSO Rules and Regulations § 321-8(B)(4).

104.    BCSO Booking Procedures state:

> Absolutely no knives, guns, ammunition or chemical agents will be accepted by [Bernalillo County Metropolitan Detention Center ("MDC")], [Juvenile Justice Center ("JDC")], or [Prisoner Transport Center ("PTC")]

- 17 -

personnel to be placed in the prisoner's property. These items may be tagged into evidence for safekeeping in accordance with evidence guidelines. Deputies will review and sign the arrestee's property inventory forms prior to leaving the facility.

BCSO Rules and Regulations § 316.1(B).

105.    Bernalillo County's Inmate Property Inventory (Admissions) Policy and Procedure states, in part:

1.    All property accepted by Law Enforcement/Remands or Turn Ins that are brought to MDC MUST FIT INTO A 9x12 PLASTIC/PROPERTY BAG.

2.    The arresting officer will be responsible for submitting the arrestees' property to the property intake corrections technician, prior to pat search and acceptance into MDC custody.

3.    Items that do not fit into the outlined bag in this policy will be refused and the arresting agency/officer will be responsible for the property not accepted.

4.    Unauthorized items: The following items are considered contraband and are not accepted into the facility for storage:

   a.    No alcoholic beverages

   b.    No ammunition (no bullets of any kind Live or not)

   c.    No chemical agents, mace, pepper spray, etc.
   d.    No knives or sharp objects of any kind.

   e.    No bedrolls

   f.    No cigarettes, any type of tobacco products lighters, or matches

   g.    No items including, tote bags or hats larger than 9x12 inches.

Inmate Property Inventory (Admissions)(effective date July 15, 2013) at 1-2, filed April 26, 2022 (Doc. 81-2)("MDC Inmate Property Inventory Policy").

## PROCEDURAL BACKGROUND

On April 22, 2021, a federal Grand Jury returned an indictment charging Valdez with: (i) Possession with Intent to Distribute 50 Grams and More of Methamphetamine, in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(A); (ii) Possession of a Firearm in Furtherance of Drug Trafficking Crime, in violation of 18 U.S.C. § 924(c)(1)(A)(i); and (iii) Felon in Possession of Firearm and Ammunition, in violation of 18 U.S.C. §§ 922(g)(1). See Indictment, filed April 22, 2021 (Doc. 3). Valdez was arraigned on May 12, 2021. See Clerk's Minutes at 1, filed May 12, 2021 (Doc. 16). On September 10, 2021, Valdez filed a Motion to Suppress Evidence. See Motion to Suppress at 1.

### 1.    The Motion to Suppress.

In his Motion to Suppress, Valdez first argues that the police officers illegally detained and seized Valdez. See Motion to Suppress at 4. Valdez argues that, "[w]hen the officers first saw Mr. Valdez, they had no reason to suspect he had done, or was doing, anything illegal." Motion to Suppress at 5. Valdez asserts that, when Valdez asked the officers what he had done wrong, "the officer told him he had been 'walking around.'" Motion to Suppress at 5 (no citation for quotation). Valdez explains that "[i]n their reports the officers present no particular and objective evidence that crime was afoot," and argues that the officers' "initial approach was an effective detention." Motion to Suppress at 5. Accordingly, Valdez asserts that he was "detained without reasonable suspicion." Motion to Suppress at 5.

Second, Valdez argues that he was arrested without probable cause when BCSO deputies handcuffed him. See Motion to Suppress at 6-7. Valdez argues that "[t]he officers did not have evidence that Mr. Valdez had committed or was committing an offense when they arrested him." Motion to Suppress at 7. Valdez contends that the resident's telephone call to police reporting "a

man walking along her street after asking her for his bag that he tossed into her yard" "did not give the officials adequate cause to believe Mr. Valdez had done something wrong."  Motion to Suppress at 7.  Valdez asserts that none of this behavior is illegal.  See Motion to Suppress at 7.

Third, Valdez argues that BCSO deputies' search of Valdez is "unlawful," because "there was no objective indication that he was armed or dangerous."  Motion to Suppress at 7.  Valdez argues that a pat-down's purpose is to search for weapons and not to discover evidence of a crime.  See Motion to Suppress at 7-8.  Valdez also argues that the search is unlawful, because "the officers did not have reasonable suspicion to believe he had or was about to commit a crime."  Motion to Suppress at 8.  Valdez argues that a frisk was improper, because he did not run away, he took his hands out of pockets when asked, he put down his bag when asked, and BCSO deputies did not see any bulges in Valdez' clothing.  See Motion to Suppress at 8.

Fourth, Valdez argues that BCSO deputies did not have probable cause to search Valdez' bag or anything inside the bag, because the bag was not in Valdez' custody or control when Denger searched it, and the search was not incident to arrest.  See Motion to Suppress at 9-10.  Valdez argues that he had a constitutionally protected "expectation of privacy in the bag and its contents," and asserts that Denger's purpose in searching the bag was to gather evidence.  Motion to Suppress at 10.  Valdez asserts that, because the search's purpose was to gather evidence, BCSO deputies needed either a search warrant or probable cause to effect a lawful search.  See Motion to Suppress at 10.

Fifth, Valdez argues that his statements to BCSO deputies after his arrest are "invalid," because they were given "after an illegal arrest."  Motion to Suppress at 10.  Valdez argues that his statements should be suppressed, because there was not "'a sufficient attenuation or break in the causal connection between the illegal detention and the statements.'"  Motion to Suppress at

11 (quoting United States v. Fox, 600 F.3d 1253, 1259 (10th Cir. 2010)).  Valdez asserts that there

were no intervening circumstances between the illegal arrest and Valdez' statements.  See Motion

to Suppress at 11.  Valdez accuses BCSO deputies of conducting a "'fishing expedition' to see if

'something turns up.'"  Motion to Suppress at 12 (no citation for quotation).

Sixth, Valdez argues that Valdez' waiver of his Miranda rights and subsequent statements

were involuntary.  See Motion to Suppress at 13-14.  Valdez contends that he was in pain and

distress when McLeod handcuffed him, which "affected [his] mental and emotional state."  Motion

to Suppress at 15.  Valdez argues also that he "did not have a full awareness of the nature of the

rights abandoned and the consequences of the decision to abandon them," and that "[w]hen the

officer asked if he understood his rights he said no."  Motion to Suppress at 15.  Valdez contends

that, "[w]hen asked again, Mr. Valdez was silent," but that "the officer launched into his

interrogation."  Motion to Suppress at 15.  Valdez asserts that he "could not understand that the

officers' aggregate behavior towards him was intended to force a statement from him," and that

his answers were involuntary, and therefore, "in violation of the Fifth Amendment."  Motion to

Suppress at 15.  Finally, Valdez argues that any evidence that BCSO deputies obtained and any

statements that Valdez made to BCSO deputies should be "suppressed as fruits of an illegal

detention, arrest and search."  Motion to Suppress at 15.

##    2.    **The Response**.

The United States responds.  See United States' Response in Opposition to Defendant's

Motion to Suppress Evidence and Statements, filed November 19, 2021 (Doc. 42)("Response").

First, the United States argues that McLeod and Denger had reasonable suspicion to detain Valdez,

because they "had a particularized and objective basis for suspecting" that Valdez "was engaged

in criminal activity": Valdez threw his bag in a stranger's yard while running from someone,

loitered in that neighborhood for several hours, and appeared agitated.  Response at 9.  The United States adds that, after responding to the resident's call, the deputies observed Valdez behaving suspiciously: Valdez was "peering into the window of an unoccupied vehicle and looking around nervously" -- "behavior consistent with someone who is about to steal a vehicle."  Response at 9-10.  Furthermore, the United States contends that, when the deputies turned on their emergency equipment and approached Valdez, Valdez "began to put his hands in his bag and in and around his pockets" and "appeared to be looking for an avenue of escape."  Response at 10.

Next, the United States argues that the deputies had reasonable suspicion that Valdez was armed and dangerous, and, therefore, a pat-down for weapons was justified.  See Response at 10-11.  The United States asserts that Valdez "reached into his bag and put his hands near/into his pockets when deputies first made their presence known" and "did not immediately submit to the deputies' show of authority."  Response at 11.  Furthermore, the United States contends that the deputies believed that their safety or that of others was in danger, because Valdez "continued to reach into the bag and picked the bag up off the ground after being told not to," and "kept his arms near his waistline/pockets after being told to keep his hands out of his pockets."  Response at 11.

The United States argues that discovery of Valdez' firearm was inevitable, because Valdez had active arrest warrants.  See Response at 11.  The United States explains that McLeod and Denger had reasonable suspicion and detained Valdez lawfully, and that, "[e]ven if the deputies had not performed a pat-down at that time, deputies would still have discovered the felony warrants" when they ran Valdez' name and identifying information through the NCIC.  Response at 12.  The United States contends that, once the warrants were discovered, Valdez "would have been arrested and searched incident to arrest," and the deputies would have discovered the magazine, firearm, and cash that Valdez had in his pockets.  Response at 12.

The United States argues also that the deputies' search of Valdez' duffel bag is a lawful inventory search, because it happened before he was booked.  See Response at 13.  The United States does not argue that the search of Valdez' bag is a search incident to arrest, because "[t]he duffel bag had been removed from Defendant's reach and was not accessible to Defendant at the time Deputy Denger searched it."  Response at 14.  Rather, the United States contends that Denger's search of the duffel bag was a valid inventory search, because Valdez "had already been arrested on his multiple felony warrants and was going to be booked into the Metropolitan Detention Center."  Response at 14-15.  The United States asserts that Valdez "conflates the standard for reasonable suspicion for an investigatory detention and probable cause for an arrest."  Response at 15.  The United States argues that their investigatory detention turned into an arrest when they discovered Valdez' outstanding warrants.  See Response at 15.  The United States addresses Valdez' argument that "the officer's purpose was to gather evidence and thus a warrant or probable cause was required," Response at 15 (citing Motion to Suppress at 10, 12), by stating that "'[a] dual motive does not invalidate an otherwise lawful [impound and inventory],'" Response at 15 (quoting United States v. Sanchez, 720 F. App'x 964, 970 (10th Cir. 2018)(unpublished)[6]).   The United States asserts that discovery of the contraband in Valdez' bag was inevitable, even if the initial search was somehow improper.  See Response at 16-17.

---

[6]United States v. Sanchez is an unpublished opinion, but the Court can rely on an unpublished United States Court of Appeals for the Tenth Circuit opinion to the extent its reasoned analysis is persuasive in the case before it.  See 10th Cir. R. 32.1(A)("Unpublished decisions are not precedential, but may be cited for their persuasive value.").  The Tenth Circuit has stated:

> In this circuit, unpublished orders are not binding precedent, . . . and we have generally determined that citation to unpublished opinions is not favored. However, if an unpublished opinion or order and judgment has persuasive value with respect to a material issue in a case and would assist the court in its disposition, we allow a citation to that decision.

Finally, the United States argues that the Court should not suppress Valdez' statements, because Valdez was "subject to investigatory detention, he was provided with Miranda warnings, and his statements were voluntary."  Response at 17.  The United States contends that Valdez' first response to McLeod reading his Miranda rights "indicated that Defendant was not responding to the question that Deputy McLeod asked."  Response at 18.  The United States asserts that Valdez demonstrated that he understood his Miranda rights, because, when McLeod "asked again whether Defendant understood the rights he had explained to him," Valdez "lowered his head, then brought it up and nodded indicating he understood his rights."  Response at 18.  The United States also contends that Valdez agreed to talk to the deputies: "Deputy McLeod then asked 'Having these rights in mind, do you wish to talk to us?'  Defendant responded by saying 'I will talk to you.'" Response at 18 (quoting McLeod Body Camera Footage at 05:36).  The United States argues that McLeod did not coerce Valdez into given a statement, but, once Valdez was in the back of the police car, McLeod "merely read him his rights, asked if he understood, and asked if he wanted to

---

United States v. Austin, 426 F.3d 1266, 1274 (10th Cir. 2005)(citations omitted).  The Court concludes that United States v. Sanchez, Scherer v. United States Department of Education, 78 F. App'x 687 (10th Cir. 2003), Searcy v. Social Security Administration., 956 F.2d 278, (10th Cir. 1992), In re Hopkins, 162 F.3d 1173 (10th Cir. 1998), United States v. Ceballos, 355 F. App'x 226 (10th Cir. 2009), United States v. Aragones, 483 F. App'x 415 (10th Cir. 2012), United States v. Wilson, 96 F. App'x 640 (10th Cir. 2004), United States v. Burciaga-Burciaga, 147 F. App'x 725 (10th Cir. 2005, United States v. King, 209 F. App'x 760 (10th Cir. 2006), United States v. Reed, 195 F. App'x 815 (10th Cir. 2006), United States v. Alabi, 597 F. App'x 991 (10th Cir. 2015), Appleby v. Cline, 711 F. App'x 459 (10th Cir. 2017), United States v. Sierra-Estrada, 248 F. App'x 973 (10th Cir. 2007), United States v. Killblane, 662 F. App'x 615 (10th Cir. 2016), United States v. Minard, 208 F. App'x 657 (10th Cir. 2006), and Oliver v. Woods, 512 F. App'x 841 (10th Cir. 2013), have persuasive value with respect to material issues, and will assist the Court in its disposition of this Memorandum Opinion and Order.

talk to him," while speaking "in a normal tone" and without drawing his weapon or threatening Valdez.  Response at 18-19.

3.    **The Reply.**

Valdez replies to the United States' Response.  See Defendant's Reply in Support of Motion to Suppress Evidence and Statements, filed December 3, 2021 (Doc. 43)("Reply").  Valdez argues that "'a particularized and objective basis'" does not exist for suspecting Valdez of criminal activity.  Reply at 2 (quoting United States v. Briggs, 720 F.3d 1281, 1284-85 (10th Cir. 2013).  Valdez asserts that his behavior -- throwing his bag into a stranger's yard, appearing agitated, being in the area for about two hours after ringing the resident's doorbell, and looking into the window of an unoccupied vehicle -- is "innocuous and not indicative of criminal behavior."  Reply at 2.  Valdez emphasizes that he did not trespass on the resident's property and that he was  polite when he asked for the return of his bag.  See Reply at 2.  Valdez asserts that he was looking into the window of a car that was for sale, and argues that standing in front of a car for sale with a duffel bag is neither illegal nor suspicious.  See Reply at 3.  Valdez maintains that he looked around nervously, because he was surrounded by law enforcement and that, "[i]n the absence of any other indicia of criminal activity, nervousness cannot be used to support a finding of reasonable suspicion."  Reply at 3 (citing United States v. Fernandez, 18 F.3d 874, 879 (10th Cir. 1994)).  Valdez contends that the resident's report that Valdez was "agitated while remaining in the neighborhood" should not carry weight, because "the individual did not know Mr. Valdez before Mr. Valdez knocked on [her] door that day," and, therefore, would "have no frame of reference as to what Mr. Valdez is normally like."  Reply at 4.

Next, Valdez argues that the deputies did not have reasonable suspicion that Valdez was armed and dangerous before they initiated the pat-down.  See Reply at 4.  Valdez contends that he

complied with McLeod's order to drop the duffel bag, and asserts that, when Valdez put his hand in his pocket, he "simply took out his mobile phone" and then made "no other motions towards his pocket." Reply at 5. Valdez counters the United States' assertion that he put his "'hands'" in his "'pockets'" by stating that "[h]e put one hand into one pocket to retrieve his phone," and that, "[h]is hands were necessarily 'near' his pockets because that's precisely how pockets work. They are typically placed at or near where one's hands would be when at rest at the side of their body." Reply at 5 (quoting Response at 11).

Valdez responds to the United States' inevitable discovery argument by asserting that, in the first place, BCSO deputies did not detain Valdez lawfully. See Reply at 5. Valdez argues that the United States detained Valdez unlawfully, and therefore, needed to procure a search warrant and to show probable cause to argue inevitable discovery. See Reply at 5. Valdez also argues that, because there was not reasonable suspicion to stop Valdez, the deputies should not have detained him, and would not have discovered his identity or that he had outstanding warrants, and so the inventory search should not have happened. See Reply at 7.

Finally, Valdez responds to the United States' argument that Valdez' statements during detention are admissible, because they were voluntary. See Reply at 7. Valdez argues that the amount of pain he was in -- as a result of being handcuffed with pins in his hand -- meant that he was not capable of making a voluntary statement. See Reply at 8. Valdez asserts that he "continued to complain about the pain until he was on the verge of tears," and that his "facial expression, position in the car and[] movements while in the car indicate that he was still in distress when law enforcement gave him the *Miranda* advisement." Reply at 8. Valdez contends that, "[w]ith a look of agony and distress on his face," he simply "nods his head." Reply at 8. Valdez

asserts that any questions he answered after that point were him "simply submitting to the will of law enforcement."  Reply at 8.

### 4.  **The Suppression Hearing**.

The Court held a hearing on February 4, 2022.  See Clerk's Minutes at 1.  The hearing began with the United States calling McLeod as its first witness.  See Tr. at 4:25-5:2 (Wilson).  McLeod testified that, on the morning of February 20, 2021, he was dispatched in response to a call from the resident of 1700 Bonaguidi Road SW.  See Tr. at 6:8-7:13 (Wilson, McLeod).  McLeod described his telephone call with the resident, his observation of Valdez, as well as his role in Valdez' subsequent detention and arrest.  See Tr. at 7:21-17:4 (Court, Wilson, McLeod).  McLeod testified:

> A.    I saw an individual directly across the street from the park [where] there is an empty dirt lot and I saw an individual matching the description carrying a duffel bag walk from the north side of the dirt lot and walk straight towards a vehicle that was for sale on the lot.  And he started peering into the vehicle at which point I advised my partner that we should probably go and make contact with him before anything were to happen.

> Q.    Okay.  So you're talking about him peering into a vehicle[;] I mean does that indicate anything to you or does that cause you . . . concern?

> A.    It causes slight concern, because since he did have a duffel bag on his person we didn't know if there were burglary tools or anything like that and with already the nature of the call that we were originally out for, we just wanted to check on the subject and see if everything was okay.

> Q.    All right, so did you leave the park at that point?

> A.    I did.

> Q.    And I guess did you both take your units[?] [D]id you drive across the street to make contact?

> A.    We did.

> Q.    Okay, and what . . . was this male doing at that time?

> A.   As I drove [across] the street he started reaching into his duffel [bag], so . . . [I] parked and got out of my vehicle[.]  I was asking the subject to keep his hands outside of the bag at which point he was starting to place them in his pockets.
>
> Q.   Okay.  And . . . what did that indicate to you and [when] did you make note of him placing his hands in his pocket?
>
> A.   Just with when we're asking him to show us [his hands] and [he's] already showing he's not verbally being compliant with us, and people hide all sorts of things in their pocket such as weapons, narcotics and I was just wanting him to keep his hands out of his pockets for my safety and his safety.

Tr. at 10:24-12:14 (Wilson, McLeod).

McLeod testified that he was wearing a body camera and running a lapel video that day; the United States moved for the video's admission into evidence as Exhibit 2.  See Tr. at 12:15-13:11 (Court, Wilson, McLeod).  McLeod testified that hear wears his body camera at his chest, and, so, when he was seated in his patrol vehicle, the lapel video did not capture everything that he could see.  See Tr. at 12:18-22; id. at 13:1-8 (Wilson, McLeod).  Next, Valdez cross-examined McLeod.  See Tr. at 21:21-35:22 (Fooks, McLeod).  On cross-examination, McLeod testified that Valdez' behavior was consistent with somebody interested in buying a car for sale displayed in a public lot, and that he was doing nothing wrong at the time McLeod and Denger approached him.  See Tr. at 21:21-31:14 (Fooks, McLeod).  McLeod also stated that he started to put on his gloves while he was approaching Valdez.  See Tr. at 31:15-17 (Fooks, McLeod).  Valdez asked at what point in the lapel video footage McLeod saw Valdez put his hand in his left pocket, and McLeod referred to a point in his lapel video where he thought Valdez was reaching into his left pocket.  See Tr. at 32:8-11 (Fooks, McLeod); McLeod Body Camera Footage at 00:35-00:36.  McLeod agreed that, at the time McLeod handcuffed Valdez, Valdez stated that he was in pain and acted as if he was in pain.  See Tr. at 32:12-23 (Fooks, McLeod).

Q.      Now, I understand that you didn't have your service [weapon] drawn at the time, but when you told him to get his hands out of the bag and put the bag down that wasn't a request[,] that was an order, correct?

A.      Yes, sir.

Q.      At this point in the video and everything you saw up until then, he'd violated no laws[,] correct?

A.      Correct, we were just going to make contact with him.

Q.      And if when you were approaching he'd simply picked up his bag and walked away you would have stopped him, correct?

A.      Excuse me?

Q.      Let's say when you initiate your lights and Officer Denger comes around from the other way and you get out of the car and you tell him to put down the bag, he's not going, he can't just walk away from you at that point can he?

A.      He can.

Q.      You would have stopped him, though, wouldn't you?

A.      No, sir.

Q.      You would have let him go?

A.      Yes, sir.

Tr. at 33:22-34:21 (Fooks, McLeod).  The United States then questioned McLeod on redirect.  See Tr. at 36:3-40:9 (Wilson, Court, McLeod).

The United States called Denger as its second witness.  See Tr. at 41:3-4 (Wilson).  Denger testified that the South Valley is a high crime area, see Tr. at 43:10-12 (Wilson, Denger), and that he was working with McLeod on February 20, 2021, see Tr. at 43:16-25 (Wilson, Denger).  Denger testified that he was dispatched to the same suspicious person call as McLeod, and that, although

he did not find Valdez right away, he eventually saw him peering into the window of a car for sale.

See Tr. at 46:7-20 (Wilson, Denger).  Denger testified:

> A.   From what I saw, he was looking in the driver's side window of a vehicle that was marked for sale on the corner, and then began looking over his shoulder[;] it appeared to be nervously.
>
> Q.   And would look[ing] into the window of a vehicle for sale by itself really be suspicious to you?
>
> A.   No, ma'am, not when [it] was marked for sale.
>
> Q.   Okay.  So was this behavior suspicious to you?
>
> A.   The fact that he matched the description and was looking in the vehicle and then kept looking over his shoulder did raise some [suspicion].
>
> Q.   And so since he matched the description what did you guys do next?
>
> A.   We went across the street and attempted to contact him.
>
> . . . .
>
> Q.   And did he seem to recognize that you guys were driving towards him?
>
> A.   . . . [Y]es, ma'am.
>
> Q.   And what did he do at that point?
>
> A.   He began looking . . . nervously[,] shifting his body weight and reaching into his pockets.
>
> Q.   And what if anything does that indicate to you?
>
> A.   It's common if somebody is looking for an avenue of escape.
>
> Q.   And what [does] reaching into the pockets indicate . . . to [you]?
>
> A.   Could . . . be attempting to grab something out of his pockets whether to use as a [weapon] or to get rid of.

Tr. at 46:23-48:8 (Wilson, Denger).  Denger testified that, at that point, Denger drove around to

Isleta Boulevard and Bonaguidi and approached Valdez from the south side of Bonaguidi, because

Valdez was "shifting [his] body weight and looking around nervously" in that direction, Tr. at 48:16-17 (Denger), which "indicated that he may attempt to flee," Tr. at 48: 23 (Denger).   Denger testified that Valdez began reaching into his duffel bag before McLeod and Denger made contact with him, see Tr. at 49:2-6 (Wilson, Denger), and that Denger suspected that Valdez was reaching in his duffel bag for tools to commit a crime or for a weapon, see Tr. at 49:13-21 (Wilson, Denger).

Denger testified that his dash camera was running that day, and the United States moved for its admission as Exhibit 3.   See Tr. at 49:22-50:4 (Wilson, Denger); Denger Body Camera Footage (recorded February 20, 2021), admitted at Hearing on February 4, 2022 as United States' Exhibit 3, filed January 14, 2022 (Doc. 47).   Denger identified Valdez in the courtroom as the man he saw that day.   See Tr. at 50:14-23 (Wilson, Denger, Court).   Denger testified that, when he got out of his vehicle and approached Valdez, Valdez was not obeying McLeod's commands to take his hands out of his pockets.   See Tr. at 51:1-11 (Wilson, Denger).   Denger testified that he heard Valdez tell McLeod that he did not have any weapons.   See Tr. at 51:16-20 (Wilson, Denger). Denger testified that he saw McLeod remove a loaded magazine from one of Valdez' pockets.   See Tr. at 51:25-52:1 (Denger).   Denger testified that he then asked Valdez for his name and date of birth, see Tr. at 52:14-16 (Wilson, Denger), and returned to his vehicle to run Valdez' information through the NCIC database, see Tr. at 52:4-11 (Wilson, Denger), which turned up three felony warrants for Valdez arrest, see Tr. at 53:6-7; id. at 53:19-20 (Denger).   McLeod and Denger then arrested Valdez.   See Tr. at 54:7-9 (Wilson, Denger).   Denger testified that, after they arrested Valdez,  Denger searched Valdez' duffel bag, see Tr. at 54:23-55:5 (Wilson, Denger), in which he found a "plastic baggie wrapped in brown packing tape," which contained a "[w]hite crystal-like substance," Tr. at 55:8-13 (Wilson, Denger).   Denger stated that he recognized the substance as methamphetamine, see Tr. at 55:16-17 (Denger), and found an additional bag of methamphetamine

in the duffel bag, see Tr. at 55:21-22 (Denger); id. at 56:2-4 (Wilson), as well as "other pieces of paraphernalia," such as "[a] black scale and sandwich baggies," Tr. at 56:6-7 (Denger).   Denger testified that he "tagged" the plastic baggies and paraphernalia into evidence.  Tr. at 56:11-12 (Denger).  The United States asked Denger: "So[,] why did you end up looking in the bag?" Tr. at 56:23 (Wilson), and Denger responded, "[b]ecause the individual was under arrest, and it was a search incident to arrest of his property," Tr. at 56:24-57:1 (Denger).

Valdez then cross-examined Denger.  See Tr. at 56:20-63:13 (Fooks, Denger).  The United States asked Denger some questions on redirect.  See Tr. at 63:19-65:3 (Wilson, Denger).  Valdez did not call any additional witnesses.  See Tr. at 65:20-23 (Court, Fooks).  The Court asked Valdez whether he agrees that the United States' summary of the four issues -- as stated in its Response -- is a fair summary.  See Tr. at 66:4-11 (Court)(citing Response at 1).  Valdez responded that "they sound fair, Your Honor, but I think really what this is all about is Terry stops and investigatory detentions and more specifically[,] reasonable suspicion."  Tr. at 66:12-15 (Fooks).  The Court stated its inclination to find that McLeod and Denger had reasonable suspicion to detain Valdez. See Tr. at 66:23-24 (Court).  Regarding the pat-down, Valdez argued that the deputies did not have reasonable suspicion that Valdez was both armed and dangerous, and that the standard requires that the suspect is both armed and dangerous.  See Tr. at 67:21-68:1 (Fooks).  Valdez asserted that his activity was innocent at the time he was detained, that the deputies did not have reasonable suspicion to detain him -- even under the Tenth Circuit's low bar -- and argued that his case is distinguishable from other Tenth Circuit cases where courts found reasonable suspicion.  See Tr. at 70:2-75:11 (Fooks, Court)(citing United States v. Johnson, 364 F.3d 1185 (10th Cir. 2004); United States v. Aragones, 483 F. App'x 415 (10th Cir. 2012); United States v. Serna, 406 F. Supp. 3d 1084 (D.N.M. 2019)(Browning, J.)).

The Court asked the United States if it agrees with Valdez that in other Tenth Circuit cases there was "something extra" that justified a finding of reasonable suspicion, and asked what the "something extra" is in this case.  Tr. at 76:14-16 (Court).  The United States responded that, although the time frame in this case is longer than that cited in those other cases, the Court should consider all of the circumstances, including Valdez' conduct from the prior night -- throwing his duffel bag over the wall of a stranger's yard -- up until the conduct that the deputies observed.  See Tr. at 76:17-78:4 (Wilson).  The United States argued that the deputies had reasonable suspicion to detain Valdez and also that Valdez' statements after the Miranda warning were voluntary.  See Tr. at 80:14-81:6 (Wilson).

The Court asked the United States to respond to Valdez' argument that he was not dangerous and asked:

> How much leeway is there on a Terry stop?  Is it as automatic as Mr. [McLeod] testified[,] that once he gets reasonable suspicion he can [perform a pat] down . . . or is there an additional requirement to do the pat-down -- that you've got to have suspicion that he's armed and dangerous or about to throw away evidence or something like that.

Tr. at 81:11-18 (Court).  The Court also asked: "[W]hat gave the McLeod the ability to use his reasonable suspicion to pat him down[?]"  Tr. at 81:23-25.  The United States responded that it is not automatic, but, in this case, Valdez' reaching for the duffel bag and into his pockets justified the pat-down.  See Tr. at 81:19-22; id. at 82:1-5 (Wilson).  The Court asked the United States if "the video was that clear that he was putting his hands in his pockets."  Tr. at 82:6-8 (Court).  The United States responded: "I thought it was more him putting his hands here and when they asked him to put his hands up[,] he didn't want to do that."  Tr. at 82:9-11 (Wilson).  The Court confirmed that "what those officers keep saying are pockets were just the area down there, rather than the actual pockets."  Tr. at 82:12-14 (Court).  The United States agreed and said:

> [W]hen they're saying get your hands up, instead he's reaching around his pockets.
> He does . . . manage[] to pull his cellphone out, and I think there is something else
> . . . in his other hand[,] so he was able to retrieve things from his pockets. . . . I think
> there is at least the inference that he was able to get into his pockets . . . .

Tr. at 82:15-25 (Wilson).  When the Court asked whether what Valdez was doing with his hands justified the pat-down, the United States responded, "Yes, Your Honor," and asserted that the officer safety justified the pat-down.  Tr. at 83:4 (Wilson).  See id. at 83:1-14 (Court, Wilson).

The Court invited Valdez to have the last word on his Motion to Suppress.  See Tr. at 84:3-4 (Court).  Valdez argued that he looked suspicious or had suspicious movements only because he was reacting to seeing McLeod driving over towards him.  See Tr. at 84:15-85:7 (Fooks).  Valdez countered the McLeod's assertion that Valdez was "non-verbal" by stating that he was talking the "whole time."  Tr. at 85:9-17 (Fooks).  Valdez also repeated that the deputies did not have any reason to believe that he was dangerous and asserted that he complied with their commands.  See Tr. at 86:6-15 (Fooks).  The United States responded briefly by stating that its understanding of McLeod's testimony is that Valdez' non-verbal cues "indicated something to them."  Tr. at 87:17-19 (Wilson).  The Court stated its inclination to deny the Motion to Suppress.  See Tr. at 88:2-89:4 (Court).

     **5.**       **The April 25, 2022, Motion Hearing.**

The Court held a motion hearing on April 25, 2022.  See Clerk's Minutes, filed April 25, 2022 (Doc. 79).  At the motion hearing, the Court told the parties that it was working hard to finish its Memorandum Opinion and Order on Valdez' Motion to Suppress.  See Draft Transcript of Hearing at 3:10-5:25, taken April 25, 2022 (Court)("Apr. Tr.").  The Court read out its main holdings regarding its upcoming Memorandum Opinion and Order on Valdez' Motion to Suppress, stating:

I am holding that the BCSO deputies had reasonable suspicion to stop and detain Mr. Valdez.  The deputies had reasonable suspicion to stop and detain Mr. Valdez, taking the circumstances['] totality into account.  Mr. Valdez's behavior the prior night, throwing the duffel bag into the resident's yard, retrieve it the next mornings, loitering in the neighborhood, looking into the window of an unoccupied car for sale, the duffel bag may have contained tools.  His agitated behavior reaching into the bag when the deputies approached.

Second, I'm prepared to hold that Mr. McLeod and Mr. Denger had reasonable suspicion that Valdez was armed and dangerous.  The deputies had reasonable suspicion that Mr. Valdez was armed and dangerous taking the circumstances totality into account, [and] [a]ll of the above [--] what I just said about [reasonable] suspicion[] I incorporate here [--] and Mr.Valdez then reached in his pockets, [he was] noncomplian[t] when asked to put up his hands and put his hands on his head.

Third, Mr. McLeod and Mr. Denger lawfully [seized] Mr. Valdez's bag, the deputies lawfully arrested Mr. Valdez on outstanding warrants[,] they lawfully seized the bag in a public place not at Mr. Valdez's home.  Mr. Valdez was alone no, one else to take the bag.

Fourth, Mr. McLeod and Mr. Denger's search of Mr. Valdez's bag was not a lawful search incident to the arrest.  I think the United States conceded this point that it was not under Arizona [v.] Gant.  It's only lawful if it is within the suspect's reach.  Two rationales that it protects officer safety or prevents destruction of evidence, neither is at play here because Mr. Valdez was handcuffed and the bag was out of his reach.

[Fifth], Mr. McLeod and Denger['s] search of Mr. Valdez's bag was not a lawful inventory search.  The Government asserted this, but . . . Mr. Denger testified it was a search incident to arrest.  So[,] the officers were not testifying that it was an inventory search.  Neither deputy testified that they performed an inventory search.  No inventory sheet was produced.  There is no indication that either deputy did an inventory search later on, just that they tagged the contents of Mr. Valdez's bag into evidence. . . .

Number [six], the contents of Mr. Valdez's bag would not have been inevitably discovered by a warrant or exigent circumstances or an inventory search.  The Government seems to be advancing that, an inventory search is what would have inevitably occurred, and of course the Government bears the burden of proving the inevitable discovery and the deputies had already searched the bag.  There is no indication the deputies would have conducted a second lawful search [and] no indication [that] they were pursuing a search warrant.  So I am not prepared to find that they would have inevitably discovered in an inventory search the contents of the [bag] . . .

Mr. Valdez is not entitled to suppression of his statements, because his Miranda waiver is valid and his statements are voluntary. The [ar]rest is law[ful], [the] Miranda warnings were timely, Mr. Valdez [nodded] that he had understood them. Mr. Valdez said[,] ["]I will talk to you,["] [and] the pain had abated after Mr. McLeod [stopped] handling Mr. Valdez's hands and wrists.

Apr. Tr. at 3:10-5:25 (Court).

The Court asked the parties what they needed, giving the trial setting of May 9, 2022. See Apr. Tr. at 6:15-16 (Court). The United States responded that the Court's ruling changes whether the United States can proceed to trial, and that it would have to reassess its case. See Apr. Tr. at 6:25-7:5 (Wilson). In response to the United States' request, the Court stated that it would grant the United States' Motion in Limine to Prohibit Discussion of Penalties or Punishment at Trial, filed April 13, 2022 (Doc. 34). See Apr. Tr. at 7:22-23 (Court).

### 6.   The United States' Notice of Supplemental Exhibits.

On April 26, 2022, the United States filed a Notice of Supplemental Exhibits. See United States' Notice of Supplemental Exhibits, filed April 26, 2022 (Doc. 81)("Supplemental Notice"). The United States attaches to the Supplemental Notice an official transcript of the February 4, 2022 hearing, see Transcript of Motion Proceedings before The Honorable James O. Browning, United States District Judge (taken February 4, 2022), filed April 26, 2022 (Doc. 81-1), the MDC Inmate Property Inventory Policy, an inmate property list for Jaime Valdez, see Valdez Property List, and the Incident Report.

### 7.   The Defendant's Motion to Strike.

On April 28, 2022, Valdez filed a motion to strike the United States' Notice and attached Supplemental Exhibits. See Defendant's Motion to Strike at 1, filed April 28, 2022 (Doc. 84)("Motion to Strike"). Valdez argues that the United States was on notice that Valdez sought to suppress all the evidence from the February 20, 2021 incident, and that the United States, if it

wishes to rely on the inevitable discovery doctrine, bears the burden of proving that the evidence

would have been inevitably discovered.  See Motion to Strike at 1.  Valdez argues that there is "no

legal or procedural basis" that allows the United States to supplement the record after the February

4, 2022, Hearing.  Valdez asserts that the Court should

> deny the government "'a second chance . . . to make its strongest case or to dress
> up arguments that previously failed.'"  *United States v. Huff*, 782 F.3d 1221, 1224
> (10th Cir. 2015)(quoting *Voelkel V. Gen. Motors Corp.*, 846 F. Supp. 1482, 1483
> (D. Kan. 1994)). The time for submitting the documents attached to its notice is
> past.
>
> Furthermore, the government does not give any reasonable or valid
> explanation for why the court should consider these documents now.  Claiming to
> misapprehend the necessity of "proof," it is trying to plug a hole in the record by
> moving to supplement it without a valid reason for doing so. Each of these
> documents contains hearsay and none have been properly authenticated.

Motion to Strike at 2.  Finally, Valdez argues that the exhibits the United States filed with its

Notice are irrelevant, because "none directly address the four pertinent inevitable discovery factors

from [United States v. Souza, 223 F.3d 1197 (10th Cir. 2000)]."  Motion to Strike at 3.

### 8.    The May 2, 2022, Pre-Trial Conference.

The Court stated that it needed to study further the United States' Supplemental Notice and

attached exhibits, but that they addressed some of its concerns whether an inventory was performed

and whether BCSO has inventory procedures .  See May 2 Tr. at 3:19-4:13 (Court).  The Court

noted that "it's the Bernalillo County Sheriffs that run MDC, so it's similar personnel doing it,"

and, so, "I don't see a sound reason to draw a distinction between an inventory search done by

police officers and [an] inventory search done by the detention facility."  May 2 Tr. at 4:14-4:19

(Court).  The Court stated that, if it treats the United States Supplemental Notice as a motion to

reconsider under United States v. Huff,  782 F.3d 1221 (10th Cir. 2015), the Court needs to be

careful about "not considering new evidence that supports the Government's position because the

exclusionary rule is an extraordinary remedy of excluding relevant, probative information." May 2 Tr. at 5:9-13 (Court).  See id. at 5:2-9 (Court).

The Court stated its current inclination to deny the Motion to Suppress in light of the new material that the United States presented last week, but invited to Valdez to speak in support of his Motion to Strike.  See May 2 Tr. at 6:18-7:5 (Court).  Valdez argued that the new materials are hearsay and have not been authenticated.  See May 2 Tr. at 7:9-22 (Fooks).  In response to the Court asking if these materials are available on the internet, the United States responded that it did not know if they are publicly available, but that it reached out to MDC to obtain them.  See May 2 Tr. at 7:23-8:5 (Court, Wilson).  Valdez argued that "a bigger issue is that we don't have any -- there has been no witness to testify as to -- not just the content of the document, but also to how that actually works practically speaking" and that he does not have an opportunity to cross-examine that individual.  May 2 Tr. at 8:8-15 (Fooks).  The Court agreed with Valdez that the record that it has "doesn't contain the things that you're talking about." May 2 Tr. at 9:5-6 (Court). The Court asked Valdez what it needs, given its inclination to deny both the Motion to Strike and the Motion to Suppress, see May 2 Tr. at 10:1-15 (Court), and Valdez responded that he would "ask for a continuance of the trial" and ask the United states for a hearing to "fill in those gaps in the record as they stand now," May 2 Tr. at 10:16-20 (Fooks).  The Court asked if Valdez would like to hold the hearing on May 9, 2022, when the trial is set to begin.  See May 2 Tr. at 3-8 (Court). Valdez responded that he needed more time to "sit down and digest this a little bit more myself." May 2 Tr. at 12:22-23 (Fooks).

The Court asked the United States why the BCSO deputies testified that "[t]he bag and the drugs went to what they say is APD evidence," and whether BCSO and APD share an evidence room.  May 2 Tr. at 13:10-12 (Court).   The United States responded that, at least in Albuquerque,

New Mexico, BCSO and APD share the same building.  See May 2 Tr. at 16-19 (Wilson).  The

Court asked the United States whether "APD officer[s] log in evidence that BCSO officers bring

to them," May 2 Tr. at 13:20-22 (Court), and the United States responded that "[t]hey have people

that work at the front desk that are, you know, a receptionist and people that can enter information

for, I believe, either agency."  May 2 Tr. at 13:23-14:1 (Wilson).  The United States asserted that

the terms "might be basically interchangeable . . . .  But I think that it's referring to the building

where they have it.  I know that they have their own system with bar codes for their case numbers

and everything, so they're not combined with APD cases.  But they're in the same facility."  May

2 Tr. at 14:9-15 (Wilson).

The Court summarized the situation: "[S]o[,] the two deputies appear to me from what is

in the record -- and I think on the record this is what I would find -- they took the duffel bag, they

took the drugs, and they took it over to that APD evidence . . . building," May 2 Tr. at 14:25-15:5

(Court), and "then they take the personal effects over to the [detention] facility," May 2 Tr. at 15:7-

8 (Court).   The Court asked the United States if its position is that the deputies performed an

inventory search, see May 2 Tr. at 15:24-16:3 (Court), and the United States responded that it was,

and that the deputies began the inventory search on the hood of the car, see May 2 Tr. at 16:4-10

(Wilson, Court).  The Court stated that one of the problems it was having was that "there was no

inventory," but "[n]ow, you've produced a police report that I think does inventory the items."

May 2 Tr. at 17:20-22 (Court).  The United States followed up by stating that the deputies "have

to document the items somewhere," and that "my point is that they either -- if they do run into

something that they determine to be contraband, then that becomes in the evidence category, and

gets logged inside of the police report," while "[a]nything else that is still remaining has to be

logged in to their property at MDC.  So one way or the other, it has to be documented."  May 2 Tr. at 17:23-18:6 (Wilson).

The Court next asked whether police officers ever think: "There is a duffel bag, I don't have a warrant[,] I'm just going to take the duffel bag to the detention facility?"  May 2 Tr. at 18:7-10 (Court).  The United States responded:

> I don't believe they are supposed to.  And that would be in reference to the rules and regulations I cited as far as not being able to tag any kind of guns, knives, chemical substances.  Not knowing what is inside of that bag, they are responsible to take those items[,] because those cannot be tagged in at MDC as personal property.  So they have to take those to the evidence unit, even if they're tagged for safekeeping, because MDC will not keep those items at that facility.

May 2 Tr. at 18:11-21 (Wilson).  The Court then asked "what standardized procedures for inventory [do] they follow before going to MDC?  Am I totally relying upon the oral policies that the two deputies testified to?"  May 2 Tr. at 19:1-4 (Court).  The United States said that "it would be a combination of the testimony from the two deputies about that being standard procedure, that they search . . . property before taking them to the MDC facility, but also the Bernalillo County Sheriff's Department Rules and Regulations talking about what cannot be tagged in at MDC . . . ."  May 2 Tr. at 19:6-12 (Wilson).  The Court stated that it has to make a leap between the MDC policy that "'[a]bsolutely no knives, guns, ammunition, or chemical agents will be accepted by MDC, JDC, or PTC personnel to be placed in the prisoner's property,'" and a policy that those items should not be taken to MDC.  May 2 Tr. at 19:18-21 (Court)(quoting BCSO Rules and Regulations §316-1).  See May 2 Tr. at 19:14 (Court).  The United States agreed that the deputies perform what the United States is calling an inventory search before they get to the detention facility.  See May 2 Tr. at 20:9-11 (Court, Wilson).  The Court then asked: "[W]hat is the standardized procedure for that pre-detention facility search?"  May 2 Tr. at 20:12-14 (Court).  The

United States said that it intended to address that issue in its response to the Motion to Strike, and that it will check the BCSO Rules and Regulations for that procedure, but, agreed with the Court that the standardized procedures for pre-detention inventory searches is in the deputies' testimony. See May 2 Tr. at 20:15-21:16 (Court, Wilson).

The Court noted that, "in the old days, you had the jail at the police station, and that was what probably the Supreme Court was thinking about" in Illinois v. Lafayette, 462 U.S. 640 (1983), because "[t]hey didn't have a different . . . facility." May 2 Tr. at 22:5-8. See id. at 22:3-4 (Court). The Court stated that "I'm not seeing a reason to draw a distinction there between the detention facility and an in-station place," but, "it's not clear to me that the standardized procedures say you do it on the hood of the car." May 2 Tr. at 22:8-15 (Court). The Court asked: "[H]ow do I get a valid inventory search exception to the warrant requirement? If they don't have standardized procedures for inventorying this personal property, how do I invoke the exception?" May 2 Tr. at 22:19-23 (Court). The United States responded that Illinois v. Lafayette covers this issue: "[I]t talks about how it is reasonable for police to search the property of an arrestee before they get booked into the facility," and "does not draw a meaningful distinction between exactly where that occurs, whether it be at the police substation or at the detention facility itself." May 2 Tr. at 22:25-23:7 (Wilson). The United States asserted that "the deputies did testify that this was standard procedure, that when you do arrest someone and you're taking them to MDC, that their standard procedure or routine procedure is to search the property," May 2 Tr. at 23:18-23 (Wilson), and that,

> between that testimony and the fact that, even if they had . . . even contrary to their routine procedure, just threw that duffel bag in the back of the police unit, never checked it at the substation, and then drove it directly out with Mr. Valdez to MDC, MDC still would have had to look through [it.]

May 2 Tr. at 24:4-11 (Wilson).   The Court confirmed that this summary is the United States'

inevitable discovery argument.  See May 2 Tr. at 24:12-17 (Court, Wilson).  Valdez responded

that this argument was not argued or briefed, and that he is "at . . . a marked disadvantage to . . .

analyze the issue," May 2 Tr. at 26:4-9 (Fooks), and does not "feel like I have an adequate

opportunity to respond to that" or "feel comfortable standing here in court and making an

argument," May 2 Tr. at 27:16-20 (Fooks).   The Court said, "I understand.  Well, let me do this:

Let me go ahead and get the opinion out.  Like I said, I'm inclined to deny the motion to strike and

also the motion to suppress the evidence.  I'm inclined to put it all in one opinion now,"  May 2

Tr. at 27:21-24 (Court), and then, "once I get the opinion out, [Mr. Fooks] has something to shoot

at, and he can decide whether he wants to give us any more evidence or try to get more evidence,"

May 2 Tr. at 28:2-5 (Court).  The Court stated that the new material needs to be considered, and

"provides the basis for a finding that the officers did do an inventory search," but,

> even if they didn't do an inventory search, that they would have taken the bag,
> unopened, to the detention facility, and then they would have found the drugs.  I
> think they did have a right to seize the bag.  And I think that for standardized
> procedures there is enough in their testimony.  It's not written out with clarity by
> BCSO.  But there is enough in their testimony to find that they did have a standard
> procedure of doing what they did, and then documenting it later with the -- in their
> police report.  So I'm inclined to deny it.

May 2 Tr. at 28:7-21 (Court).  Valdez stated that he still wants a motion to continue the trial, to

which the United States responded that it does not oppose that motion and offered to file

supplemental briefing.  See May 2 Tr. at 28:22-29:3 (Court, Fooks, Wilson).  The parties said that

they would prepare a motion to continue the trial, and file the motion, and the Court stated that, if

it is satisfied with the motion, the Court will call off the jury.  See May 2 Tr. at 29:20-30:1 (Court).

## LAW REGARDING MOTIONS TO STRIKE

Rule 12(f) of the Federal Rules of Civil Procedures provides:

**(f) Motion to Strike.** The court may strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter.  The court may act:

> (1) on its own; or

> (2) on motion made by a party either before responding to the pleading or, if a response is not allowed, within 21 days after being served with the pleading.

Fed. R. Civ. P. 12(f).   Professors Charles Alan Wright and Arthur Miller have recognized, however, that such motions are not favored and, generally, the court should deny them:

> The district court possesses considerable discretion in disposing of a Rule 12(f) motion to strike redundant, impertinent, immaterial, or scandalous matter. However, because federal judges have made it clear, in numerous opinions they have rendered in many substantive contexts, that Rule 12(f) motions to strike on any of these grounds are not favored, often being considered purely cosmetic or "time wasters," there appears to be general judicial agreement, as reflected in the extensive case law on the subject, that they should be denied unless the challenged allegations have no possible relation or logical connection to the subject matter of the controversy . . .

5C C. Wright & A. Miller, <u>Federal Practice & Procedure</u> § 1382, at 433-36 (3d. ed. 2004)(footnotes omitted).  <u>Accord</u> <u>Budget v. Capital W. Sec., Inc.</u>, 2009 WL 4807619, at *1 (citing <u>Scherer v. U.S. Dep't of Educ.</u>, 78 F. App'x 687, 689 (10th Cir. 2003)(unpublished)) ("While motions to strike are generally disfavored, the decision to grant a motion to strike is within the discretion of the court.")).

"Allegations will not be stricken as immaterial under this rule unless they have no possible bearing on the controversy." <u>Estate of Gonzales v. AAA Life Ins. Co.</u>, No. CIV 11–0486 JB/WDS, 2012 WL 1684599, at *5 (D.N.M. May 8, 2012)(Browning, J.)(internal quotation marks

omitted)(quoting <u>Sai Broken Arrow C, LLC v. Guardian Emergency Vehicles, Inc.</u>, 2010 WL 132414, at *5).   Professors Wright and Miller have also commented on what constitutes "immaterial" matter in the context of a motion to strike.   5C Wright & Miller, <u>supra</u>, § 1382, at 458-60 (footnotes omitted).   "'Immaterial' matter is that which has no essential or important relationship to the claim for relief or the defenses being pleaded, or a statement of unnecessary particulars in connection with and descriptive of that which is material."   5C Wright & Miller, <u>supra</u>, § 1382, at 458-60 (footnotes omitted).

Moreover, "[o]nly material included in a 'pleading' may be the subject of a motion to strike, and courts have been unwilling to construe the term broadly.   Motions, briefs, . . . memoranda, objections, or affidavits may not be attacked by the motion to strike." <u>Dubrovin v. Ball Corp. Consol. Welfare Ben. Plan for Emps.</u>, Civil Action No. 08–cv–00563– WYD–KMT, 2009 WL 5210498, at *1 (D. Colo. Dec. 23, 2009)(Wiley, J.).   <u>Accord</u> <u>Ysais v. N.M. Judicial Standard Comm'n</u>, 616 F. Supp. 2d 1176, 1184 (D.N.M. 2009)(Browning, J.)("<u>Ysais</u>")(citing <u>Searcy v. Soc. Sec. Admin.</u>, 956 F.2d 278, 1992 WL 43490 at *1, *4(10th Cir. 1992))("Generally . . . motions, briefs, and memoranda may not be attacked by a motion to strike.").   "The Federal Rules of Civil Procedure define 'pleadings' as a complaint or third-party complaint; an answer to a complaint, a third-party complaint, a counterclaim, or a crossclaim; and, 'if the court orders one, a reply to an answer.'"   <u>Ysais</u>, 616 F. Supp. 2d at 1184 (quoting Fed. R. Civ. P. 7(a)).

"Striking a pleading or part of a pleading is a drastic remedy and because a motion to strike may often be made as a dilatory tactic, motions to strike under Rule 12(f) generally are disfavored." <u>Estate of Gonzales v. AAA Life Ins. Co.</u>, 2012 WL 1684599, at *5 (quoting <u>Sai Broken Arrow C, LLC v. Guardian Emergency Vehicles, Inc.</u>, 2010 WL 132414, at *5)(internal quotation marks

omitted)).  "The exception to this principle is that a Court may 'choose to strike a filing that is not allowed by local rule, such as a reply filed without leave of court.'"  Ysais, 616 F. Supp. 2d at 1184 (citing In re Hopkins, 162 F.3d 1173, 1998 WL 704710 at *3 (10th Cir. 1998)).

For example, in Skyline Potato Co., Inc. v. Hi–Land Potato Co., Inc., No. CIV 10–0698 JB/RHS, 2012 WL 6846386 (D.N.M. Dec. 31, 2012)(Browning, J.), the Court denied a motion to strike a letter filed with the Court, because the letter was not a pleading, and did not pertain to either party's legal defenses or arguments; the letter expressed one party's position regarding whether the Court should rule on summary judgment motions pending at the close of a bench trial. See 2012 WL 6846386, at *6.  Similarly, in Great American Insurance v. Crabtree, No. CIV 11-1129, 2012 WL 3656500 (D.N.M. Aug. 23, 2012)(Browning, J.), the Court denied a plaintiff's motion to strike exhibits attached to the defendant's motion to dismiss, because they were neither pleadings nor irrelevant.  See 2012 WL 3656500, at *18.  In Applied Capital, Inc. v. Gibson, No. CIV 05-0098, 2007 WL 5685131 (D.N.M. 2007)(Browning, J.), the Court refused the plaintiff's request to strike a motion to dismiss, because rule 12(f) applies only to pleadings and not to a motion to dismiss.  See 2007 WL 5685131, at *18.  In Estate of Anderson v. Denny's, Inc., 291 F.R.D. 622, 635 (D.N.M. 2013)(Browning, J.), the Court denied the plaintiff's request to strike a notice of completion of briefing for similar reasons.  See 291 F.R.D. at 635.

In Lane v. Page, the plaintiff filed a motion to strike parts of the defendants' answer, because it was "devoid of factual allegations and assert[ed] improper defenses."  272 F.R.D. at 588.  Specifically, the plaintiff argued that the defendants' affirmative defenses should "put the plaintiff on notice of how the defense applies."  272 F.R.D. at 588.  The plaintiff therefore asked the Court not only to strike some of the defendants' answers, but also to "require the Defendants to amend their answers."  272 F.R.D. at 588.  The defendants argued that rule 8 does "not require

- 45 -

them to provide factual support for their affirmative defenses" and contended that their answers adequately responded to the plaintiff's complaint.  272 F.R.D. at 588.  The Court "decline[d] to extend the heightened pleading standard the Supreme Court established in <u>Bell Atlantic Corp. v. Twombly</u> and <u>Ashcroft v. Iqbal</u> to affirmative defenses pled in answers, because the text of the rules, and the functional demands of claims and defenses, militate against requiring factual specificity in affirmative defenses."  272 F.R.D. at 588.  The Court struck two improperly labeled affirmative defenses that stated the defendants "reserve the right to assert additional affirmative defenses."  272 F.R.D. at 601.  The Court concluded the statement was not a defense, explaining:

> "[a]n affirmative defense, under the meaning of Fed. R. Civ. P. 8(c), is a defense that does not negate the elements of the plaintiff's claim, but instead precludes liability even if all of the elements of the plaintiff's claim are proven."  <u>Roberge v. Hannah Marine Corp.</u>, [No. 96–1691,] 1997 WL 468330, at *3 [(6th Cir. 1997)].  "A reservation of unpled defenses is not a defense of any kind, much less an affirmative one."  <u>Mission Bay Ski & Bike</u>, 2009 WL 2913438, 2009 WL 2913438 at *5 [(N.D. Ill. Jan. 9, 2009)(Goldgar, J.)].

In <u>Tavasci v. Cambron</u>, No. CIV 16-0461 JB/LF, 2016 WL 6405896 (D.N.M. Oct. 25, 2016)(Browning, J.), the Court retreated some from that holding, however, because it did not want to encourage such motions, which do not advance the ball in a case.  The Court refused to strike a reservation of defenses, "[w]here a defendant reserves unpled defenses yet also agrees to comply with rule 15," because "the Court cannot conclude that 'under no set of circumstances' would the reservation of unpled defenses prevail."  2016 WL 6405896, at *18 (quoting <u>Friends of Santa Fe Cty. v. LAC Minerals</u>, Inc., 892 F. Supp. 1333, 1343 (D.N.M. 1995)(Hansen, J.)(citations omitted)).

## <u>LAW REGARDING FOURTH AMENDMENT SEARCHES</u>

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures."  U.S. Const. amend. IV.

It also commands that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV. In determining whether a Fourth Amendment violation has occurred, courts must "assur[e] preservation of that degree of privacy against government that existed when the Fourth Amendment was adopted." United States v. Jones, 565 U.S. 400, 406 (2012)(Scalia, J.)(alteration in original)(quoting Kyllo v. United States, 533 U.S. 27, 31 (2001)(Scalia, J.)).

"Not all searches require a warrant. The hallmark of the Fourth Amendment is reasonableness." United States v. Harmon, 785 F. Supp. 2d 1146, 1157 (D.N.M. 2011)(Browning, J.). See United States v. McHugh, 639 F.3d 1250, 1260 (10th Cir. 2011)("[T]he ultimate touchstone of the Fourth Amendment is 'reasonableness.'")(quoting Brigham City, Utah v. Stuart, 547 U.S. 398 (1978)). "In the criminal context, reasonableness usually requires a showing of probable cause." Herrera v. Santa Fe Pub. Sch., 792 F. Supp. 2d 1174, 1184 (D.N.M. 2011)(Browning, J.)(quoting Bd. of Educ. of Indep. Sch. Dist. No. 92 of Pottawatomie Cty. v. Earls, 536 U.S. 822, 828 (2002)). The Supreme Court of the United States has stated in the law enforcement context that "searches conducted outside the judicial process, without prior approval by judge or magistrate, are per se unreasonable under the Fourth Amendment -- subject only to a few specifically established and well-delineated exceptions." Katz v. United States, 389 U.S. 347, 357 (1967)(footnotes omitted).

1. **Reasonable Government Searches.**

"[B]ecause 'the ultimate touchstone of the Fourth Amendment is reasonableness,'" when a search implicating the Fourth Amendment has occurred, the district court must determine whether the search is reasonable. Kentucky v. King, 563 U.S. 452, 459 (2011)(quoting Brigham

City v. Stuart, 547 U.S. 398, 403 (2006)).   See Samson v. California, 547 U.S. 843, 848 (2006)("'[U]nder our general Fourth Amendment approach' we 'examin[e] the totality of the circumstances' to determine whether a search is reasonable within the meaning of the Fourth Amendment.")(quoting United States v. Knights, 534 U.S. 112, 118 (2001)).  "Although the Fourth Amendment ordinarily requires the degree of probability embodied in the term 'probable cause,' a lesser degree satisfies the Constitution when the balance of governmental and private interests makes such a standard reasonable."   United States v. Knights, 534 U.S. at 121.  The Supreme Court has justified this balancing test with the recognition that "[t]he Fourth Amendment does not protect all subjective expectations of privacy, but only those that society recognizes as 'legitimate.'" Vernonia Sch. Dist. 47J v. Acton, 515 U.S. 646, 654 (1995)(quoting New Jersey v. T.L.O., 649 U.S. 325, 338 (1985)).

       "Whether a search is reasonable 'is determined by assessing, on the one hand, the degree to which it intrudes upon an individual's privacy and, on the other, the degree to which it is needed for the promotion of legitimate governmental interests.'"   Samson v. California, 547 U.S. at 848 (quoting United States v. Knights, 534 U.S. at 118).   See Banks v. United States, 490 F.3d 1178, 1184 (10th Cir. 2007)(stating that the Supreme Court "described the totality-of-the-circumstances test as one where 'the reasonableness of a search is determined by assessing, on the one hand, the degree to which it intrudes upon an individual's privacy, and on the other, the degree to which it is needed for the promotion of legitimate governmental interests'" (quoting United States v. Knights, 534 U.S. at 119-20)).

       As the text of the Fourth Amendment indicates, the ultimate measure of the constitutionality of a governmental search is "reasonableness."   At least in a case . . . where there was no clear practice, either approving or disapproving the type of search at issue, at the time the constitutional provision was enacted, whether a particular search meets the reasonableness standard "'is judged by balancing its

intrusion on the individual's Fourth Amendment interests against its promotion of legitimate governmental interests.'"

Vernonia Sch. Dist. 47J v. Acton, 515 U.S. at 652-53 (1995)(quoting Skinner v. Ry. Labor Executives' Ass'n, 489 U.S. 602, 617 (1989)).   The Supreme Court has held that the test of reasonableness under the Fourth Amendment is not a concrete test:

> The test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application.   In each case [determining reasonableness] requires a balancing of the need for the particular search against the invasion of personal rights that the search entails.   Courts must consider the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted.

Bell v. Wolfish, 441 U.S. 520, 559 (1979).

In analyzing the first factor -- the intrusion on the individual's privacy -- courts look to the individual's privacy expectations.   See, e.g., United States v. Knights, 534 U.S. at 119-20 (noting that the petitioner had a "significantly diminished . . . reasonable expectation of privacy," because a condition of his probation was to consent to search of his apartment without notice or probable cause, and because he was clearly notified and informed of the provision); Banks v. United States, 490 F.3d at 1186-87 (noting that the plaintiffs, convicted felons on probation, have a more limited expectation of privacy than the ordinary citizen, and noting that "[w]hat is 'reasonable' under the fourth amendment for a person on conditional release, or a felon, may be unreasonable for the general population"); Boling v. Romer, 101 F.3d 1336, 1340 (10th Cir. 1999)("[W]hile obtaining and analyzing the DNA or saliva of an inmate convicted of a sex offense is a search and seizure implicating Fourth Amendment concerns, it is a reasonable search and seizure.   This is so in light of an inmate's diminished privacy rights . . . .").

As Justice Kagan has noted, property law informs society's expectations about what government intrusions are reasonable: "It is not surprising that in a case involving a search of a

home, property concepts and privacy concepts should so align.  The law of property 'naturally enough influence[s]' our 'shared social expectations' of what places should be free from governmental incursions."   Florida v. Jardines, 569 U.S. 1, 13 (2013)(Kagan, J., concurring)(quoting Georgia v. Randolph, 547 U.S. 103, 111 (2006)).  Similarly, in Vernonia Sch. Dist. 47J v. Acton, Justice Scalia, writing for the majority noted: "What expectations are legitimate varies, of course, with context, depending, for example, upon whether the individual asserting the privacy interest is at home, at work, in a car, or in a public park."  515 U.S. at 654 (internal citations omitted).

   2.   **Traffic Stops.**

A traffic stop is an investigative detention, see United States v. Toro-Pelaez, 107 F.3d 819, 823 (10th Cir. 1997), and is thus analyzed according to the principles that the Supreme Court set forth in Terry v. Ohio, 392 U.S. 1 (1968)("Terry"), see United States v. Kitchell, 653 F.3d 1206, 1216 (10th Cir. 2011)(concluding that a traffic stop is a Terry stop); United States v. Leon-Quijada, 107 F.3d 786, 792 (10th Cir. 1997).  In Terry, the Supreme Court authorized police officers to conduct limited seizures and to search a person's outer clothing when the officer has reasonable suspicion that criminal activity may be afoot.  See Terry, 392 U.S. at 30-31.  The Tenth Circuit has concluded that traffic stops fall into the category of Terry stops.  See United States v. Toro-Pelaez, 107 F.3d at 823-24 ("A traffic stop is a seizure within the meaning of the Fourth Amendment[, but] it is characterized as an investigative detention, which requires reasonable suspicion of criminal activity before a seizure can be made, rather than a full custodial arrest, which requires probable cause."); United States v. Sedillo, No. CR 08-1419 JB, 2010 WL 965743, at *10 (D.N.M. Feb. 19, 2010)(Browning, J.); United States v. Hanrahan, No. CR 04-1978 JB, 2005 WL 2312746, at *4 (D.N.M. Aug. 12, 2005)(Browning, J.), aff'd, 508 F.3d 962 (10th Cir. 2007).

For officers to lawfully stop a vehicle, they must have "a particularized and objective basis for suspecting the particular persons stopped of criminal activity." United States v. Leos-Quijada, 107 F.3d at 792 (citing United States v. Cortez, 449 U.S. 411, 417-18 (1981)).  Police officers may stop a vehicle only when they have "a reasonable, articulable suspicion that the detainee has been, is, or is about to be engaged in criminal activity."  United States v. Elkins, 70 F.3d 81, 83 (10th Cir. 1995)(citing United States v. Nicholson, 983 F.2d 983, 987 (10th Cir. 1993)).  Accord United States v. Ramos, 194 F. Supp. 3d at 1156.  Reasonable suspicion is not determined by any one factor but by the totality of the circumstances that the officer knew.  See United States v. Ceballos, 355 F. App'x 226, 229 (10th Cir. 2009)(unpublished); United State v. Elkins, 70 F.3d at 83 (citing Alabama v. White, 496 U.S. 325, 330 (1990)).  Even if the officer does not form subjective reasonable suspicion, if the circumstances of which he is aware would lead an officer to develop reasonable suspicion, the stop is proper.  See United States v. Ceballos, 355 F. App'x at 229 (holding that an officer's "subjective characterization of his actions is irrelevant").

If a police officer observes a traffic violation, the officer has cause to execute a traffic stop. See Whren v. United States, 517 U.S. 806, 809-10 (1996)("As a general matter, the decision to stop an automobile is reasonable where the police have probable cause to believe that a traffic violation has occurred."); United States v. Ramstad, 308 F.3d 1139, 1144 & n. 1 (10th Cir. 2002)(acknowledging that Whren v. United States "indicate[s] that probable cause is a *sufficient* ground for a stop," but explaining that reasonable suspicion is all that is necessary (quoting United States v. Callarman, 273 F.3d 1284, 1286 (10th Cir. 2001)(emphasis in United States v. Ramstad and United States v. Callarman).  Even if the officer has an ulterior motive for executing the traffic stop -- i.e., to investigate some other suspected illegal conduct -- the officer can lawfully stop a vehicle that he or she observes violating the traffic laws.  See Whren v. United States, 517 U.S. at

813-14; United States v. King, 209 F. App'x 760, 762 (10th Cir. 2006)(unpublished)("The constitutional reasonableness of a traffic stop does not depend on the actual motivations of the officer involved.")(citing Whren v. United States, 517 U.S. at 813).  In other words, there is no constitutional prohibition on what are colloquially referred to as "pretext stops," so long as the officer also has a constitutional basis for executing the stop.  United States v. Sedillo, 2010 WL 965743, at *10.

"A seizure for a traffic violation justifies a police investigation of that violation." Rodriguez v. United States, 575 U.S. 348, 354 (2015).  See Knowles v. Iowa, 525 U.S. 113, 117 (1998)(observing that the investigation into the traffic offense is "a relatively brief encounter" that is "more analogous to a so-called 'Terry stop' . . . than to a formal arrest")(quoting Berkemer v. McCarty, 468 U.S. 420, 439 (1984)).  The "tolerable duration of police inquiries in the traffic-stop context is determined by the seizure's 'mission' -- to address the traffic violation that warranted the stop, . . . and attend to related safety concerns."  Rodriguez v. United States, 575 U.S. at 354. Because the officer's purpose is to address the traffic infraction, the stop may last no longer than is necessary to effectuate that purpose.  See Illinois v. Caballes, 543 U.S. 405, 407 (2005).  The authority for the seizure therefore ends when the officer completes -- "or reasonably should have [] completed" -- the tasks tied to the traffic infraction.  Rodriguez v. United States, 1575 U.S. at 354.  See United States v. Hunnicutt, 135 F.3d 1345 (10th Cir. 1998)(observing that the traffic stop must last no longer than necessary to confirm or deny the suspicion that justified the stop -- the traffic offense); United States v. Ramos, 194 F. Supp. 3d at 1157.  In short, absent reasonable suspicion to justify an extended detention, an officer cannot "measurably extend" the stop beyond the time reasonably necessary to complete his traffic-related inquiries.  Rodriguez v. United States, 575 U.S. at 355 (quoting Arizona v. Johnson, 555 U.S. 323, 333 (2009)).

Beyond writing the traffic citation, an officer's mission includes "ordinary inquiries incident to [the traffic] stop." Illinois v. Caballes, 543 U.S. at 408. Typically, these inquiries involve checking the driver's license, registration, and proof of insurance, as well as determining whether any outstanding warrants for the driver exist. See Delaware v. Prouse, 440 U.S. 648, 658-60 (1979). These checks serve the same purpose as the traffic code: to ensure that vehicles on the road are operated safely and responsibly. See Delaware v. Prouse, 440 U.S. at 658-59; 4 W. LaFave, Search and Seizure § 9.3(c), 507-517 (5th ed. 2012). Similarly, a VIN inspection confirms that the driver can legally operate this particular vehicle -- because it is not stolen -- on the highway. See New York v. Class, 475 U.S. at 115 (concluding that "a demand to inspect the VIN, like a demand to see license and registration papers, is within the scope of police authority pursuant to a traffic violation stop"). The Supreme Court has held VIN searches "constitutionally permissible in light of the lack of a reasonable expectation of privacy in the VIN and the fact that the officers observed respondent commit two traffic violations." New York v. Class, 475 U.S. at 119. See id. at 114 ("[I]t is unreasonable to have an expectation of privacy in an object required by law to be located in a place ordinarily in plain view from the exterior of the automobile."). Unlike checking license and insurance, however, checking the VIN located inside of the vehicle's doorjamb requires opening the vehicle's door. Nonetheless, the Supreme Court has stated that neither of the VIN's two locations -- "either inside the doorjamb, or atop the dashboard and thus ordinarily in plain view of someone outside the automobile" -- is subject to a reasonable expectation of privacy. New York v. Class, 475 U.S. at 118. Checking a vehicle's VIN therefore has a similarly close connection to roadway safety as the ordinary inquiries, so it can fairly be characterized as part of the officer's traffic mission.

Officers may also engage in routine questioning while conducting the traffic stop but "only 'so long as [unrelated] inquiries do not measurably extend the duration of the stop.'" Rodriguez v. United States, 575 U.S. at 355 (quoting Arizona v. Johnson, 555 U.S. at 327-28). See Muehler v. Mena, 544 U.S. 93, 101 (2005)(noting that, because unrelated inquiries did not "exten[d] the time [the petitioner] was detained[,] . . . no additional Fourth Amendment justification . . . was required"). Accordingly, an officer may conduct certain unrelated checks during a lawful traffic stop, but "he may not do so in a way that prolongs the stop, absent the reasonable suspicion ordinarily demanded to justify detaining an individual." Rodriguez v. United States, 575 U.S. at 355.

In Rodriguez v. United States, the Supreme Court held that a "seizure justified only by a police-observed traffic violation, therefore, become[s] unlawful if it is prolonged beyond the time reasonably required to complete th[e] mission of issuing a ticket for the violation." 575 U.S. at 350-51 (alterations in original)(internal quotation marks and citation omitted). There, a police officer issued a driver a traffic warning, and returned to the driver and to the passenger all of their documents. See 575 U.S. at 351-52. After "the justification for the traffic stop was 'out of the way'" and without permission from the driver, the officer: (i) instructed the driver to turn off the ignition, exit the vehicle, and stand by the patrol car; and (ii) deployed a K-9 to circle the vehicle twice to sniff for drugs. 575 U.S. at 352. "[S]even or eight minutes had elapsed from the time [the officer] issued the written warning until the dog indicated the presence of drugs." 575 U.S. at 352. The Supreme Court rejected the United States Court of Appeals for the Eighth Circuit's conclusion that the seven- or eight-minute delay constituted an acceptable "*de minimis* intrusion on Rodriguez's personal liberty." 575 U.S. at 353. The Supreme Court concluded that the dog sniff, if performed without reasonable suspicion, measurably extended the detention and noted that

the officer's authority to detain the driver "end[ed] when tasks tied to the traffic infraction are -- or reasonably should have been -- completed." Rodriguez v. United States, 575 U.S. at 354. See United States v. Sharpe, 470 U.S. 675, 686 (1985)(stating that, in determining the reasonable duration of a stop, "it [is] appropriate to examine whether the police diligently pursued [the] investigation")(alterations added).

### 3.   Vehicle Searches.

While an automobile stop may be made based on reasonable suspicion that the driver has committed a crime, see United States v. Toro-Pelaez, 107 F.3d at 823-24, an officer must have probable cause to believe that the vehicle contains contraband or other evidence of criminality to execute an automobile search, see United States v. Forbes, 528 F.3d 1273, 1277-78 (10th Cir. 2008)("[T]he Fourth Amendment unquestionably prohibits the search of a vehicle's interior unless law enforcement officials receive consent, have a warrant, or otherwise establish probable cause to support the search."). Under the automobile-exception to the warrant requirement, however, a warrant is generally not required. See Maryland v. Dyson, 527 U.S. 465, 466-67 (1999); United States v. Burgess, 576 F.3d 1078, 1087 (10th Cir. 2009)(citing California v. Acevedo, 500 U.S. 565, 580 (1991)). The ongoing exigent circumstance that the vehicle might drive away has led the Supreme Court to conclude that a warrant is not required to search a vehicle. See Maryland v. Dyson, 527 U.S. at 466-67 ("[W]here there [is] probable cause to search a vehicle[,] a search is not unreasonable if based on facts that would justify the issuance of a warrant, even though a warrant has not been actually obtained.")(citing United States v. Ross, 456 U.S. 798, 809 (1982))(internal quotes omitted); California v. Carney, 471 U.S. 386, 393-94 (1985). Thus, as long as the investigating officer has probable cause to believe that the vehicle contains contraband

or evidence of criminality, he or she may search the vehicle without a search warrant.  See United States v. Sedillo, 2010 WL 965743, at *11.

    **4.**    **Consensual Searches.**

Searches conducted pursuant to consent constitute one exception to the Fourth Amendment's search-warrant and probable-cause requirements.  See Schneckloth v. Bustamonte, 412 U.S. 218, 219 (1973).  When an individual consents to a police search and the consent is "freely and voluntarily given," the search does not implicate the Fourth Amendment.  United States v. Peña, 143 F.3d 1363, 1366 (10th Cir. 1998)(quoting Schneckloth v. Bustamonte, 412 U.S. at 219).  The Tenth Circuit has provided a two-part test for determining voluntariness, which requires that: (i) the government "'proffer clear and positive testimony that consent was unequivocal and specific and intelligently given'"; and (ii) "the officers must have used no 'implied or express duress or coercion.'"  United States v. Sanchez, 608 F.3d 685, 690 (10th Cir. 2010)(quoting United States v. Taverna, 348 F.3d 873, 878 (10th Cir. 2003)).

Determining whether a party's consent was free and voluntary is a question of fact to be determined from the totality of the circumstances.  See United States v. Peña, 143 F.3d at 1366. The Supreme Court and the Tenth Circuit have developed a non-exhaustive list of factors that courts should consider when trying to determine whether a defendant's consent was voluntarily given:

> (i) the "threatening presence of several officers;" (ii) the "use of aggressive language or tone of voice indicating that compliance with an officer's request is compulsory," or, conversely, the "officer's pleasant manner and [ ] tone of voice;" (iii) the "prolonged retention of a person's personal effects such as identification," or, conversely, "the prompt return of the defendant's identification and papers;" (iv) the "absence of other members of the public," or, conversely, whether the stop occurs in "a public location such as 'the shoulder of an interstate highway, in public view;'" (v) the "officer's failure to advise the defendant that [he or] she is free to leave." United States v. Ledesma, 447 F.3d [1307,] 1314 [10th Cir. 1997)](citing

and quoting numerous sources).   Other factors include: (vi) "the display of a weapon, [and (vii)] physical touching by the officer."   United States v. Anderson, 114 F.3d 1059, 1064 (10th Cir. 1997).

United States v. Sedillo, No. CR 08-1419 JB, 2010 WL 965743, at *12 (D.N.M. Feb. 19, 2010) (Browning, J)(some alterations in original).  See United States v. Fox, 600 F.3d 1253, 1258 (10th Cir. 2010).  The inquiry is an objective one.  See United States v. Ringold, 335 F.3d 1168, 1172 (10th Cir. 2003).  "As long as a reasonable innocent person, as opposed to a person knowingly carrying contraband, would feel free to leave, such encounters are consensual and need not be supported by reasonable suspicion of criminal activity."  United States v. Laboy, 979 F.2d 795, 798 (10th Cir. 1992).

Because courts are required to look at the totality of the circumstances in determining whether an individual's consent was voluntary, see United States v. Peña, 143 F.3d at 1366, no one factor is dispositive in a court's inquiry into the circumstances.  For example, although an officer's failure to advise a defendant that he or she is free to leave might suggest in some circumstances that coercive law enforcement conduct caused the defendant's consent to search, the Supreme Court has ruled that officers do not need to advise an individual of his or her right to refuse to consent to a search for that individual's consent to be voluntary.  See Schneckloth v. Bustamonte, 412 U.S. at 232.  Moreover, the mere presence of officers near a building's exits, threatening no more than to question individuals if they seek to leave, "should not [result] in any reasonable apprehension by any [individuals] that they would be seized or detained in any meaningful way."  United States v. Drayton, 536 U.S. 194, 205 (2002)(internal citations omitted).  Additionally, an officer's display of a weapon may contribute to the coercive nature of a situation, but "[t]he presence of a holstered firearm . . . is unlikely to contribute to the coerciveness of the encounter absent active brandishing of the weapon."  United States v. Drayton, 536 U.S. at 205.

- 57 -

Accordingly, "it is only by analyzing all the circumstances of an individual consent that it can be ascertained whether in fact it was voluntary or coerced. It is this careful sifting of the unique facts and circumstances of each case that is evidenced in our prior decisions involving consent searches." Schneckloth v. Bustamonte, 412 U.S. at 232.

A suspect may give consent through conduct rather than words. "To satisfy the first prong of the voluntariness requirement, a defendant's consent must be clear, but it need not be verbal. Consent may instead be granted through gestures or other indications of acquiescence, so long as they are sufficiently comprehensible to a reasonable officer." United States v. Guerrero, 472 F.3d at 789-90. See Ysasi v. Brown, 3 F. Supp. 3d 1088, 1143 (D.N.M. 2014)(Browning, J.)(noting that consent "need not be spoken, but 'may instead be granted through gestures or other indications of acquiescence'"). For example, in United States v. Ringold, 335 F.3d 1168 (10th Cir. 2003), the Tenth Circuit held that an affirmative nod was sufficient to constitute consent. See 335 F.3d at 1175.

In United States v. Gordon, the suspect moved to suppress all physical evidence an officer seized from a locked duffel bag. See 173 F.3d at 765. The officer then asked to see the suspect's train passenger ticket and identification, inquired into his travel plans, and asked if he had any luggage. See 173 F.3d at 765. The officer did not inform the suspect that he was free to leave or not answer her questions. See 173 F.3d at 765. The officer asked to search the suspect's luggage and the suspect gave his consent. See 173 F.3d at 765. She asked him whether he had any contraband, informing him that contraband was the subject of her search. See 173 F.3d at 765. When the officer encountered the suspect's locked bag, she asked him if he could open it. See 173 F.3d at 765. Although the suspect did not respond verbally, he "removed the key from his pocket and handed it to [the officer]." 173 F.3d at 766. The Tenth Circuit concluded that the suspect's

"voluntary relinquishment of the key evidenced his consent to search the locked duffle bag." 173 F.3d at 765.

The Tenth Circuit proceeded to describe how the search of the locked bag, which was inside the suspect's other luggage, did not exceed the scope of the suspect's consent to search his luggage. See 173 F.3d at 766. The ultimate issue in determining the scope of consent is what a reasonable person would have understood the suspect's consent to include. See United States v. Wacker, 72 F.3d 1453, 1470 (10th Cir. 1995). The Tenth Circuit determines whether a search remains within the boundaries of the consent given based on the totality of the circumstances. See United States v. Sanchez, 89 F.3d 715, 719 (10th Cir. 1996). When an officer tells a suspect the object of his search and the suspect consents to a search for that object within a certain area, the Tenth Circuit has "consistently and repeatedly" held that the suspect thereby consents to a search of any area within the confines of the officer's request where the object may be found. United States v. Peña, 143 F.3d at 1368 (concluding that, "[b]ecause Peña consented to a search for drugs, he consented to a search of any area in the motel room where one might hide drugs"). See United States v. McRae, 81 F.3d 1528, 1538 (10th Cir. 1996)(holding that search did not exceed the scope of consent given when the suspect gave the officers consent to search his vehicle's trunk, and they found contraband when they lifted up the trunk's carpet); United States v. Wacker, 72 F.3d at 1470 (holding that, "where a suspect does not limit the scope of a search, . . . an officer is justified in searching the entire vehicle"); United States v. Santurio, 29 F.3d 550, 553 (10th Cir. 1994)(holding that the removal of "a few screws from the strip holding down the carpet which covered the metal compartment containing the packages of cocaine" did not exceed the scope of consent to search the car); United States v. Mains, 33 F.3d 1222, 1227 (10th Cir. 1994)(holding that, because the

defendant consented to a search of his apartment for another person, he consented to the search of any area large enough to accommodate that individual).

Notably, if the suspect fails to object to the officer's search, it indicates that "the search was within the scope of consent." United States v. Gordon, 173 F.3d at 766. See United States v. Sanchez, 89 F.3d at 719 (concluding that an officer's search of a suspect's car was valid when the suspect gave consent to search the car for weapons, but failed to object when the officer began to search the glove compartment and discovered narcotics). Accordingly, in United States v. Gordon, the Tenth Circuit found it "most significant[]" that Gordon did not object to a search of the locked bag when the officer discovered it within his larger bags. 173 F.3d at 766 (citing Florida v. Jimeno, 500 U.S. 248, 252 (1991)("A suspect may of course delimit as he chooses the scope of the search to which he consents.")). The Tenth Circuit emphasized: "We consistently and repeatedly have held a defendant's failure to limit the scope of a general authorization to search, and failure to object when the search exceeds what he later claims was a more limited consent, is an indication the search was within the scope of consent." 173 F.3d at 766.

### 5.      Probable Cause for Search Warrants.

"The Supreme Court requires that a magistrate judge be provided information sufficient to determine the existence of probable cause before he or she issues a warrant." United States v. Romero, 743 F. Supp. 2d 1281, 1302 (D.N.M. 2010)(Browning, J.)(citing Illinois v. Gates, 462 U.S. at 239), aff'd, 749 F.3d 900 (10th Cir. 2014). Probable cause requires "more than mere suspicion but less evidence than is necessary to convict." United States v. Burns, 624 F.2d 95, 99 (10th Cir. 1980). To establish probable cause to justify a search of a home, an affidavit in support of a search warrant "must contain facts sufficient to lead a prudent person to believe that a search would uncover contraband or evidence of criminal activity." United States v. Danhauer, 229 F.3d

at 1006.  "Probable cause undoubtedly requires a nexus between suspected criminal activity and

the place to be searched."  United States v. Corral-Corral, 899 F.2d 927, 937 (10th Cir. 1990).  The

task of the Magistrate Judge issuing the search warrant

> is simply to make a practical, common-sense decision whether, given all the
> circumstances set forth in the affidavit before him, including the veracity and basis
> of knowledge of persons supplying hearsay information, there is a fair probability
> that contraband or evidence of a crime will be found in a particular place.

United States v. Reed, 195 F. App'x 815, 821 (10th Cir. 2006)(unpublished)(internal quotation

marks omitted)(quoting Illinois v. Gates, 462 U.S. at 238).  See United States v. Glover, 104 F.3d

1570, 1578 (10th Cir. 1997)(concluding that, in determining whether an affidavit supports a

finding of probable cause, the court must review the affidavit as a whole and look to the totality of

the information contained therein), abrogated on other grounds by Corley v. United States, 556

U.S. 303 (2009).  In making his or her determination, the Magistrate Judge "may draw reasonable

inferences from the material provided in the warrant application."  United States v. Rowland, 145

F.3d at 1205.

     "A reviewing court should accord great deference to a magistrate's determination of

probable cause . . . ."  United States v. Reed, 195 F. App'x at 822.  The court's duty is "simply to

ensure that the magistrate had a 'substantial basis for . . . conclud[ing]' that probable cause

existed."  Illinois v. Gates, 462 U.S. at 238-39 (alteration in original)(quoting Jones v. United

States, 362 U.S. at 271).  This deference is appropriate to further the Fourth Amendment's strong

preference for warrants.  See Massachusetts v. Upton, 466 U.S. 727, 733 (1984); Aguilar v. Texas,

378 U.S. 108, 110-11 (1964)("An evaluation of the constitutionality of a search warrant should

begin with the rule 'that the informed and deliberate determinations of magistrates empowered to

issue warrants . . . are to be preferred over the hurried action of officers . . . .'"  (quoting United

States v. Lefkowitz, 285 U.S. 452, 464 (1932)), abrogated on other grounds by Illinois v. Gates, 462 U.S. 213.  Because of the strong preference for warrants, "in a doubtful or marginal case a search under a warrant may be sustainable where without one it would fall."  United States v. Ventresca, 380 U.S. at 106.

"The deference accorded a magistrate judge's probable cause determination, however, is not boundless."  United States v. Alabi, 943 F. Supp. 2d at 1253-54 (citing United States v. Leon, 468 U.S. 897, 914 (1984)).  "The court should not defer to a magistrate judge's probable-cause determination where there is no substantial basis for concluding that the affidavit in support of the warrant established probable cause."  United States v. Sedillo, 297 F. Supp. 3d 1155, 1180 (D.N.M. 2017)(Browning, J.)(citing United States v. Danhauer, 229 F.3d at 1006).  Specifically, the court should not defer to a Magistrate Judge's "probable cause determination if it is a mere ratification of the bare conclusions or 'hunches' of others or where it involves an improper analysis of the totality of the circumstances."  United States v. Reed, 195 F. App'x at 822 (citing United States v. Leon, 468 U.S. at 915; Massachusetts v. Upton, 466 U.S. 727, 734 (1984); Illinois v. Gates, 462 U.S. at 239).

### 6.  **Inventory Searches**.

An inventory search undertaken pursuant to impoundment or the authority to impound "constitutes a well-defined exception to the warrant requirement."  Illinois v. Lafayette, 462 U.S. 640, 643 (1983).  See South Dakota v. Opperman, 428 U.S. 364, 372 (1976).  Discussing the relationship between probable cause and inventory searches in its opinion in United States v. Griffin, 729 F.2d 475 (7th Cir. 1984), the United States Court of Appeals for the Seventh Circuit stated:

> In applying the reasonableness standard adopted by the Framers, [the] Court has consistently sustained police intrusions into automobiles impounded or otherwise in lawful police custody where the process is aimed at securing or protecting the car and its contents.  Thus, the justification for an inventory search does not rest on probable cause and the absence of a warrant is immaterial to the reasonableness of the search.

729 F.2d at 481 (citations omitted)(internal quotation marks omitted)(quoting Illinois v. Lafayette, 462 U.S. at 643).  "The policies behind the warrant requirement are not implicated in an inventory search."  Colorado v. Bertine, 479 U.S. 367, 371 (1987)(citing South Dakota v. Opperman, 428 U.S. at 370 n.5).  Inventory searches developed in response to three needs: (i) the need to protect the owner's property while it remains in police custody; (ii) the need to protect the police against claims or disputes over lost, stolen, or vandalized property; and (iii) the need to protect the police from danger.  See South Dakota v. Opperman, 428 U.S. at 369.  Inventory searches are allowed to insure against claims of lost, stolen, or vandalized property, and to guard the police from danger. See Florida v. Wells, 495 U.S. 1, 2 (1990)(citing South Dakota v. Opperman, 428 U.S. at 369)

A warrantless inventory search is proper when the search is conducted pursuant to standard police procedures for the purpose of protecting the car and its contents.  See United States v. Maraga, 76 F. App'x 223, 228 (10th Cir. 2003)(unpublished)("An impoundment must either be supported by probable cause, or be consistent with the police role as 'caretaker' of the streets and completely unrelated to an ongoing criminal investigation."); United States v. Lugo, 978 F.2d 631, 636 (10th Cir. 1992)("When the police acquire temporary custody of a vehicle, a warrantless inventory search of the vehicle does not offend Fourth Amendment principles so long as the search is made pursuant to 'standard police procedures' and for the purpose of 'protecting the car and its contents.'")(quoting South Dakota v. Opperman, 428 U.S. at 372));.  "The policy or practice governing inventory searches should be designed to produce an inventory." Florida v. Wells, 495 U.S. at 4 (citing Colorado v. Bertine, 479 U.S. at 376).  "[I]n forbidding uncanalized discretion to police officers conducting inventory searches, there is no reason to insist that they be conducted in a totally mechanical 'all or nothing' fashion."  Florida v. Wells, 495 U.S. at 4.  A court can consider an officer's testimony regarding the procedures and the purpose of the search as evidence. See United States v. Lugo, 978 F.2d at 637.  A written policy concerning inventory searches is not necessary; an oral policy is sufficient to meet the standard procedure test that the Tenth Circuit articulated in United States v. Lugo.  See Molina v. Spanos, 208 F.3d 226, 1999 WL 626126, at *9 (10th Cir. 1999)(unpublished table decision); United States v. Jacquez, 409 F.Supp.2d 1286, 1298 (D.N.M. 2005)(Browning, J.)("Although there may not be a written policy concerning inventory searches, including inventory searches of unlocked containers, an oral policy is sufficient to meet the standard procedure test articulated in United States v. Lugo.").

64

If an inventory search is conducted pursuant to department policy, to find the inventory search unconstitutional, the officers must have acted out of bad faith, for the sole purpose of investigation.  See Colorado v. Bertine, 479 U.S. at 371 ("[T]here was no showing that the police, who were following standardized procedures, acted in bad faith or for the sole purpose of investigation."); United States v. Moraga, 76 F. App'x 223, 228 (10th Cir. 2003)("Inventory searches must be conducted according to standardized procedures, and the police must act in good faith and cannot search for the sole purpose of investigation.").  Inventory searches, however, "must not be a ruse for a general rummaging in order to discover incriminating evidence."  United States v. Martinez, 512 F.3d 1268, 1274 (10th Cir. 2008)(quoting Florida v. Wells, 495 U.S. at 4)(internal quotation marks omitted).  See United States v. Tueller, 349 F.3d 1239, 1243 (10th Cir. 2003).  If a police officer performs an inventory search of a vehicle before ultimately deciding not to have it towed, a court must determine "whether at the time of the inventory search [the officer] reasonably believed that the car would be towed."  United States v. Henderson, 61 F.3d 906, 1995 WL 431397, at *3 (7th Cir. 1995)(before Posner, C.J., Cummings, J., and Ripple, J.)(unpublished table decision).

## LAW REGARDING FOURTH AMENDMENT SEIZURES

For purposes of analyzing Fourth Amendment seizures, the Tenth Circuit has divided interactions between police and citizens into three categories: (i) consensual encounters; (ii) investigative stops; and (iii) arrests.  See Oliver v. Woods, 209 F.3d 1179, 1186 (10th Cir. 2000).  See also Dorato v. Smith, 108 F. Supp. 3d 1064, 1118 (D.N.M. 2015)(Browning, J.)(noting that investigative stops are seizures); United States v. Young, 347 F. Supp. 3d 747, 770 (D.N.M. 2018)(Browning, J.)(describing an arrest as a seizure).  "A police officer may seize someone either by physical force or a show of authority."  United States v.

Roberson, 864 F.3d 1118, 1121 (10th Cir. 2017)(citing United States v. Salazar, 609 F.3d 1059, 1064 (10th Cir. 2010)).  "[W]hen an officer does not apply physical force to restrain a subject, a Fourth Amendment seizure occurs only if (a) the officer shows his authority; and (b) the citizen 'submits to the assertion of authority.'"  United States v. Salazar, 609 F.3d at 1064 (quoting California v. Hodari D., 499 U.S. 621, 626 (1991)).  "'[T]he test for existence of a show of authority is an objective one: not whether the citizen perceived that he was being ordered to restrict his movement, but whether the officer's words and actions would have conveyed that to a reasonable person.'"  United States v. Salazar, 609 F.3d at 1064 (quoting California v. Hodari D., 499 U.S. at 628).  "If a reasonable person would feel free to terminate the encounter, then he or she has not been seized." United States v. Ojeda-Ramos, 455 F.3d 1178, 1183 (10th Cir. 2006)(quoting United States v. Drayton, 536 U.S. 194, 201 (2002)).  See California v. Hodari D., 499 U.S. at 627-28 ("[A] person has been 'seized' within the meaning of the Fourth Amendment only if, in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." (quoting United States v. Mendenhall, 446 U.S. 544, 554 (1980))).  The standard for submission is also objective, see United States v. Salazar, 609 F.3d at 1064 (citing United States v. Cardoza, 129 F.3d 6, 14 n.4 (1st Cir. 1997)), but "[s]ubmission 'requires, at minimum, that a suspect manifest compliance with police orders,'" United States v. Roberson, 864 F.3d at 1122 (quoting United States v. Mosley, 743 F.3d 1317, 1326 (10th Cir. 2014)).

### 1.   **Consensual Encounters.**

A consensual encounter occurs when a police officer approaches a person to ask questions under circumstances where a reasonable person would feel free to refuse to answer and to end the encounter.  See Oliver v. Woods, 209 F.3d at 1186.  For example, officers generally may "go to a

person's home to interview him."  United States v. Daoust, 916 F.2d 757, 758 (1st Cir. 1990).  "It

is not improper for a police officer to call at a particular house and seek admission for the purpose

of investigating a complaint or conducting other official business," 1 Wayne LaFave, Search and

Seizure: A Treatise on the Fourth Amendment § 2.3(b), at 475 (3d ed. 1996).

    **2.**    **Investigative Stops.**

    In United States v. King, 990 F.2d 1552 (10th Cir. 1993), the Tenth Circuit noted: "Terry

was the first case to recognize that 'the Fourth Amendment governs 'seizures' of the person  . . .

[other than] arrests' and created a 'narrowly drawn' exception to the probable cause requirement

for lesser government intrusions into an individual's liberty."  United States v. King, 990 F.2d at

1557 (first quoting Terry v. Ohio, 392 U.S. 1, 16 (1968); and then quoting Terry v. Ohio, 392 U.S.

at 27).  The Tenth Circuit has recognized that, in Terry v. Ohio, the Supreme Court identified two

police actions: (i) an investigative detention -- a "stop"; and (ii) a protective search -- a "frisk."

United States v. King, 990 F.2d at 1557 (citing United States v. Sokolow, 490 U.S. 1, 7 (1989);

Adams v. Williams, 407 U.S. 143, 147-48 (1972)).  The Tenth Circuit explained:

> Terry has come to stand for two distinct propositions -- an investigative detention
> ("stop") in which a police officer, for the purpose of investigation, may briefly
> detain a person on less than probable cause,  . . . and a protective search ("frisk")
> which permits an officer, in the course of an investigative detention, to conduct a
> limited search for weapons for his or her own protection.

United States v. King, 990 F.2d at 1557.  When evaluating either of these actions, a court asks

whether the action was reasonable under the Fourth Amendment.  See United States v. Wilson, 96

F. App'x 640, 643 (10th Cir. 2004); United States v. King, 990 F.2d at 1557.

    **a.**    **Investigative Detentions and Reasonable Suspicion.**

    A police-citizen encounter that is not consensual may be a constitutional investigative

detention.  See Dorato v. Smith, 108 F. Supp. 3d at 1118.  An investigative detention occurs when an officer stops and briefly detains a person "in order to determine his identity or to maintain the status quo momentarily while obtaining more information."  Oliver v. Woods, 209 F.3d at 1186 (quoting Adams v. Williams, 407 U.S. at 146).  Such brief investigative detentions must meet two distinct requirements to be "reasonable" under the Fourth Amendment.  Dorato v. Smith, 108 F. Supp. 3d at 1118.  First, the officer "must have a particularized and objective basis for suspecting the particular person stopped of criminal activity."  Oliver v. Woods, 209 F.3d at 1186 (quoting United States v. Cortez, 449 U.S. 411, 417-18 (1981)).  Second, the investigative detention that follows the stop must be "reasonably related in scope to the circumstances" which justified the stop in the first place, Terry v. Ohio, 392 U.S. at 20, because the Fourth Amendment imposes "limitations on both the length of the detention and the manner in which it is carried out," United States v. Holt, 264 F.3d 1215, 1229 (10th Cir. 2001).

"For reasonable suspicion to exist, an officer 'need not rule out the possibility of innocent conduct'; he or she simply must possess 'some minimal level of objective justification' for making the stop."  United States v. Winder, 557 F.3d 1129, 1134 (10th Cir. 2009)(quoting United States v. Vercher, 358 F.3d 1257, 1261 (10th Cir. 2004)).  Information "falling 'considerably short' of a preponderance standard" will meet the standard for reasonable suspicion.  United States v. Winder, 557 F.3d at 1134 (quoting United States v. Arvizu, 534 U.S. 266, 274 (2002)).  See Illinois v. Wardlow, 528 U.S. 119, 123 (2000)(noting that "'reasonable suspicion' is a less demanding standard than probable cause and requires a showing considerably less than preponderance of the evidence").

In United States v. Johnson, 364 F.3d 1185 (10th Cir. 2004), the Tenth Circuit held that an

officer had reasonable suspicion to continue questioning and to frisk a suspect after: (i) the officer had responded to a call from a citizen who gave his telephone number, and gave a detailed and accurate description of possible criminal activity and of the suspect; (ii) the contact occurred in Albuquerque's highest-crime area; and (iii) the suspect displayed nervous behavior.  See 364 F.3d at 1194.  The Tenth Circuit noted that the officer's experience and training allowed him to make inferences, based on a combination of the surrounding circumstances, that criminal activity was afoot.  See 364 F.3d at 1194 ("His suspicions were particularized to [the suspect], and were based on how his training and experience taught him to interpret a number of objectively reasonable details.").  While many of the factors that the Tenth Circuit considered would not, without more, have given rise to reasonable suspicion, the combination of circumstances was sufficient.  See 364 F.3d at 1193 (noting that the district court had erred, because "[a]ll of these factors, mitigating and aggravating, should have been analyzed as part of the totality of the circumstances faced by [the officer] at the inception of the detention").

In United States v. Ceballos, 355 F. App'x 226 (10th Cir. 2009)(unpublished), the police officer observed a young girl walking down the street at night.  See 355 F. App'x at 227-28.  A truck pulled alongside the girl, the driver of the truck and the girl spoke briefly, then the truck drove ahead, and the girl continued on her walk.  See 355 F. App'x at 228.  Rather than leave, however, the truck drove ahead and parked with its lights off at a dark spot on the road by which the girl would have to walk.  See 355 F. App'x at 228.  The officer spoke to the girl, who seemed unconcerned and told him that the man in the truck had asked only if she needed a ride; she had refused.  See 355 F. App'x at 228.  Not investigating any particular crime or suspected crime, and admittedly acting on a "hunch," the officer turned on his emergency lights and pulled behind the

truck.   355 F. App'x at 228, 229.   Upon talking to the truck's driver, Ceballos, the officer

discovered that Ceballos' breath smelled of alcohol, that he did not have a driver's license, and

that he had a gun and other items in his vehicle.   See 355 F. App'x at 227-29.  The Tenth Circuit

concluded that the facts available to the officer would have led a reasonable officer to conclude

that reasonable suspicion existed and that the officer's "subjective characterization of his actions

is irrelevant."  355 F. App'x at 229.  The Tenth Circuit explained, in an opinion that the Honorable

Michael R. Murphy, now-Senior United States Circuit Judge for the Tenth Circuit, wrote and the

Honorable Mary Beck Briscoe, now-Senior United States Circuit Judge for the Tenth Circuit, and

the Honorable Robert H. McWilliams, the late United States Circuit Judge for the Tenth Circuit,

joined:

> A review of the totality of the circumstances shows Gallegos was not acting on an unparticularized hunch; during his testimony he articulated specific facts that caused him to suspect Ceballos intended to assault or abduct the teenage pedestrian. Specifically, at the time Gallegos initiated the traffic stop, he had observed Ceballos slow his vehicle as he passed a teenage girl walking alone late at night.  He then observed Ceballos alter his route by making a U-turn and following the girl down a narrow, nearly deserted residential street.  Ceballos pulled alongside the girl, who he did not know, and asked her if she wanted a ride.  She refused, telling him she lived up the street.  Ceballos then drove further down the road, pulled into a driveway as if to turn around and return to the main road, but instead backed out and drove a few feet further east, in the same direction the girl was walking.  He parked in a dark location and turned off his lights.
>
> . . . .
>
> We agree with the Government that Officer Gallegos had reasonable suspicion to stop and detain Ceballos.  Ceballos showed an interest in a teenage girl he did not know, to the point that he changed his route to follow her down a dark street, offered her a ride, and then parked where the girl would be required to walk past him as she continued to her home.  The facts found by the district court, viewed in totality, amply support the constitutionality of the investigative detention.

355 F. App'x at 229.  The Tenth Circuit did not require the officer to identify the particular crime

of which the officer had reasonable suspicion or even to acknowledge having reasonable suspicion. See 355 F. App'x at 229.  The Tenth Circuit was content to find that a reasonable officer would have reasonable suspicion that "Ceballos intended to assault or abduct the teenage pedestrian." 355 F. App'x at 229.  The Tenth Circuit demanded only that an officer have facts from which a reasonable officer could form a reasonable suspicion that criminal conduct was occurring or was about to occur.  See 355 F. App'x at 229.

In United States v. Aragones, 483 F. App'x 415 (10th Cir. 2012)(unpublished), the Tenth Circuit found reasonable suspicion based upon an officer's knowledge of the defendant's

> (1) gang tattoo; (2) presence in a high crime area; (3) abrupt move away from the officer as soon as [the defendant] saw [the officer]; (4) glancing about in a manner consistent with an attempt to find a route to flee; and, (5) approach to [a private] home's back door without conversing with the residents visible inside.

483 F. App'x at 417.  At the district court level, in ruling on the motion to suppress, the Honorable Martha A. Vázquez, now-Senior United States District Court Judge for the District of New Mexico, had concluded that, because the defendant's conduct in standing outside a private residence and looking in was "'consistent with the most benign of conduct, including a visit to a friend's house or calling upon a neighbor for assistance,'" and that the officer did not have reasonable suspicion at the time of the stop and should have waited longer to rule out innocent conduct.  483 F. App'x at 418 (quoting United States v. Aragones, No. CR 10-2453 MV, 2011 WL 13174481, at *19 (D.N.M. June 10, 2011)(Vázquez, J.)).  The Tenth Circuit disagreed, however, stating: "The problem is that conduct giving rise to reasonable suspicion sufficient to support an investigative detention can be -- and often is -- consistent with innocent behavior."  United States v. Aragones, 483 F. App'x at 418.  The Tenth Circuit noted that, moreover, the defendant's conduct was not necessarily innocent,

because an Albuquerque public ordinance prohibits "[e]ntering upon any private property and looking into any occupied dwelling without the consent of the occupant or owner of the dwelling." 483 F. App'x at 417 (quoting Albuquerque, N.M., Ordinance § 12-2-21(B)).  The Tenth Circuit, thus, reversed Judge Vázquez' decision, disagreeing with her conclusion that the officer lacked reasonable suspicion of unlawful activity, and concluded that "a reasonable officer could have suspected that [the defendant] wasn't a welcome guest and did not have consent to look into the home."  483 F. App'x at 417.

> **b.    Frisks.**

A "frisk" is "a protective search  . . .  which permits an officer, in the course of an investigative detention, to conduct a limited search for weapons for his or her own protection." United States v. King, 990 F.2d at 1557 (citing Adams v. Williams, 407 U.S. at 147-48)).  An officer may "stop and frisk" an individual under the Fourth Amendment if a reasonably prudent person "in the circumstances would be warranted in the belief that his safety or that of others was in danger." Terry v. Ohio, 392 U.S. at 27.  "The officer need not be absolutely certain that the individual is armed; the issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger." Terry v. Ohio, 392 U.S. at 27.  A frisk "must  . . .  be confined in scope to an intrusion reasonably designed to discover guns, knives, clubs, or other hidden instruments for the assault of the police officer." Terry v. Ohio, 392 U.S. at 29.  In evaluating the validity of the stop-and-frisk, a court should consider the totality of the circumstances.  See Florida v. Bostick, 501 U.S. 429, 436 (1991).

> **c.    Traffic Stops.**

"'A traffic stop is a seizure within the meaning of the Fourth Amendment  . . . .'" United

States v. Holt, 264 F.3d at 1220 (quoting United States v. Hunnicutt, 135 F.3d 1345, 1348 (10th Cir. 1998)).  "'For the duration of a traffic stop, . . . a police officer effectively seizes everyone in the vehicle, the driver and all passengers.'"  United States v. White, 584 F.3d 935, 945 (10th Cir. 2009)(quoting Arizona v. Johnson, 555 U.S. 323, 327 (2009)).  "This seizure implicates a passenger's Fourth Amendment interests to the same degree as the driver's."  United States v. Wilson, 96 F. App'x at 643 (citing United States v. Erwin, 875 F.2d 268, 270 (10th Cir. 1989)). "Therefore, both the driver and passenger have standing to challenge the constitutionality of the initial stop." United States v. White, 584 F.3d at 945.  See United States v. Wilson, 96 F. App'x at 643 ("Wilson does not assert any such interest in the truck or its contents[;] [n]evertheless, Wilson may, as he does here, 'contest the lawfulness of his own detention and seek to suppress evidence found in the vehicle as the fruit of the illegal detention.'" (quoting United States v. Nava-Ramirez, 210 F.3d at 1131; and citing United States v. Gama-Bastidas, 142 F.3d 1233, 1239 (10th Cir. 1998); United States v. Shareef, 100 F.3d 1491, 1500 (10th Cir. 1996))).  The Tenth Circuit "reject[s] any notion that a vehicular stop detains for Fourth Amendment purposes only the driver simply because the passenger may be free to depart."  United States v. Erwin, 875 F.2d at 270.

The Terry v. Ohio framework applies whether the traffic stop is based on probable cause or reasonable suspicion.  See United States v. Holt, 264 F.3d at 1230.  "[B]ecause 'the ultimate touchstone of the Fourth Amendment is reasonableness,'" Kentucky v. King, 563 U.S. 452, 459 (2011)(quoting Brigham City v. Stuart, 547 U.S. at 403), courts

> assess the reasonableness of a routine traffic stop under the principles laid out for investigative detentions in Terry v. Ohio, 392 U.S. 1 (1968), considering "whether the officer's action was justified at its inception, and whether it was reasonably related in scope to the circumstances which justified the interference in the first

place."

United States v. Wilson, 96 F. App'x at 643 (quoting United States v. Holt, 264 F.3d at 1220).  A

court must examine "both the length of the detention and the manner in which it is carried out,"

United States v. Holt, 264 F.3d at 1230, "keeping in mind that an officer may extend the duration

and scope of the initial detention based on 'an objectively reasonable and articulable suspicion that

illegal activity has occurred or is occurring,'" United States v. Wilson, 96 F. App'x at 643 (quoting

United States v. Caro, 248 F.3d 1240, 1244 (10th Cir. 2001)).  "When the stop is extended based

on reasonable suspicion, the further detention must, like the original traffic stop, 'be temporary,

lasting no longer than necessary to effectuate the purpose of the [further detention], and the scope

of the [further] detention must be carefully tailored to its underlying justification.'"  United States

v. Wilson, 96 F. App'x at 644 (alterations in original)(quoting United States v. Wood, 106 F.3d

942, 945 (10th Cir. 1997)).  "A traffic stop is justified at its inception if an officer has . . .

reasonable articulable suspicion that a particular motorist has violated any of the traffic . . .

regulations of the jurisdiction."  United States v. Winder, 557 F.3d at 1134.

**3.**     **Arrests.**

An arrest is a seizure that is "characterized by highly intrusive or lengthy search or

detention," Oliver v. Woods, 209 F.3d at 1186 (quoting United States v. Cooper, 733 F.2d 1360,

1363 (10th Cir. 1984)); a police-citizen encounter that goes beyond the limits of a stop under Terry

v. Ohio is an arrest, see United States v. Perdue, 8 F.3d 1455, 1462 (10th Cir. 1993)("An encounter

between police and an individual which goes beyond the limits of a Terry stop, however, may be

constitutionally justified only by probable cause or consent.").  The general rule is that "the use of

firearms, handcuffs, and other forceful techniques" is sufficiently intrusive to signal that a person

has been placed under arrest.[7]  United States v. Melendez-Garcia, 28 F.3d 1046, 1052-53 (10th Cir. 1994).  See Florida v. Royer, 460 U.S. 491, 499 (1983).

"Inasmuch as an arrest exceeds an investigative stop's limited scope or duration, it must be supported by probable cause."  United States v. Rodriguez, 836 F. Supp. 2d 1258, 1288 (D.N.M. 2011)(Browning, J.).     See  Wilson  v.  Jara,  866  F. Supp. 2d  1270,  1292  (D.N.M. 2011)(Browning, J.)("Probable cause must support an arrest, 'characterized by highly intrusive or lengthy  search  or  detention.'"  (quoting  Oliver v. Woods,  209 F.3d at 1185)),  aff'd,  512 F. App'x 841 (10th Cir. 2013)(unpublished).  "Probable cause to arrest exists only when the 'facts and circumstances within the officers' knowledge, and of which they have reasonably trustworthy information, are sufficient in themselves to warrant a man of reasonable caution in the belief that an offense has been or is being committed.'"  United States v. Valenzuela, 365 F.3d 892, 896-97 (10th Cir. 2004)(quoting United States v. Edwards, 242 F.3d 928, 934 (10th Cir. 2001); and citing Draper v. United States, 358 U.S. 307, 313 (1959)).  Although "[p]robable cause does not require facts sufficient for a finding of guilt  . . . , it does require 'more than mere suspicion.'"  United States v. Morris, 247 F.3d 1080, 1088 (10th Cir. 2001)(quoting United States v. Vazquez-Pulido, 155 F.3d 1213, 1216 (10th Cir. 1998)).  The Supreme Court has made the following distinction between reasonable suspicion, which is sufficient for an investigatory stop under Terry v. Ohio,

---

[7]The use of handcuffs, however, does not always elevate a detention into an arrest. See United States v. Albert, 579 F.3d 1188, 1195 (10th Cir. 2009)("[W]e have approved the use of handcuffs in the context of a Terry stop."); Pierre-Louis v. Schake, No. CIV 12-0527 JB/RHS, 2014 WL 1954783, at *44-49 (D.N.M. April 30, 2014)(Browning, J.)(concluding that the defendant police officer acted reasonably in handcuffing the plaintiff, whom he suspected had recently assaulted a person on the side of the road by threatening him with a gun); United States v. Reyes-Vencomo, 866 F. Supp. 2d 1304, 1330 (D.N.M. 2012)(Browning J.)("The use of handcuffs  . . .  does not always elevate a detention into an arrest.").

and probable cause, which is required before an arrest can be made:

> Reasonable suspicion is a less demanding standard than probable cause not only in the sense that reasonable suspicion can be established with information that is different in quantity or content than that required to establish probable cause, but also in the sense that reasonable suspicion can arise from information that is less reliable than that required to show probable cause.

Alabama v. White, 496 U.S. 325, 330 (1990).

Probable cause is measured against an objective standard.  See Beck v. Ohio, 379 U.S. 89, 96 (1964).  "The subjective belief of an individual officer as to whether there was probable cause for making an arrest is not dispositive."  United States v. Valenzuela, 365 F.3d at 896-97 (citing Florida v. Royer, 460 U.S. at 507; United States. v. Treto-Haro, 287 F.3d 1000, 1006 (10th Cir. 2002)).  Thus, the primary consideration is "whether a reasonable officer would have believed that probable cause existed to arrest the defendant based on the 'information possessed by the [arresting] offic[er].'"  Olsen v. Layton Hills Mall, 312 F.3d 1304, 1312 (10th Cir. 2002)(alterations in Olsen v. Layton Hills Mall)(quoting Romero v. Fay, 45 F.3d 1472, 1476 (10th Cir. 1995)).

### a.  **When a Detention Becomes an Arrest.**

The Tenth Circuit has held that a police-citizen encounter which goes beyond an investigative stop's limits is an arrest that probable cause or consent must support to be valid.  See United States v. Perdue, 8 F.3d at 1462 ("An encounter between police and an individual which goes beyond the limits of a Terry stop, however, may be constitutionally justified only by probable cause or consent.").  "Terry stops must be limited in scope to the justification for the stop . . . [and] the intrusiveness of a search or seizure will be upheld if it was reasonable under the totality of the circumstances."  United States v. Perdue, 8 F.3d at 1462.  "The government has the burden of

demonstrating 'that the seizure it seeks to justify on the basis of a reasonable suspicion was sufficiently limited in scope and duration to satisfy the conditions of an investigative seizure.'" United States v. Perdue, 8 F.3d at 1462 (quoting Florida v. Royer, 460 U.S. at 500).

This Court has also engaged in the balancing act of deciding when a detention becomes an arrest. In United States v. Perea, 374 F. Supp. 2d 961 (D.N.M. 2005)(Browning, J.), aff'd sub nom. United States v. Burciaga-Burciaga, 147 F. App'x 725 (10th Cir. 2005)(unpublished), the Court had to determine whether the police transformed the investigative detention into an arrest by drawing their weapons on the suspect, handcuffing him, and placing him in the back of a police car. See United States v. Perea, 374 F. Supp. 2d at 976. In that case, the Court determined that such measures were appropriate and did not elevate the investigative detention to the level of an arrest. See 374 F. Supp. 2d at 976. The Court recognized that, "[i]n 'most scenarios,' when officers effectuate what would otherwise be considered a Terry stop by pointing guns at a suspect, that stop is elevated to an arrest, which requires probable cause." 374 F. Supp. 2d at 974 (quoting United States v. Perdue, at 1463). See United States v. Burciaga-Burciaga, 147 F. App'x at 730 (affirming the Court's determination in United States v. Perea that the officers had reasonable suspicion to believe that the suspect might be armed and dangerous, justifying the officers' use of firearms and not transforming the vehicle stop into a formal arrest requiring probable cause); United States v. Gama-Bastidas, 142 F.3d at 1240 ("[T]he use of firearms, handcuffs, and other forceful techniques are justified only by probable cause or when 'the circumstances reasonably warrant such measures.'" (quoting United States v. Perdue, 8 F.3d at 1462)).

There "exist[s], however, a limited set of circumstances in which officers may draw their guns at a suspect without transforming the stop into an arrest. 'The use of guns in connection with

a stop is permissible where the police reasonably believe the weapons are necessary for their protection.'" United States v. Perea, 374 F. Supp. 2d at 974 (quoting United States v. Perdue, at 1462).   See United States v. Merkley, 988 F.2d 1062, 1064 (10th Cir. 1993)(upholding reasonableness of stop when officers detained the defendant at gunpoint, and placed him in handcuffs where suspect had threatened to kill someone and was pounding interior of truck with his fists); United States v. Lechuga, 925 F.2d 1035, 1040 (7th Cir. 1991)(holding that the officer's "drawing his gun but keeping it pointed to the street" was not "unreasonably intrusive"); United States v. Alexander, 907 F.2d 269, 272-73 (2d Cir. 1990)(holding that the law enforcement officers did not convert the stop into an arrest by "unholstering their guns and frisking" the defendant when they suspected that the defendant had "just completed a narcotics purchase," there were a number of "innocent bystanders on the crowded city street," and stopping a vehicle "is especially hazardous and supports the need for added safeguards").   Similarly, there are circumstances in which a seizure is not an arrest merely because the subject of the detention is placed in handcuffs. See United States v. Merkley, 988 F.2d at 1064; United States v. Miller, 974 F.2d 953, 957 (8th Cir. 1992)("Numerous cases have held that a police officer's use of handcuffs can be a reasonable precaution during a Terry stop."); United States v. Hastamorir, 881 F.2d 1551, 1557 (11th Cir. 1989)("The handcuffing of Hastamorir constituted a Terry stop, and was a reasonable action designed to provide for the safety of the agents.").   United States v. Perea was one of those unique cases, because the police had reasonable cause to believe that the person whom they were detaining was the suspect whom they sought to arrest -- a man wanted for murder who, it was believed, might be armed and dangerous.  See 374 F. Supp. 2d at 976.  The Tenth Circuit affirmed the Court's

determination that the stop was not an arrest:

> The officers' conduct during the felony stop was appropriate in relation to the perceived threat.  The measures taken during a *Terry* stop must be "reasonably related in scope to the circumstances which justified the interference in the first place" and may not go beyond what is necessary for officer safety.  *United States v. King*, 990 F.2d 1552, 1563 (10th Cir. 1993)(quoting *Terry v. Ohio*, 392 U.S. 1, 20 . . . (1968)).  The felony stop was justified by suspicion that someone in the Escalade might have a gun, or at least was dangerous.  The officers displayed their weapons only as long as necessary to ensure that the vehicle and its occupants posed no threat.  The officers put their guns away as soon as they handcuffed Mr. Burciaga, placed him in the back of a police car, and confirmed that no one else was in the car.

United States v. Burciaga-Burciaga, 147 F. App'x at 730.

### b.   Officers Have a Duty to Investigate Easily Accessible Evidence Before Making an Arrest.

"[T]he Fourth Amendment requires officers to reasonably interview witnesses readily available at the scene, investigate basic evidence, or otherwise inquire if a crime has been committed at all before invoking the power of warrantless arrest and detention." Romero v. Fay, 45 F.3d at 1476-77.  Police officers "may not ignore easily accessible evidence and thereby delegate their duty to investigate [to others]." Baptiste v. J.C. Penney Co., 147 F.3d 1252, 1259 (10th Cir. 1998).  However, "[o]nce probable cause is established, an officer is not required to continue to investigate for exculpatory evidence before arresting a suspect." Garcia v. Casuas, No. CIV 11-0011 JB/RHS, 2011 WL 7444745, at *49 (D.N.M. Dec. 8, 2011)(Browning, J.)(citing Cortez v. McCauley, 478 F.3d 1108, 1121 n.18 (10th Cir. 2007)).

In Romero v. Fay, the Tenth Circuit confronted the issue of when an officer must conduct further investigation before arresting an individual.  In that case, law enforcement officers interviewed two individuals -- Stella Gutierrez and Manuel Duran -- who implicated the plaintiff

in a murder.  See 45 F.3d at 1474.  Approximately four hours later, without conducting additional investigation or obtaining a warrant, an officer arrested the plaintiff for murder.  See 45 F.3d at 1474.  After he was taken into custody, the plaintiff told the officer that he was innocent and that he had an alibi.  See 45 F.3d at 1474.  The plaintiff stated that three individuals would establish that he was asleep at home when the murder occurred.  See 45 F.3d at 1474.  The officer refused the plaintiff's offer of names of alibi witnesses and said that the witnesses "were of little significance because they would lie to protect" the plaintiff.  45 F.3d at 1474.  The officer never interviewed the alibi witnesses.  See 45 F.3d at 1474.  The plaintiff was incarcerated for three months before the government dismissed the case and he was released.  See 45 F.3d at 1474.

The plaintiff brought a 42 U.S.C. § 1983 action for, among other things, violations of his Fourth Amendment rights.  See Romero v. Fay, 45 F.3d at 1474.  The plaintiff argued that, regardless whether the officers' interviews of Gutierrez and of Duran established probable cause, under clearly established law, a reasonable officer would have investigated his alibi witnesses before arresting him.  See 45 F.3d at 1476.  The Tenth Circuit disagreed, in an opinion that the Honorable Bobby R. Baldock, now-Senior United States Circuit Judge for the Tenth Circuit, authored, and the Honorable Deanall Reece Tacha, former-United States Circuit Judge for the Tenth Circuit, and the Honorable Monroe G. McKay, Senior United States Circuit Judge for the Tenth Circuit joined.  See 45 F.3d at 1476.  The Tenth Circuit stated that the Fourth Amendment requires officers to only "reasonably interview witnesses readily available at the scene, investigate basic evidence, or otherwise inquire if a crime has been committed at all before invoking the power of warrantless detention."  45 F.3d at 1476-77.  The Tenth Circuit determined:

> Once [the defendant] concluded based on the facts and information known

to him that probable cause existed to arrest Plaintiff for the murder of David Douglas, his failure to question Plaintiff's alibi witnesses prior to the arrest did not negate probable cause. Thus, [the defendant's] failure to investigate Plaintiff's alibi witnesses prior to arrest did not constitute a constitutional violation.

45 F.3d at 1478.

In Baptiste v. J.C. Penney Co., officers arrested the plaintiff for shoplifting after: (i) receiving reports from store security guards that they witnessed her shoplifting on store surveillance; and (ii) watching a video of the surveillance footage on which the security officers relied in reaching their conclusion -- which supported the plaintiff's story that she had not stolen anything. See 147 F.3d at 1254-55. The Tenth Circuit, in an opinion that Judge Murphy, authored, and the Honorable Stephen Hale Anderson, Senior United States Circuit Judge for the Tenth Circuit, and the Honorable James Kenneth Logan, the late United States Circuit Judge for the Tenth Circuit joined, concluded that qualified immunity did not apply. See 147 F.3d at 1257-59. The Tenth Circuit asserted that the security guards' allegations were based solely on the plaintiff's conduct, "which was memorialized in its entirety on the videotape." 147 F.3d at 1257. The Tenth Circuit stated that the police officers "viewed the very same conduct on the videotape, which this court has concluded failed to establish probable cause." 147 F.3d at 1257. The Tenth Circuit held that, consequently, "it was . . . not reasonable for the officers to rely on the security guards' allegations." 147 F.3d at 1257. The Tenth Circuit added that

police officers may not ignore easily accessible evidence and thereby delegate their duty to investigate and make an independent probable cause determination based on that investigation. . . . Here, [the defendants] did conduct some investigation by viewing the videotape and questioning [the plaintiff]. They argue, however, that they should be allowed to rely on the statement of the guards for probable cause to arrest. Because the officers knew that the allegations of the guards were based on observations of conduct captured and preserved on an available videotape, to credit this argument would allow a wholesale delegation of police officers' duty to

investigate and make an independent probable cause determination.

Baptiste v. J.C. Penney Co., 147 F.3d at 1259.

In Cortez v. McCauley, officers responded to a call from a nurse stating that a woman had brought her two-year-old daughter to the hospital asserting that the child had complained that her babysitter's boyfriend had molested her. See 478 F.3d at 1113. Without (i) interviewing the girl, her mother, the nurse, or the attending physician; (ii) inspecting the girl's clothing for signs of sexual assault; or (iii) waiting for the results of the child's medical examination, the officers arrested the boyfriend. See 478 F.3d at 1113. The Tenth Circuit, in an en banc opinion that the Honorable Paul Joseph Kelly Jr., now-Senior United States Circuit Judge for the Tenth Circuit, authored, explained that,

> whether we view it as a need for more pre-arrest investigation because of insufficient information, . . . or inadequate corroboration, what the officers had fell short of reasonably trustworthy information indicating that a crime had been committed by [the defendant]. See BeVier v. Hucal, 806 F.2d 123, 128 (7th Cir. 1986)("A police officer may not close her or his eyes to facts that would help clarify the circumstances of an arrest. Reasonable avenues of investigation must be pursued especially when, as here, it is unclear whether a crime had even taken place."). Based on the facts above, [the defendant] was arrested without probable cause.

Cortez v. McCauley, 478 F.3d at 1116 (footnotes and citations omitted). The Tenth Circuit further held that

> it was established law that "the probable cause standard of the Fourth Amendment requires officers to reasonably interview witnesses readily available at the scene, investigate basic evidence, or otherwise inquire if a crime has been committed at all before invoking the power of warrantless arrest and detention." Romero, 45 F.3d at 1476-77 (footnote omitted); see also Baptiste v. J.C. Penney, Co., 147 F.3d [at] 1259 ("[P]olice officers may not ignore easily accessible evidence and thereby delegate their duty to investigate and make an independent probable cause determination based on that investigation."). In the present case, witnesses were readily available for interviews, physical evidence was available, and a medical

- 82 -

> diagnosis was forthcoming.  Defendants, however, . . . conducted no investigation.
> Instead, the Defendants relied on the flimsiest of information conveyed by a
> telephone call.

Cortez v. McCauley, 478 F.3d at 1117-18 (footnotes omitted).  The Tenth Circuit concluded,

therefore, that qualified immunity did not apply.  See Cortez v. McCauley, 478 F.3d at 1118-22.

In Garcia v. Casuas, a detective with the City of Rio Rancho, New Mexico -- Monica

Casuas -- arrested the plaintiff, Mitchell Garcia, for sexual penetration of a minor.  See 2011 WL

7444745, at *8.  The plaintiff was ultimately exonerated, and subsequently filed a § 1983 claim

against the arresting officer and Rio Rancho for, among other things, unlawfully arresting him in

violation of his Fourth Amendment rights.  See 2011 WL 7444745, at *12.  The Court concluded

that the officer had probable cause to arrest the plaintiff based on information gleaned from other

officers' interviews of the plaintiff, the victim -- K.J., the victim's mother -- Audrey Odom, and a

witness at the scene on the night of the incident -- Jennifer Katz.  See 2011 WL 7444745, at *43-

46.  Garcia argued that, by failing to re-interview Odom and Katz, and instead choosing to rely on

the other officers' interviews of them, Casuas "fail[ed] to interview readily accessible witnesses."

2011 WL 7444745, at *15.  Garcia contended that, moreover, Casuas should have known that

failing to personally interview him, Odom, Katz, K.J., and Katz' neighbors before arresting him

violated his constitutional rights.  See 2011 WL 7444745, at *15.  Garcia argued that, had Casuas

interviewed him before arresting him, she would have discovered Katz' and Odom's motivations

to lie.  See 2011 WL 7444745, at *15.

Finding that the defendant's failure to conduct further investigation before arresting the

plaintiff did not constitute a Fourth Amendment violation, the Court explained:

> Although Garcia cites Romero v. Fay and cases from several other circuits

for the general proposition that officers must interview witnesses at the scene, Garcia points to no case law which would establish that, after the officers at the scene have interviewed witnesses, the Constitution requires the investigating detective to interview those witnesses again. . . .   Here, the responding police officers . . . interviewed every adult alleged to be involved in the incident and briefly spoke with K.J. . . . .

Garcia also states that, if Casuas had investigated further, she would have known that there was no semen on the bedding, and she would have discovered Katz' and Odom's motivation if she spoke to him. . . .  The Tenth Circuit's discussion of probable cause in Romero v. Fay also undercuts Garcia's assertion that Casuas was required to do more after [K.J.'s interview] solidified the existence of probable cause.  In Romero v. Fay, the Tenth Circuit held:

> Plaintiff contends that regardless of whether the statements by Duran and Gutierrez supplied probable cause for Defendant Fay to arrest Plaintiff, under clearly established law a reasonable police officer would have investigated his alibi witnesses before arresting him, and the exculpatory information possessed by them would have negated the probable cause to arrest.  We disagree.

45 F.3d at 1466.  In Baptiste v. J.C. Penney Co., the Tenth Circuit also recognized that "officers are not required to conduct full investigations before making an arrest."  147 F.3d at 1257 n.8.

. . . .

These cases establish that Casuas was not required to speak to [Katz' neighbors], because they did not appear to be material witnesses.  Garcia has made no allegations and presented no facts suggesting that the neighbors were ever around K.J.  Garcia has also not presented any facts demonstrating that [the neighbors] have shed light on the motivations of Katz or Odom.  Garcia only speculates that Casuas *might* have found something.  An officer is not required to exhaust every possible lead to satisfy the Fourth Amendment.  In Romero v. Fay, the Tenth Circuit held:

> Once Defendant Fay concluded based on the facts and information known to him that probable cause existed to arrest Plaintiff for the murder of David Douglas, his failure to question Plaintiff's alibi witnesses prior to the arrest did not negate probable cause.  Thus, Defendant Fay's failure to investigation Plaintiff's alibi witnesses prior to arrest did not constitute a

constitutional violation.

45 F.3d at 1478.

. . . .

Furthermore, Garcia's other statements belie the fact that, if Casuas had interviewed him before his arrest, he would have explained that Katz and Odom were biased or trying to frame him.  When [another officer] interviewed Garcia on the night of the incident, he asked Garcia whether Katz and Odom had a reason to beat him up, and informed him that he was being accused of choking K.J. . . . .  Garcia responded that Katz and Odom had no reason to beat him up, and denied hurting K.J., never mentioning that Katz and Odom might have beat him up or encouraged K.J. to accuse him because they were romantically interested in him. . . .  During his interrogation after his arrest, Garcia never mentioned that Katz and Odom might have improper motives.  The cases that Garcia cites establish only that the police may not ignore available material witnesses.  Here, Thacker spoke with Garcia; Garcia denied doing wrong and never related that he may have been framed.  Garcia presents no cases, and the Court could find none, suggesting that Casuas was required to repeat the steps other officers had already taken and re-interview all witnesses. . .  .  Finally, waiting for the laboratory results would not have substantially altered the probable-cause determination, because, while the New Mexico Department of Public Safety Forensic Laboratory found no semen, it does not have the capabilities to detect the presence of urine in or on a substance  . . . .

Once probable cause is established, an officer is not required to continue to investigate for exculpatory evidence before arresting a suspect.  See Cortez v. McCauley, 478 F.3d at 1121 n.18 (citing Baker v. McCollan, 443 U.S. 137, 145-46 (1979)).  The Court has already determined that Casuas had probable cause to arrest Garcia and that there was a substantial basis for the issuance of the arrest warrant after the safe-house interview.  Casuas was not required to investigate further after that determination.

Garcia v. Casuas, 2011 WL 7444745, at *47-49 (alterations added).

## RELEVANT LAW REGARDING THE EXCLUSIONARY RULE

When evidence is obtained in violation of a person's Fourth or Fifth Amendment rights, the government will generally be prohibited from using that evidence in a criminal prosecution of that person.  See Sanchez-Llamas v. Oregon, 548 U.S. 331, 332-33 (2006)("[T]he exclusionary

rule has been used primarily to deter certain Fourth and Fifth Amendment violations, including, e.g., unconstitutional searches and seizures, and confessions exacted in violation of the right against compelled self-incrimination or due process.")(internal citations omitted); United States v. Calandra, 414 U.S. 338, 347 (1974)("Under this rule, evidence obtained in violation of the Fourth Amendment cannot be used in a criminal proceeding against the victim of the illegal search and seizure."). The exclusionary rule will apply if the defendant can show, by a preponderance of the evidence, a constitutional violation under the Fourth Amendment and a causal nexus between the violation and the evidence sought to be excluded. See United States v. Torres-Castro, 470 F.3d 992, 999 (10th Cir. 2006). Once the defendant makes this showing, the burden shifts to the United States to prove that an exception to the exclusionary rule applies. See United States v. Torres-Castro, 470 F.3d at 999. The Supreme Court has recognized several exceptions to the exclusionary rule. See United States v. Alabi, 943 F. Supp. 2d 1201, 1255 (D.N.M. 2013), aff'd, 597 F. App'x 991 (10th Cir. 2015)(unpublished).

One such exception is the attenuation doctrine: "Evidence is admissible when the connection between unconstitutional police conduct and the evidence is remote or has been interrupted by some intervening circumstance, so that 'the interest protected by the constitutional guarantee that has been violated would not be served by suppression of the evidence obtained.'" Utah v. Strieff, 136 S. Ct. 2056, 2061 (2016)(quoting Hudson v. Michigan, 547 U.S. 586, 593 (2006)). "The attenuation doctrine evaluates the causal link between the government's unlawful act and the discovery of evidence." Utah v. Strieff, 136 S. Ct. at 2061. To determine whether there are sufficient intervening acts to break the causal chain between the unlawful stop and the

discovery of evidence, courts examine the three factors that the Supreme Court articulated in Brown v. Illinois, 422 U.S. 590 (1975).

First, the Court looks to the "temporal proximity" between the unconstitutional conduct and the discovery of evidence to determine how closely the discovery of evidence followed the unconstitutional search. Brown v. Illinois, 422 U.S. at 603. This factor often favors suppressing the evidence unless "substantial time" elapses between an unlawful act and the time the evidence is obtained. Kaupp v. Texas, 538 U.S. 626, 633 (2003)(per curiam). The Supreme Court has previously concluded that a time span of "less than two hours" between the unconstitutional arrest and the confession was too short an interval, and, therefore, counseled in favor of suppressing the evidence. Brown v. Illinois, 422 U.S. at 604.

Second, the Court considers "the presence of intervening circumstances." Brown v. Illinois, 422 U.S. at 603-04. The Supreme Court found sufficient intervening circumstances to admit the evidence in Segura v. United States, 468 U.S. 796 (1984), where it applied the independent source doctrine. See 468 U.S. at 799-801, 814. There, agents had probable cause to believe that apartment occupants were dealing cocaine. See 468 U.S. at 799-800. They sought a warrant. See 468 U.S. at 799-800. In the meantime, they entered the apartment, arrested the occupant, and discovered evidence of drug activity during their security sweep. See 468 U.S. at 800-01. The next evening, they obtained a search warrant. See 468 U.S. at 800-01. The Supreme Court deemed the evidence admissible, notwithstanding the illegal search, because the information supporting the warrant was "wholly unconnected with the entry and was known to the agents well before the initial entry." 468 U.S. at 814. The Supreme Court suggested that "the existence of a valid warrant favors finding that the connection between unlawful conduct and the

discovery of evidence is 'sufficiently attenuated to dissipate the taint.'" Utah v. Strieff, 136 S. Ct. at 2062 (quoting Segura v. United States, 468 U.S. at 815).

Third, and "particularly" significant under the Supreme Court's analysis, the Supreme Court examines "the purpose and flagrancy of the official misconduct." Brown v. Illinois, 422 U.S. at 604. See Utah v. Strieff, 136 S. Ct. at 2062 (observing that the third factor is particularly significant). The exclusionary rule exists to deter police misconduct. See Davis v. United States, 564 U.S. 229, 236-37 (2011). The third factor reflects this rationale by favoring exclusion "only when the police misconduct is most in need of deterrence -- that is, when it is purposeful or flagrant." Utah v. Strieff, 136 S. Ct. at 2063. Mere negligence in violating the Fourth Amendment "hardly rise[s] to a purposeful or flagrant violation." Utah v. Strieff, 136 S. Ct. at 2063. See United States v. Ramos, 194 F. Supp. 3d 1134, 1185-87 (D.N.M. 2016)(Browning, J.).

### 1.    **Good-Faith Exception.**

Recognizing that the "sole purpose" of the exclusionary rule "is to deter future Fourth Amendment violations," the Supreme Court has held that evidence will not be excluded where the officer who obtained the evidence -- through an unlawful search or seizure -- acted in good faith. United States v. Davis, 564 U.S. 229, 236-37 (2011). To determine whether the good-faith exception applies, courts must balance the deterrent effect of excluding the evidence against "the 'substantial social costs' generated by the rule." United States v. Davis, 564 U.S. at 237 (quoting United States v. Leon, 468 U.S. 897, 907 (1984)). The Supreme Court has explained that "[t]he basic insight of the *Leon* line of cases is that the deterrence benefits of exclusion 'var[y] with the culpability of the law enforcement conduct' at issue." United States v. Davis, 564 U.S. at 238 (second alteration in original)(quoting Herring v. United States, 555 U.S. 135, 143 (2009)).

Consequently, "[w]hen the police exhibit 'deliberate,' 'reckless,' or 'grossly negligent' disregard for Fourth Amendment rights, the deterrent value of exclusion is strong and tends to outweigh the resulting costs." United States v. Davis, 564 U.S. at 238 (quoting Herring v. United States, 555 U.S. at 144). By contrast, "when the police act with an objectively reasonable good-faith belief that their conduct is lawful, or when their conduct involves only simple, isolated negligence, the deterrence rationale loses much of its force, and exclusion cannot pay its way." United States v. Davis, 564 U.S. at 238 (citations and internal quotation marks omitted).

### a.   **Warrants Based on Illegally Obtained Information**.

"When a search is conducted pursuant to a warrant that is based on illegally obtained information, a court is not to blindly apply the good-faith exception." United States v. Alabi, 943 F. Supp. 2d at 1260. "Instead, the court is to consider the warrant with the illegally obtained information excluded and determine, based on the remaining information, whether probable cause nevertheless existed." United States v. Alabi, 943 F. Supp. 2d at 1260. If the remaining content of the warrant affidavit establishes probable cause, the search pursuant to that warrant was appropriate, and the evidence need not be excluded:

> When a warrant is tainted by some unconstitutionally obtained information, we nonetheless uphold the warrant if there was probable cause absent that information. "An affidavit containing erroneous or unconstitutionally obtained information invalidates a warrant if that information was critical to establishing probable cause. If, however, the affidavit contained sufficient accurate or untainted evidence, the warrant is nevertheless valid." *United States v. Snow*, 919 F.2d 1458, 1460 (10th Cir. 1990).

United States v. Sims, 428 F.3d 945, 954 (10th Cir. 2005)(citation omitted). See United States v. Cusumano, 83 F.3d 1247, 1250 (10th Cir. 1996)("In our review, we may disregard allegedly tainted material in the affidavit and ask whether sufficient facts remain to establish probable

cause.").  "The apparent rationale for this rule is that one officer cannot execute a warrant 'in good

faith' if it contains information that he or a fellow officer obtained illegally."  United States v.

Alabi, 943 F. Supp. 2d at 1260 (quoting United States v. Herrera, 444 F.3d 1238, 1249 (10th Cir.

2006)).

> ### b.   United States v. Leon.

In United States v. Leon, the Supreme Court faced the question whether to apply the good-

faith exception when a police officer mistakenly thought probable cause supported a warrant from

which he obtained evidence.  See 468 U.S. at 905.  The Supreme Court noted that excluding this

evidence would not deter police misconduct.  See 468 U.S. at 918-19.  The officer had taken all of

the necessary steps to comply with the Fourth Amendment and reasonably thought his warrant,

and, thus, his search, was valid.  See 468 U.S. at 918-19.  The Supreme Court explained that, when

a warrant is issued on less than probable cause, the person whose conduct the law wishes to deter

is the issuing judge and that excluding the evidence would not have a significantly deterrent effect

on judicial conduct.  See 468 U.S. at 916-17.  The Supreme Court, thus, concluded that a court

need not suppress evidence seized pursuant to a facially valid warrant which later turns out to lack

probable cause, as long as police were acting in good-faith reliance on that warrant.  See 468 U.S.

at 922-23.

"The Tenth Circuit therefore now applies the rule that, in cases where the police obtained

a warrant but the affidavit supporting the warrant does not establish probable cause, suppression

of the evidence found is generally not warranted, so long as the officers relied in good faith on the

warrant."       United States v. Martinez,   696   F. Supp. 2d  1216,  1244  (D.N.M.

2010)(Browning, J.)(citing United States v. Tuter, 240 F.3d 1292, 1300 (10th Cir. 2001); United

States v. Danhauer, 229 F.3d 1002, 1007 (10th Cir. 2000)).

> "[T]he suppression of evidence obtained pursuant to a warrant should be ordered . . . only in those unusual cases in which exclusion will further the purposes of the exclusionary rule," [United States v. Leon, 468 U.S.] at 918 . . . "Where an officer acting with objective good faith obtains a search warrant from a detached and neutral magistrate and the executing officers act within its scope, there is nothing to deter." *United States v. Nolan*, 199 F.3d 1180, 1184 (10th Cir. 1999).

United States v. Tuter, 240 F.3d at 1298-99.  Furthermore, the Tenth Circuit has explained that,

"[u]nder *Leon*, we presume good-faith when an officer acts pursuant to a warrant unless one of

'four contexts' appl[ies]."  United States v. Barajas, 710 F.3d 1102, 1110 (10th Cir. 2013).

> First, evidence should be suppressed if the issuing magistrate was misled by an affidavit containing false information or information that the affiant would have known was false if not for his "reckless disregard of the truth."  [United States v. Leon, 468 U.S.] at 923 . . . .  Second, the exception does not apply when the "issuing magistrate wholly abandon[s her] judicial role." *Id.*  Third, the good-faith exception does not apply when the affidavit in support of the warrant is "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable." *Id.* (quotation omitted).  Fourth, the exception does not apply when a warrant is so facially deficient that the executing officer could not reasonably believe it was valid. *See id.*

United States v. Danhauer, 229 F.3d at 1007 (quoting United States v. Leon, 468 U.S. at 922-23).

See United States v. Perrine, 518 F.3d 1196, 1206-07 (10th Cir. 2008).  "If any of these situations

is present, the good-faith exception should not be applied, and the evidence should be excluded."

United States v. Romero, 743 F. Supp. 2d at 1316.

### c.  **Herring v. United States**.

In Herring v. United States, officers arrested Herring pursuant to an arrest warrant listed in

the Dale County, Alabama, warrant database.  See 555 U.S. at 137.  In the search incident to that

arrest, officers found drugs and a gun on Herring's person.  See 555 U.S. at 137.  Herring was then

indicted on federal gun- and drug-possession charges.  See 555 U.S. at 138.  It turned out, however, that the warrant under which the officers arrested Herring had been recalled, but the database had not been updated to reflect that recall.  See 555 U.S. at 138.  Asserting that the evidence found during the search was fruit of an unlawful arrest, Herring sought to suppress it.  See 555 U.S. at 138.  The district court denied Herring's motion to suppress, and the United States Court of Appeals for the Eleventh Circuit affirmed.  See 555 U.S. at 138.

The Supreme Court affirmed the Eleventh Circuit's affirmation of the district court's denial of Herring's motion to suppress, based primarily on the good-faith exception to the exclusionary rule.  See 555 U.S. at 140-46.  The Supreme Court agreed with the Eleventh Circuit that, although the police's failure to update the warrant database to reflect that Herring's warrant was withdrawn was negligent, it was not reckless or deliberate.  See 555 U.S. at 140.  The Supreme Court reiterated its holding in United States v. Leon: "When police act under a warrant that is invalid for lack of probable cause, the exclusionary rule does not apply if the police acted 'in objectively reasonable reliance' on the subsequently invalidated search warrant."  Herring v. United States, 555 U.S. at 142 (quoting United States v. Leon, 468 U.S. at 922).  Tracing the history of cases applying and declining to apply the exclusionary rule, the Supreme Court distilled a general principle: "To trigger the exclusionary rule, police conduct must be sufficiently deliberate that exclusion can meaningfully deter it, and sufficiently culpable that such deterrence is worth the price paid by the justice system."  Herring v. United States, 555 U.S. at 144.  The Supreme Court further explained that "evidence should be suppressed only if it can be said that the law enforcement officer had knowledge, or may properly be charged with knowledge, that the search was unconstitutional."  Herring v. United States, 555 U.S. at 143 (internal quotation marks omitted)(quoting Illinois v.

Krull, 480 U.S. 340, 348-49 (1987)).  As long as the "police have [not] been shown to be reckless in maintaining [the] warrant system, or to have knowingly made false entries to lay the groundwork for future false arrests," exclusion of evidence is not warranted when the arrest was made on objectively reasonable reliance on a warrant that had been subsequently recalled.  Herring v. United States, 555 U.S. at 146.

> ### d.    Davis v. United States.

In Davis v. United States, the Supreme Court confronted the question whether to apply the exclusionary rule when police conduct a search in objectively reasonable reliance on binding judicial precedent.  See 564 U.S. at 239.  At the time of the officer's search, the Supreme Court had not yet decided Arizona v. Gant, 556 U.S. 332 (2009) -- which held that the Fourth Amendment requires officers to demonstrate a continuing threat to their safety posed by the arrestee or a need to preserve evidence related to the crime of the arrest to justify a warrantless vehicular search incident to arrest.  See Arizona v. Gant, 556 U.S. at 341-48.  The Eleventh Circuit had interpreted the Supreme Court's decision in New York v. Belton, 453 U.S. 454 (1981), as establishing a bright-line rule authorizing the search of a vehicle's passenger compartment incident to a recent occupant's arrest.  See United States v. Gonzalez, 71 F.3d 819, 825 (11th Cir. 1996). Although the officers' search incident to the defendant's arrest "was in strict compliance with then-binding Circuit law and was not culpable in any way," it was unconstitutional under Arizona v. Gant.  United States v. Davis, 564 U.S. at 239-40.

The Supreme Court determined that the "acknowledged absence of police culpability dooms [the defendant's] claim."  United States v. Davis, 564 U.S. at 240.  The Supreme Court explained that "[p]olice practices trigger the harsh sanction of exclusion only when they are

deliberate enough to yield 'meaningful' deterrence, and culpable enough to be 'worth the price paid by the justice system.'" United States v. Davis, 564 U.S. at 240 (quoting Herring v. United States, 555 U.S. at 144). The Supreme Court stated: "The conduct of the officers here was neither of these things. The officers who conducted the search did not violate [the defendant's] Fourth Amendment rights deliberately, recklessly, or with gross negligence. Nor does this case involve any 'recurring or systemic negligence' on the part of law enforcement." United States v. Davis, 564 U.S. at 240 (quoting and citing Herring v. United States, 555 U.S. at 144). The Supreme Court concluded that, "[u]nless the exclusionary rule is to become a strict-liability regime, it can have no application in this case." United States v. Davis, 564 U.S. at 240.

**2.      Inevitable-Discovery Exception.**

Under the inevitable-discovery exception, "illegally obtained evidence may be admitted if it 'ultimately or inevitably would have been discovered by lawful means.'" United States v. Christy, 739 F.3d 534, 540 (10th Cir. 2014)(quoting Nix v. Williams, 467 U.S. at 444). "The government possesses the burden of proving by a preponderance of the evidence that the evidence at issue would have been discovered without the Fourth Amendment violation." United States v. Cunningham, 413 F.3d 1199, 1203 (10th Cir. 2005). In United States v. Owens, 782 F.2d 146 (10th Cir. 1986), the Tenth Circuit noted that, for the inevitable-discovery exception to apply, there must be a "lawful police investigation [that] inevitably would have discovered" the evidence in question. 782 F.2d at 152. Relying on this statement from United States v. Owens, the Court stated in United States v. Christy, 810 F. Supp. 2d 1219 (D.N.M. 2011)(Browning, J.), aff'd, 739 F.3d 534 (10th Cir. 2014), that the inevitable-discovery exception "permits evidence to be admitted if an independent, lawful police investigation inevitably would have discovered it." 810 F. Supp.

2d at 1274 (citations and internal quotation marks omitted).  On appeal, however, the Tenth Circuit

clarified that the inevitable-discovery exception does not require an independent investigation that

would have discovered the evidence in question.  See United States v. Christy, 739 F.3d at 540.

The Tenth Circuit explained:

> In *Cunningham* and [United States v. Souza, 223 F.3d 1197 (10th Cir. 2000),] we applied inevitable discovery to situations like the one here -- where there was "one line of investigation that would have led inevitably to the obtaining of a search warrant by independent lawful means but was halted prematurely by a search subsequently contended to be illegal."  *Cunningham*, 413 F.3d at 1204 n.1.  In Cunningham, police searched the defendant's home after getting his consent.  *Id.* at 1202.  The defendant later contested the search, claiming his consent was coerced.  *Id.*  We held that even if the search was illegal, the evidence was admissible because the officers "would have obtained a search warrant" if the search had not occurred.  *Id.* at 1205.  In *Souza*, police illegally opened a UPS package that contained drugs.  223 F.3d at 1200, 1202.  We held the evidence admissible under inevitable discovery because the officers "would have obtained a warrant" had the illegal search not occurred.  *Id.* at 1206.  Thus, our case law does not require a second investigation when the first (and only) investigation would inevitably have discovered the contested evidence by lawful means.
>
> . . . .
>
> Thus, lest there be any doubt, we reaffirm the notion that inevitable discovery requires only that the lawful means of discovery be "independent of the constitutional violation," [United States v.] *Larsen*, 127 F.3d [984,] 987 [(10th Cir. 1997)], and conclude that a second investigation is not required.

United States v. Christy, 739 F.3d at 540-41.

In United States v. Souza, the Tenth Circuit "set forth the standard for considering whether

the inevitable discovery doctrine applies to a warrantless search," United States v. Cunningham,

413 F.3d at 1203, when "there is no exception to the warrant requirement that could serve as a

basis for the inevitable discovery exception," United States v. Souza, 223 F.3d at 1203.  The Tenth

Circuit stated that "a court may apply the inevitable discovery exception only when it has a high

level of confidence that the warrant in fact would have been issued and that the specific evidence

in question would have been obtained by lawful means." United States v. Souza, 223 F.3d at 1205.

The Tenth Circuit adopted four factors to determine "how likely it is that a warrant would have

been issued and that the evidence would have been found pursuant to a warrant":

> 1) "the extent to which the warrant process has been completed at the time those
> seeking the warrant learn of the search"; 2) the strength of the showing of probable
> cause at the time the search occurred; 3) whether a warrant ultimately was obtained,
> albeit after the illegal entry; and 4) "evidence that law enforcement agents 'jumped
> the gun' because they lacked confidence in their showing of probable cause and
> wanted to force the issue by creating a fait accompli."

United States v. Souza, 223 F.3d at 1204 (citations omitted)(quoting United States v. Cabassa, 62

F.3d 470, 473-74, 473 n.2 (2d Cir. 1995)).  Applying the first factor, the Tenth Circuit stated:

> [T]he prerequisite to a consideration of the inevitable discovery exception in these
> cases, steps taken to obtain a warrant prior to the unlawful search, is present in this
> case.  Special Agent Rowden took steps to alert his office that he would be coming
> back to prepare a warrant for the package and made sure that the affidavit form
> would be ready when he got back to his office.  Also, the package was specifically
> placed on the floor behind Detective Sloan for the purpose of obtaining a warrant.

United States v. Souza, 223 F.3d at 1205.  Regarding the second factor, the Tenth Circuit stated:

> [A]t the time the illegal search occurred, probable cause to believe the package
> contained contraband was extremely strong.  The package itself contained several
> suspicious characteristics, including all of the openings on the box being heavily
> taped, the box having been sent through third party shipping, the sender having only
> used a first name, and the box being solid so that no side of it could be compressed.
> Moreover, the box was alerted to by a certified narcotics dog, which is itself
> sufficient to create probable cause.

United States v. Souza, 223 F.3d at 1205-06.  The Tenth Circuit noted that a sergeant eventually

obtained a search warrant.  See United States v. Souza, 223 F.3d at 1206.  Regarding the third

factor, the Tenth Circuit stated that, unlike "*Cabassa*, there is no question . . . concerning the

inevitability of discovery of the evidence if the police had obtained a search warrant because the

package was secured by the officers and there was no chance that it would not still be there when the warrant actually was issued." United States v. Souza, 223 F.3d at 1206.  The Tenth Circuit did not reach the fourth factor, but concluded that, although it was

> very reluctant to apply the inevitable discovery exception in situations where the government fails to obtain a search warrant and no exception to the warrant requirement exists, in this case the inevitability of discovery of the evidence convince[d] [it] that [the case before it was] one of those occasions when the doctrine should apply.

United States v. Souza, 223 F.3d at 1206.

In United States v. Owens, the Tenth Circuit emphasized the "danger of admitting unlawfully obtained evidence on the strength of some judge's speculation that it would have been discovered legally anyway."  782 F.2d at 152-53 (internal quotation marks omitted)(quoting United States v. Romero, 692 F.2d 699, 704 (10th Cir. 1982)).  The Tenth Circuit considered whether contraband seized without a warrant could still be admitted under the inevitable-discovery doctrine.  See United States v. Owens, 782 F.2d at 152-53.  Rejecting the United States' position that the motel maids' routine cleaning of the defendant's room for the next occupant would have revealed the contraband and that, therefore, discovery of the evidence was inevitable, the Tenth Circuit concluded:

> Several factors suggest that motel employees performing routine cleaning may not have inevitably discovered the cocaine.  First, if the [motel]'s staff had cleared [the defendant's] room, they would not necessarily have opened and searched all his luggage and closed containers.  In fact, such an intrusion would have been a significant invasion of his privacy.  Second, even if the room had been cleared and the white powder inside the closed bag had been discovered by the motel staff, the lack of any police involvement in routine room cleanings suggests that police discovery of the evidence would not have been inevitable.  The evidence certainly does not demonstrate that the [motel]'s staff would necessarily have recognized the powder as cocaine or have called the police if they had so recognized it.  Finally, absent the unlawful search, [the defendant] might have posted bail on the charge of

> receiving stolen property and could have returned to his motel room before either
> the cleaning staff or the police discovered the contraband.  Alternatively, a friend
> could have returned to claim the closed bag.

782 F.2d at 153.  "United States v. Owens suggests that courts should be realistic, if not skeptical,

when assessing the probability that law-enforcement officers would inevitably have uncovered the

challenged evidence through an independent investigation."  United States v. Martinez, 696 F.

Supp. 2d 1216, 1244 (D.N.M. 2010)(Browning, J.).

In United States v. Cunningham, the Tenth Circuit "appl[ied] the inevitable discovery

doctrine . . . because [it was] convinced that without Mr. Cunningham's disputed consent, the

warrant to search his house would have been issued and the incriminating evidence would have

been discovered."  413 F.3d at 1205.  The Tenth Circuit, in addressing the first factor -- the extent

to which the warrant process had been completed at the time those seeking the warrant learn of the

search -- stated:

> Here, the officers took substantial steps to obtain a warrant before the contested
> search occurred.  The record demonstrates that they had focused their investigation
> on 1175 and 1179 East 76th Terrace, and had drafted an affidavit to support a search
> warrant for one of these homes.  As a result of their conversation with the [assistant
> United States attorney], the officers decided that further surveillance on the two
> homes was necessary before they specifically selected one to search, and they
> proceeded to conduct that surveillance immediately.  The officers' actions clearly
> indicate they took steps to obtain a search warrant and that they intended to obtain
> the warrant for either 1175 or 1179 East 76th Terrace as soon as possible.

413 F.3d at 1204.  Regarding the second factor -- the strength of the showing of probable cause at

the time the search occurred -- the Tenth Circuit stated:

> The officers also possessed strong probable cause for their search of 1179
> East 76th Terrace by the time Mr. Cunningham arrived at the home.  Prior to that
> time, they had acquired background information about the alleged check-writing
> ring, narrowed their investigation to one residential block, and focused on the two
> homes sharing a common driveway.  The officers' surveillance had uncovered the

- 98 -

following additional information: a red car containing two individuals identified earlier in the investigation arrived, parked briefly, and then pulled out from behind 1179 East 76th Terrace; a black pickup truck previously observed in the investigation was stopped containing Mr. Cunningham, who said that he lived at 1179 East 76th Terrace; the residents of 1175 East 76th Terrace told officers that the home next door had been receiving all of the traffic that evening, and the officers ruled out 1175 East 76th Terrace as the location visited by the alleged check supplier; and a gray Blazer previously observed in the investigation was seen parked by 1179 East 76th Terrace. The government thus had sufficient probable cause for a search of 1179 East 76th Terrace at the time of Mr. Cunningham's disputed consent to search his home.

United States v. Cunningham, 413 F.3d at 1204-05. Regarding the third factor -- whether a warrant ultimately was obtained, albeit after the illegal entry -- the Tenth Circuit stated: "Moreover, the officers ultimately did obtain a warrant, albeit based in part on information retrieved from inside Mr. Cunningham's home." 413 F.3d at 1205. Regarding the fourth factor -- evidence that the officers "jumped the gun," because they lacked confidence in their showing of probable cause and wanted to force the issue by creating a fait accompli -- the Tenth Circuit stated:

There is also no evidence the officers "jumped the gun" due to a lack of confidence about probable cause and out of a desire to force the issue. [United States v. Souza, 223 F.3d] at 1204. Instead, the record indicates that the search occurred at the time it did because of the coincidental arrival of Mrs. Cunningham. Her presence on the scene led to a series of events that culminated in her son's release from jail, his return home, and his consent to search. As a result, we are satisfied the government has demonstrated that, as in Souza, but for Mrs. Cunningham's arrival at 1179 East 76th Terrace on the evening of the search, the officers would have obtained a search warrant and the evidence in question would have been found. Id. at 1205.

United States v. Cunningham, 413 F.3d at 1205 (citations omitted). The Tenth Circuit, therefore, applied the inevitable-discovery doctrine. See 413 F.3d at 1205.

In United States v. Christy, the Court applied the four United States v. Souza factors and determined that the inevitable-discovery exception applied. See 810 F. Supp. 2d at 1275-79. Regarding the first factor -- the extent to which the warrant process had been completed at the time

those seeking the warrant learn of the search -- the Court stated: "The deputies did not take any steps to obtain a warrant before entering Christy's residence.  The United States concedes that they did not attempt to obtain a warrant before entering Christy's residence. . . .  This factor thus weighs against applying the inevitable discovery exception."  810 F. Supp. 2d at 1275 (citations omitted). As to the second factor -- the strength of the showing of probable cause at the time the search occurred -- the Court concluded:

> The Court finds that Carvo had strong probable cause that Christy committed crimes.  At the time of the search, Carvo believed he had probable cause for the California crime of unlawful sexual intercourse, because Christy and K.Y. exchanged naked pictures through electronic mail transmissions over the internet and then arranged a meeting in the middle of the night for K.Y. to run away with Christy.
>
> . . . .
>
> . . . . Because Carvo knew that K.Y. and Christy were exchanging naked pictures, "the belief that there was a sexual relationship or sexual interest between the two was reasonable."  These circumstances are sufficient to form "a reasonable ground for belief of [Christy's] guilt," for the California crime of unlawful sexual intercourse.  Maryland v. Pringle, 540 U.S. 366, 371 . . . (2003)(citation omitted), for the California crime of unlawful sexual intercourse.
>
> Carvo also had strong probable cause for the federal crime of coercion or enticement.  Carvo believed that he had probable cause for the federal crime of enticement or coercion, because of Christy's and K.Y.'s communications through the internet and electronic mail transmissions, because Christy sent K.Y. naked pictures of himself and solicited pictures of K.Y., which showed her breasts, and because cellular telephone evidence shows that Christy traveled across state lines to bring K.Y. to New Mexico.
>
> . . . .
>
> . . . . Because Carvo knew that Christy and K.Y. communicated through electronic mail transmissions, that Christy sent K.Y. naked pictures of himself and solicited pictures of K.Y., because evidence showed that Christy traveled across state lines with K.Y., and because Carvo had strong probable cause that Christy committed the California crime of unlawful sexual intercourse, Carvo had "a

reasonable ground for belief of [Christy's] guilt," Maryland v. Pringle, 540 U.S. 366, 371 . . . (2003)(citation omitted), for the federal crime of coercion or enticement.  Because Carvo had strong probable cause for the California crime of unlawful sexual intercourse and for the federal crime of enticement or coercion, this factor weighs in favor of application of the inevitable discovery doctrine.

United States v. Christy, 810 F. Supp. 2d at 1276-78 (brackets in original)(citations to record and

footnote omitted).  Regarding the third factor, -- whether a warrant ultimately was obtained, albeit

after the illegal entry -- the Court held:

> The deputies "ultimately did obtain a warrant, albeit based in part on information retrieved" from Littlefield's actions of peering through a crack in the blinds in Christy's window, and from the deputies' entry into Christy's residence and subsequent interview of Christy.  *United States v. Cunningham*, 413 F.3d at 1205.  Although portions of the affidavits supporting the warrants were based on information the Court has found illegally obtained, the affidavits also included information from the California investigation.  Although the Tenth Circuit appears to rely on illegally obtained information in its inevitable discovery analysis, the Court does not believe that it can do so.  Carvo had strong probable cause that Christy committed California and federal crimes, and Carvo's probable cause was based on his investigation, and not on any information he learned from the BCSO or from the Albuquerque FBI.  Because Carvo had strong probable cause for a California crime and a federal crime, based on information that he learned in his investigation, and not based on information he learned from the BCSO or from the Albuquerque FBI, Carvo would have obtained search warrants that were not based on illegally obtained information.  Based upon Carvo's belief that he had probable cause for both violations of California state law and violations of federal law, he would "have asked [BCSO] and/or -- either one -- the FBI to obtain a search warrant for [Christy's] Albuquerque residence, vehicle, computers, cell phones, things of that nature."  If the BCSO or Albuquerque FBI were not able to obtain a search warrant for these locations, Carvo would have written a federal search warrant himself and come to the District of New Mexico to seek the warrant with himself as the affiant.  Carvo is cross designated to acquire both state and federal search warrants.  This factor thus weighs in favor of application of the inevitable-discovery doctrine.

United States v. Christy, 810 F. Supp. at 1278-79 (second and third alterations in original)(citations

omitted).  As to the fourth factor -- the existence of evidence that the officers jumped the gun,

because they lacked confidence in their showing of probable cause and wanted to force the issue

by creating a fait accompli -- the Court determined:

> There is "no evidence that the officers 'jumped the gun' due to a lack of confidence about probable cause and out of a desire to force the issue." *United States v. Cunningham*, 413 F.3d at 1205.  The record indicates that the search occurred when it did because the deputies believed that they had exigent circumstances to enter Christy's residence.  This factor thus weighs in favor of application of the inevitable discovery doctrine.

United States v. Christy, 810 F. Supp. 2d at 1279.  Consequently, the Court applied the inevitable-

discovery doctrine.  See 810 F. Supp. 2d at 1279.

On appeal, the Tenth Circuit affirmed the Court's decision.  See 739 F.3d at 539-44.

Addressing the United States v. Souza factors, the Tenth Circuit noted that the defendant

challenged the Court's ruling only on factors two and four -- the strength of the probable cause

showing when the unlawful search occurred and whether the officers "'jumped the gun' to sidestep

the warrant requirement."  United States v. Christy, 739 F.3d at 541 (quoting Opening Brief of

Appellant at 24, United States v. Christy, 739 F.3d 534 (10th Cir. 2014)(No. 12-2127)).  Regarding

the second factor -- the strength of the showing of probable cause at the time the unlawful search

occurred -- the Tenth Circuit stated:

> The district court found that Officer Carvo knew that K.Y. was a minor, there was a large age difference between her and Mr. Christy, the two exchanged sexually explicit pictures, and that Mr. Christy traveled across state lines with K.Y.  Given those factual findings, it is a reasonable inference that a sexual relationship existed between Mr. Christy and K.Y.  Officer Carvo also knew that K.Y. was potentially suicidal, had left her depression medication behind, and ran away from home with Mr. Christy.  Based on that knowledge, Officer Carvo's belief that K.Y. was at risk for sexual victimization and assault was reasonable.  Thus, Officer Carvo had reasonable grounds to believe that Mr. Christy engaged in sexual activity in violation of California law and coerced or enticed K.Y. to travel across state lines to engage in criminal sexual activity in violation of federal law.  The district court was correct in weighing this factor in favor of applying inevitable discovery.

United States v. Christy, 739 F.3d at 542 (citations omitted).  Analyzing the fourth factor --
evidence that the officers jumped the gun because they lacked confidence in their showing of
probable cause and wanted to force the issue by creating a fait accompli -- the Tenth Circuit
explained:

> Mr. Christy argues that the deputies "jumped the gun" by forcing entry into his
> home due to their lack of confidence about probable cause.  Yet as the district court
> found, no evidence supports the theory that the deputies forced entry for that reason.
> Instead, the deputies forced entry because they believed K.Y. was in danger.  Mr.
> Christy argues that the search was not in fact justified by exigent circumstances and
> points to the district court's conclusion that it was not.  But that is beside the point.
> The record fully supports the reasonableness of the deputies' assessment of danger.
> The district court was correct in weighing this factor in favor of the government.

United States v. Christy, 739 F.3d at 543 (citations omitted).  The Tenth Circuit concluded,
therefore, that the Court properly applied the United States v. Souza factors.  See 739 F.3d at 542.

## **RELEVANT LAW REGARDING MIRANDA RIGHTS**

Law enforcement officials must give the Miranda warnings to a person subject to
"'custodial interrogation.'"   United States v. Hudson, 210 F.3d 1184, 1190 (10th Cir.
2000)(quoting Miranda, 384 U.S. at 444).  A person is in custody if "'his freedom of action is
curtailed to a degree associated with formal arrest.'"   United States v. Hudson, 210 F.3d at 1190
(quoting Berkemer v. McCarty, 468 U.S. 420, 440 (1984)).  The court must examine "whether 'a
reasonable [person] in the suspect's position would have understood his situation . . . as the
functional equivalent of formal arrest.'"   United States v. Hudson, 210 F.3d at 1190 (alterations in
original)(quoting Berkemer v. McCarty, 468 U.S. at 442).

### 1.    **Custodial Interrogation.**

A suspect cannot invoke his Miranda rights anticipatorily; Miranda's protections do not

trigger until the suspect is in a custodial interrogation context.  See McNeil v. Wisconsin, 501 U.S. 171, 182 n.3 (1991).   See also Appleby v. Cline, 711 F. App'x 459, 464 (10th Cir. 2017)(unpublished); United States v. Cook, 599 F.3d 1208, 1214 (10th Cir. 2010)("[I]n order to implicate Miranda and Edwards,[8] there must be a custodial interrogation.").   "'By custodial interrogation, we mean questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way.'" Berkemer v. McCarty, 468 U.S. at 428 (quoting Miranda, 384 U.S. at 444).   There are "'[t]wo discrete inquiries . . . essential to the determination'" of custody: "'first, what were the circumstances surrounding the interrogation; and second, given those circumstances, would a reasonable person have felt he or she was at liberty to terminate the interrogation and leave.'" J.D.B. v. North Carolina, 564 U.S. 261, 270 (2011)(quoting Thompson v. Keohane, 516 U.S. 99, 112 (1995)(internal quotation marks, alteration, and footnote omitted by J.D.B. v. North Carolina)).   See United States v. Erving L., 147 F.3d 1240, 1245 (10th Cir. 1998).   "'Once the scene is set and the players' lines and actions are reconstructed, the court must apply an objective test to resolve the ultimate inquiry: was there a formal arrest or restraint on freedom of movement of the degree associated with formal arrest.'"   J.D.B. v. North Carolina, 564 U.S. at 270 (quoting Thompson v. Keohane, 516 U.S. at 112 (internal quotation marks, alteration, and footnote omitted in J.D.B. v. North Carolina)).   A suspect's Miranda rights, such as a suspect's right to counsel, may trigger before a law-enforcement officer gives a Miranda warning.   See United States v.

---

[8]Edwards v. Arizona, 451 U.S. 477 (1981), held that once an individual expresses a desire for counsel, that individual is "not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police."   Edwards v. Arizona, 451 U.S. at 484-85.

Bautista, 145 F.3d 1140, 1147 n.3 (10th Cir. 1998).

What amounts to custody, however, is only half of the inquiry.  See United States v. Cash, 733 F.3d 1264, 1277 (10th Cir. 2013)("'The fact that [a defendant is] in custody,' however, 'does not automatically render [an] exchange an interrogation.'"   (alterations in United States v. Cash)(quoting Fox v. Ward, 200 F.3d 1286, 1298 (10th Cir. 2000)).  A suspect in custody may not invoke his Miranda rights if he is not also interrogated.  See Rhode Island v. Innis, 446 U.S. 291, 293, 300 (1980).  Interrogation does not require "express questioning of a defendant while in custody."  Rhode Island v. Innis, 446 U.S. at 298-99.  The Supreme Court explained that Miranda was concerned with more than just questioning, but also the "'interrogation environment,'" which implicated practices that "did not involve express questioning."  Rhode Island v. Innis, 446 U.S. at 299 (quoting Miranda, 384 U.S. at 458).  "For example, one of the practices discussed in *Miranda* was the use of line-ups in which a coached witness would pick the defendant as the perpetrator.  This was designed to establish that the defendant was in fact guilty as a predicate for further interrogation."  Rhode Island v. Innis, 446 U.S. at 299 (citing Miranda, 384 U.S. at 453).

> A variation on this theme discussed in *Miranda* was the so-called "reverse line-up" in which a defendant would be identified by coached witnesses as the perpetrator of a fictitious crime, with the object of inducing him to confess to the actual crime of which he was suspected in order to escape the false prosecution.

Rhode Island v. Innis, 446 U.S. at 299 (quoting Miranda, 384 U.S. at 453).  Accordingly, "the term 'interrogation' under *Miranda* refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect."  Rhode Island v. Innis, 446 U.S. at 301 (quoting Miranda, 384 U.S at 439).  See United States v. Cash, 733 F.3d at 1277 ("[I]nterrogation extends *only* to words or actions that the officers should

have known were reasonably likely to elicit an incriminating response." (emphasis added by United States v. Cash)(quoting Fox v. Ward, 200 F.3d at 1298). "The latter portion of this definition focuses primarily upon the perceptions of the suspect, rather than the intent of the police." Rhode Island v. Innis, 446 U.S. at 301. See United States v. Yepa, 862 F.3d 1252, 1257 (10th Cir. 2017).

"[C]onduct 'normally attendant to arrest and custody'" is "not the 'functional equivalent' of interrogation." Fox v. Ward, 200 F.3d at 1298 (quoting Rhode Island v. Innis, 446 U.S. at 301)(concluding that officers "merely introduc[ing] themselves" to a suspect and leaving their business cards did not constitute interrogation). The Tenth Circuit has concluded, however, that interrogation "includes those instances where a defendant is in custody and it is clear that questioning/interrogation is imminent." United States v. Bautista, 145 F.3d at 1147 n.3 (citing United States v. Kelsey, 951 F.2d 1196, 1199 (10th Cir. 1991)("It is clear from the exchange between Kelsey and the police described above that the police intended to question Kelsey at some point at his home.")). See Connecticut v. Barrett, 479 U.S. 523, 531 (1987)("[C]ustodial interrogation is inherently coercive and . . . a defendant must receive detailed warnings that he or she has the rights to remain silent to receive assistance of counsel before and during questioning."). The Tenth Circuit, however, has since walked back from United States v. Bautista and United States v. Kelsey. In United States v. Cash, a suspect was handcuffed and placed in the back of a squad car after a scuffle with the police, but that did not amount to an interrogation even though questioning was imminent. United States v. Cash, 733 F.3d at 1278-79. Rather, the Tenth Circuit focused its inquiry on specific exchanges between the suspect and officers to determine whether the officer's questions were "'reasonably likely to elicit an incriminating response'" as Rhode

Island v. Innis commands.  United States v. Cash, 733 F.3d at 1278-79 (quoting Rhode Island v. Innis, 446 U.S. at 301).  See United States v. Yepa, 862 F.3d at 1258-61; United States v. Benard, 680 F.3d 1206, 1212 (10th Cir. 2012).

The Court has considered custodial interrogation on several occasions.  In United States v. Romero, 743 F. Supp. 2d 1281, the Court applied Rhode Island v. Innis and concluded that a suspect was subjected to interrogation, but was not in custody, so Miranda did not apply.  See United States v. Romero, 743 F. Supp. 2d at 1332.  The Court determined that a suspect was interrogated, because officers asked the suspect about his whereabouts on a Friday night, and the officer knew that the suspect was the last person to see the victim alive on Friday.  See United States v. Romero, 743 F. Supp. 2d at 1332.  The Court concluded, however, that the suspect was not in custody, because there was "nothing excessively coercive . . . about the circumstances of the questioning."  743 F. Supp. 2d at 1334.  The suspect sat in a police vehicle while questioned, but: (i) he sat in the front seat; (ii) the car's back door was open, suggesting informality; (iii) both windows were rolled down, also suggesting informality and indicating that the suspect was not in a non-public questioning room; (iv) there was no prolonged accusatory questioning; (v) the suspect was not taken to a police station; (vi) law enforcement officers did not display their weapons; and (vii) the officers never touched the suspect.  See 743 F. Supp. 2d at 1334-35.  See also United States v. Young, 347 F. Supp. 3d 747, 787-89 (D.N.M. 2018)(Browning, J.)(stating that a defendant in handcuffs was in custody, but that no interrogation occurred when the officer did not ask the defendant any questions reasonably likely to elicit an incriminating response); United States v. Begay, 310 F. Supp. 3d 1318, 1358-59 (D.N.M. 2018)(Browning, J.)(concluding that law enforcement officers interrogated a defendant when they asked him questions, but that the

interrogation was not custodial, because the officers informed the defendant that he was not under arrest and could stop the interview; because the officers did not engage in accusatory questioning; and, because, although multiple officers joined the questioning, they separated the defendant from those individuals who would provide him moral support, and the defendant could see an officer's firearm, the officers did not physically contact the defendant or suggest that the defendant had to comply); id. at 1362-63 (concluding that the defendant was not in custody when law enforcement officers informed him that he did not need to answer their questions; when the officers did not engage in accusatory, prolonged questioning and asked few questions; when the defendant of his own volition separated himself from those who could lend moral support; and when the officers did not physically or orally suggest that the defendant must comply with their requests); United States v. Fox, No. CR 05-0772 JB, 2006 WL 4017485, at *10-11 (D.N.M. Oct. 29, 2006)(Browning, J.)(explaining that no Fifth Amendment violation occurred where the defendant was advised of his rights, made the incriminating statements after making his telephone call, admitted that he received no pressure to waive his rights, and was not deprived of basic physical comforts like food and sleep); United States v. Jones, 411 F. Supp. 2d 1262, 1268-72 (D.N.M. 2005)(Browning, J.)(deeming no Fifth Amendment violation where police interviewed the defendant in surroundings familiar to him, informed him of his rights, engaged in no coercive conduct, and gave the defendant a choice to speak with them and sign an advice of rights form).

### 2.    Miranda Waiver.

Waiver of a person's Fifth Amendment privilege against self-incrimination must be made "voluntarily, knowingly and intelligently."  United States v. Burson, 531 F.3d 1254, 1256 (10th Cir. 2008)(citations omitted).  An express statement is not required; the waiver can be inferred

from the defendant's actions and words.  See United States v. Nelson, 450 F.3d 1201, 1211 (10th Cir. 2006)(citing United States v. Toro-Pelaez, 107 F.3d 819, 825 (10th Cir. 1997)).  "Whether this standard is met 'depends in each case upon the particular facts and circumstances surrounding that case, including the background, experience, and conduct of the accused.'"  United States v. Burson, 531 F.3d at 1256 (quoting Maynard v. Boone, 468 F.3d 665, 676 (10th Cir. 2006)).  The government generally bears the burden of proving, by a preponderance of the evidence, that a valid waiver occurred.  See United States v. Burson, 531 F.3d at 1256; United States v. Nelson, 450 F.3d at 1210-11.  The Tenth Circuit has noted that this standard incorporates two distinct requirements:

> "First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception.  Second, the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it. Only if the totality of the circumstances surrounding the interrogation reveal both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the Miranda rights have been waived."

United States v. Morris, 287 F.3d 985, 988 (10th Cir. 2002)(quoting Colorado v. Spring, 479 U.S. 564, 573 (1987)).  In determining whether a waiver of rights was knowing and intelligent, the Tenth Circuit employs a totality of the circumstances approach.  See United States v. Burson, 531 F.3d at 1256-57 (citing Colorado v. Spring, 479 U.S. at 573).  "In determining whether rights were voluntarily waived, we consider: the suspect's age, intelligence, and education; whether the suspect was informed of his or her rights; the length and nature of the suspect's detention and interrogation; and the use or threat of physical force against the suspect."  United States v. Smith, 606 F.3d 1270, 1276 (10th Cir. 2010)(citing Smith v. Mullin, 379 F.3d 919, 934 (10th Cir. 2004);

United States v. Minjares-Alvarez, 264 F.3d 980, 985 (10th Cir. 2001)).  A "state of intoxication does not automatically render a statement involuntary." United States v. Muniz, 1 F.3d 1018, 1022 (10th Cir. 1993).  "Rather the test is 'whether a [suspect's] will was overborne by the circumstances surrounding the giving of a confession.'" United States v. Smith, 606 F.3d at 1276-77 (quoting Dickerson v. United States, 530 U.S. 428, 434 (2000)("Dickerson")(alterations in United States v. Smith)).

In United States v. Tafoya, 399 F. Supp. 2d 1227 (D.N.M. 2005)(Browning, J.), the Court considered whether a suspect had knowingly waived his Miranda rights after he was given the warning and responded to the officer's questioning related to the investigation.  See 399 F. Supp. 2d at 1238.  Although the suspect was "emotional" during the questioning, he "gave clear and appropriate answers" to the questions asked of him.  399 F. Supp. 2d at 1238-39.  On those facts, the Court concluded that the suspect had "made voluntary" statements.  399 F. Supp. 2d at 1239.  See United States v. Begay, 310 F. Supp. 3d 1318, 1364-65 (D.N.M. 2018)(Browning, J.)(concluding that the defendant voluntarily waived Miranda rights during an interrogation).

### 3.   Requests for an Attorney.

The Fifth and Fourteenth Amendments to the Constitution of the United States of America provide the accused a "right to have counsel present during custodial interrogation." Edwards v. Arizona, 451 U.S. at 482.  In Miranda, the Supreme Court held:

> If the individual states that he wants an attorney, the interrogation must cease until an attorney is present.  At that time, the individual must have an opportunity to confer with the attorney and to have him present during any subsequent questioning.  If the individual cannot obtain an attorney and he indicates that he wants one before speaking to police, they must respect his decision to remain silent.

384 U.S. at 474.  The Supreme Court expanded on that principle in Edwards v. Arizona, concluding that, once an individual, subject to custodial interrogation, expresses a desire for counsel, that individual is "not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police."  Edwards v. Arizona, 451 U.S. at 484-85.  See Edwards v. Arizona, 451 U.S. at 485 ("Had Edwards initiated the meeting on January 20, nothing in the Fifth and Fourteenth Amendments would prohibit the police from merely listening to his voluntary, volunteered statements and using them against him at trial."); Davis v. United States, 512 U.S. 452, 458 (1994)("[I]f a suspect requests counsel at any time during the interview, he is not subject to further questioning until a lawyer has been made available or the suspect himself reinitiates conversation.").  The Tenth Circuit has held that Edwards v. Arizona applies -- and a suspect can invoke a right to counsel -- before the officers have issued a Miranda warning.  See United States v. Kelsey, 951 F.2d at 1199 ("It is clear from the exchange between Kelsey and the police . . . that the police intended to question Kelsey at some point at his home, and that the police understood Kelsey to be invoking his right to counsel during questioning.").

This rule amounts to a "second layer" of protection for the accused who has invoked his right to an attorney in that further communication with law enforcement does not mean that he waived his right to an attorney, unless he initiates the conversation.  Maryland v. Shatzer, 559 U.S. 98, 104 (2010).  "When an accused has invoked his right to have counsel present during custodial interrogation, a valid waiver of that right cannot be established by showing only that he responded to further police-initiated custodial interrogation even if he has been advised of his rights."

Maryland v. Shatzer, 559 U.S. at 104 (quoting Edwards v. Arizona, 451 U.S. at 484-85).

> The rationale of *Edwards* is that once a suspect indicates that "he is not capable of undergoing [custodial] questioning without advice of counsel," "any subsequent waiver that has come at the authorities' behest, and not at the suspect's own instigation, is itself the product of the 'inherently compelling pressures' and not the purely voluntary choice of the suspect.

Maryland v. Shatzer, 559 U.S. at 104-05 (quoting Arizona v. Roberson, 486 U.S. 675, 681 (1988) (Arizona v. Roberson quoting Miranda, 384 U.S. at 467)).  Accordingly, "a voluntary *Miranda* waiver is sufficient at the time of an initial attempted interrogation to protect a suspect's right to have counsel present, but it is not sufficient at the time of subsequent attempts if the suspect initially requested the presence of counsel." Maryland v. Shatzer, 559 U.S. at 105.  The Supreme Court noted, however, that the "*Edwards* rule is not a constitutional mandate, but judicially prescribed prophylaxis." Maryland v. Shatzer, 559 U.S. at 105.[9]  A break in custody of fourteen days or more ends the Edwards v. Arizona rule that a subsequent attempt to obtain a Miranda waiver is ineffective when the suspect initially requested counsel.  See Maryland v. Shatzer, 559 U.S. at 110.

The request for counsel must be clear and unequivocal.  See Davis v. United States, 512 U.S. at 459.  A "suspect need not 'speak with the discrimination of an Oxford don,'" Davis v. United States, 512 U.S. at 459 (quoting Davis v. United States, 512 U.S. at 476 (Souter, J., concurring)), but "[i]nvocation of the Miranda right to counsel 'requires, at a minimum, some statement that can reasonably be construed to be an expression of a desire for the assistance of an attorney,'" Davis v. United States, 512 U.S. at 459 (quoting McNeil v. Wisconsin, 501 U.S. 171,

---

[9]But see Dickerson v. United States, 530 U.S at 460; infra n.19.

178 (1991)).  The applicability of the rule that law enforcement cease custodial interrogation upon a clear request for counsel "requires courts to determine whether the accused actually invoked his right to counsel."  Davis v. United States, 512 U.S. at 453.  An individual's "ambiguous" or "equivocal" references to an attorney, regarding which "a reasonable officer in light of the circumstances would have understood only that the suspect *might* be invoking the right to counsel," do not give rise to an invocation of the right to counsel such that police must cease questioning. Davis v. United States, 512 U.S. at 453 (emphasis in original).  The Supreme Court later explained: "If an ambiguous act, omission, or statement could require police to end the interrogation, police would be required to make difficult decisions about an accused's unclear intent and face the consequence of suppression 'if they guess wrong.'"  Berghuis v. Thompkins, 560 U.S. 370, 382 (2010)(quoting Davis v. United States, 512 U.S. at 461).  "Suppression of a voluntary confession in these circumstances would place a significant burden on society's interest in prosecuting criminal activity."  Berghuis v. Thompkins, 560 U.S. at 382.

The Supreme Court held in Davis v. United States that a defendant's statement to law enforcement agents that "[m]aybe I should talk to a lawyer" was not a clear and unequivocal request for counsel.  512 U.S. at 462.  See Maryland v. Shatzer, 559 U.S. at 112 (noting that a defendant's statement that "'he would not talk about this case without having an attorney present'" satisfactorily invoked the defendant's right to an attorney (quoting Shatzer v. State, 405 Md. 585, 589, 954 A.2d 1118, 1120 (Md. 2008))); United States v. Zamora, 222 F.3d 756, 765 (10th Cir. 2000)(holding that Zamora's statement "'I might want to talk to my attorney'" is ambiguous and does not invoke the right to counsel)(quoting the agent's testimony at the suppression hearing about Zamora's statements).  In United States v. Santistevan, 701 F.3d 1289 (10th Cir. 2012), the

Tenth Circuit held that a letter a defendant handed to a law-enforcement agent, which read "Mr. Santistevan does not wish to speak with you without counsel" is "an unambiguous invocation of the right to counsel."  United States v. Santistevan, 701 F.3d at 1292-93.  Although the defendant agreed to speak with law enforcement without his attorney present almost immediately after handing over the letter, the Tenth Circuit determined that, "once the suspect unambiguously invokes the right to counsel -- as Mr. Santistevan did here by giving the letter to the agent -- all questioning must stop."  United States v. Santistevan, 701 F.3d at 1293.  In United States v. Lux, 905 F.2d 1379 (10th Cir. 1990), the Tenth Circuit affirmed a district court finding that a defendant did not make an unambiguous request for counsel when she asked how long it would take if she wanted a lawyer and whether she would have to stay in jail while she waited for a lawyer.  United States v. Lux, 905 F.2d at 1381.  See Valdez v. Ward, 219 F.3d 1222, 1232-33 (10th Cir. 2000)(holding that a non-native English speaker's statement, in response to whether he understood his Miranda rights, that "Yes, I understand it a little bit and I sign it because I understand it [sic] something about a lawyer and he want [sic] to ask me questions and that's what I'm looking for [sic] a lawyer" is an ambiguous request for counsel); Mitchell v. Gibson, 262 F.3d 1036, 1056 (10th Cir. 2001)("Even construed most favorably to Mr. Mitchell, his statement asking police whether he needed an attorney is not, in light of the circumstances, a sufficiently clear request for counsel to require the cessation of questioning under Davis."); United States v. Sierra-Estrada, 248 F. App'x 973, 981 (10th Cir. 2007)(unpublished)(collecting appellate court cases).  The Court has ruled previously that a suspect's question about "whether she needed an attorney" did not constitute a clear and unequivocal request sufficient to invoke a right to counsel.  United States v. Alfaro, No. CR 08-0784 JB, 2008 WL 5992268, at *13 (D.N.M. Dec. 17, 2008)(Browning, J.).

See United States v. Martinez, No. CR 02-1055 JB, 2006 WL 4079686, at *12 (D.N.M. Nov. 21, 2006)(Browning, J.)(ruling that "an inquiry whether he might need a lawyer . . . was not an unequivocal assertion of his right to counsel.").

### 4.     Midstream Miranda Warnings.

The Supreme Court first considered midstream Miranda warnings in Oregon v. Elstad, 470 U.S. 298 (1985)("Elstad") -- a home-burglary case.  In Elstad, a witness to the burglary implicated an 18-year-old neighbor -- Michael Elstad -- and, on that information, State of Oregon detectives confronted the teenager in his parents' home.  See Elstad, 470 U.S. at 300.  Without issuing a Miranda warning, detectives briefly questioned Elstad in his parents' living room, and Elstad admitted that he was involved in the burglary.  See Elstad, 470 U.S. at 301.  The detectives then escorted Elstad to the sheriff's headquarters and read him his Miranda rights.  See 470 U.S. at 301.  Elstad waived them and gave a full written confession.  See 470 U.S. at 301-02.

On appeal, Elstad argued that his "confession was tainted by the earlier failure of the police to provide *Miranda* warnings," Elstad, 470 U.S. at 305, and, drawing on the Fourth Amendment's fruit-of-the-poisonous-tree doctrine, see Wong Sun v. United States, 371 U.S. 471 (1963), he contended that the confession "must be excluded," Elstad, 470 U.S. at 305.  The Supreme Court disagreed with Elstad, concluding that "procedural *Miranda* violation[s] differ[] in significant respects from" Fourth Amendment violations.  Elstad, 470 U.S. at 306 (alterations added).  It explained that, unlike a Fourth Amendment search-and-seizure violation, a Miranda violation does not necessarily mean that there was a constitutional violation.  See Elstad, 470 U.S. at 306-07.  The Fifth Amendment prohibits the use of compelled testimony; "[f]ailure to administer *Miranda* warnings," on the other hand, "creates a presumption of compulsion," but "unwarned statements

that are otherwise voluntary" are nevertheless barred under <u>Miranda</u>.  <u>Elstad</u>, 470 U.S. at 306-07.

Thus, the "*Miranda* exclusionary rule" is prophylactic, and "sweeps more broadly than the Fifth

Amendment itself."  <u>Elstad</u>, 470 U.S. at 307.

That <u>Miranda</u> sweeps more broadly than the Fifth Amendment means that, unlike a Fourth

Amendment violation, a <u>Miranda</u> violation does not necessarily require a confession's exclusion.[10]

---

[10]There is tension in this reasoning and with the Supreme Court's later determination in <u>Dickerson</u> that <u>Miranda</u> is a constitutional rule.  <u>See</u> <u>Dickerson</u>, 530 U.S. at 437-38, 441.  In <u>Dickerson</u>, although conceding that "we have repeatedly referred to the *Miranda* warnings as 'prophylactic,' and 'not themselves rights protected by the Constitution,'" <u>Dickerson</u>, 530 U.S. at 437-38 (quoting <u>New York v. Quarles</u>, 467 U.S. 649, 653 (1984); <u>Michigan v. Tucker</u>, 417 U.S. 433, 444 (1974)), the Supreme Court concluded that "*Miranda* is a constitutional decision," because (i) it had consistently applied <u>Miranda</u> to state court decisions and (ii) <u>Miranda</u> had invited legislative action "to protect the constitutional right against coerced self-incrimination," <u>Dickerson</u>, 530 U.S. at 438-40.  If <u>Miranda</u> is a constitutional rule, however, it is hard to see how it can "sweep[] more broadly than the Fifth Amendment itself."  <u>Elstad</u>, 470 U.S. at 306.  It is possible that the Supreme Court meant that <u>Miranda</u> implicated additional constitutional amendments, such as the Fourteenth, but the statement's context in <u>Elstad</u> suggests that the Supreme Court meant that <u>Miranda</u>'s exclusionary rule arose from judicial rulemaking, and not from some other Amendment beyond the Fifth.  <u>See</u> <u>Elstad</u>, 470 U.S. at 305; <u>Elstad</u>, 470 U.S at 307 ("*Miranda's* preventive medicine provides a remedy even to the defendant who has suffered no identifiable constitutional harm.").  The Supreme Court, in expressly recognizing this tension, noted that <u>Elstad</u> "does not prove that *Miranda* is a nonconstitutional decision, but simply recognizes the fact that unreasonable searches under the Fourth Amendment are different from unwarned interrogation under the Fifth Amendment."  <u>Dickerson</u>, 530 U.S. at 441.  <u>But</u> <u>see</u> <u>Dickerson</u>, 530 U.S. at 454 (Scalia, J., dissenting)("The proposition that failure to comply with *Miranda*'s rules does not establish a constitutional violation was central to the *holdings* of [*Michigan v.*] *Tucker*, [530 U.S. 428 (2000)], [*Oregon v.*] *Hass*, [420 U.S. 714 (1975)], [*New York v.*] *Quarles*, [467 U.S. 649 (1984)], and *Elstad*.")(emphasis in original)(alterations added).

   Because <u>Elstad</u>'s reasoning to exclude fruit-of-the-poisonous-tree evidence rested, in large part, on <u>Miranda</u> being a nonconstitutional rule, <u>Dickerson</u>'s determination that <u>Miranda</u> is a constitutional rule reopened the question why fruit-of-the-poisonous-tree evidence is not excluded after a procedurally tainted <u>Miranda</u> warning.  <u>See</u> <u>United States v. Patane</u>, 542 U.S. 630 (2004)("<u>Patane</u>")(plurality op.)("Based on its understanding of *Dickerson*, the Court of Appeals rejected the post-*Dickerson* views of the Third and Fourth Circuits that the fruits doctrine does not apply to *Miranda* violations.").  <u>See also</u> <u>Sanchez-Llamas v. Oregon</u>, 548 U.S. at 348 ("We have applied the exclusionary rule primarily to deter constitutional violations.").

See 470 U.S. at 307; Sanchez-Llamas v. Oregon, 548 U.S. 331, 348 (2006)("We have applied the

---

The Supreme Court attempted to resolve this tension in Patane, but a divided court did not produce a controlling opinion. See Patane, 542 U.S. at 635-36. The Honorable Antonin G. Scalia, then-Associate Justice of the Supreme Court, the Honorable Clarence Thomas, Associate Justice of the Supreme Court, and the Honorable William H. Rehnquist, then-Chief Justice of the Supreme Court, determined that Miranda was a prophylactic rule, and that admitting "fruits" evidence from a voluntary statement did not implicate the Fifth Amendment's self-incrimination clause. Patane, 542 U.S. at 636. The plurality reasoned that, even taking Dickerson's holding to heart that Miranda is a constitutional rule, there must be a close fit between the constitutional violation and the remedy. See Patane, 542 U.S. at 643. It concluded that admitting nontestimonial fruits of a voluntary statement do not implicate the self-incrimination clause, so there is no fit between the Miranda violation and the exclusionary remedy. See Patane, 542 U.S. at 643 ("The admission of such fruit presents no risk that a defendant's coerced statements (however defined) will be used against him at a criminal trial."). In so concluding, the three justices in the plurality reaffirmed that Elstad's reasoning was sound. Patane, 542 U.S. at 639-40. The Honorable Sandra Day O'Connor and the Honorable Anthony M. Kennedy, then-Associate Justices of the Supreme Court of the United States, concurred in the judgment and agreed that Elstad is still good law after Dickerson. See Patane, 542 U.S. at 645 (Kennedy, J., concurring). The two Justices did not, however, expressly adopt the constitutional "fit" analysis that the plurality deployed. Patane, 542 U.S. at 645. They concluded that admitting nontestimonal fruits from a voluntary statement "does not run the risk of admitting into trial an accused's coerced incriminating statements against himself." Patane, 542 U.S. at 645 (Kennedy, J., concurring). Instead of concluding that such a remedy would not fit the constitutional violation, however, they concluded that excluding such evidence would not serve the police "deterrence rationale" infusing Miranda. Patane, 542 U.S. at 645 (Kennedy, J., concurring). The concurrence did not comment on Elstad's rationale that Miranda did not justify excluding "fruits" evidence, because, unlike the Fourth Amendment, Miranda is not a constitutional rule.

Elstad's constitutional reasoning, thus, may no longer be good law, but its trustworthiness and deterrence rationales may be. See Elstad, 470 U.S. at 308. Moreover, despite Dickerson's suggestion that "fruits" evidence may need to be excluded as Miranda is a constitutional rule, five justices eschewed that suggestion in Patane. Patane, 542 U.S. at 643, 645. Accordingly, the Court concludes that a procedural Miranda violation does not require the Court to exclude nontestimonal evidence from a voluntary statement based on a fruit-of-the-poisonous-tree theory. See Wong Sun v. United States, 371 U.S. at 471; United States v. Phillips, 468 F.3d 1264, 1266 (10th Cir. 2006).

Furthermore, the Court would join the Justices who have noted that Miranda is not properly rooted or found in the Constitution, but instead is the product of the Supreme Court's power to provide prophylactic rules. See Maryland v. Shatzer, 559 U.S. at 106. It may not be a bad rule in that it has -- with its bright-line application -- made a lot of otherwise fuzzy confessions valuable and protected police in their work, but its constitutional and judicial underpinnings are shaky if not non-existent.

exclusionary rule primarily to deter constitutional violations.").  Indeed, the prosecution may still use a confession obtained in violation of Miranda for impeachment purposes.  See Elstad, 470 U.S. at 307.  Moreover, the Supreme Court reasoned that categorically barring a confession after a midstream Miranda warning "undercuts the twin rationales" of the prophylactic Miranda rule -- trustworthiness and deterrence.  Elstad, 470 U.S. at 308.  See Dickerson, 530 U.S. at 433 ("The roots of this test developed in the common law, as the courts of England and then the United States recognized that coerced confessions are inherently untrustworthy.").

> "A free and voluntary confession is deserving of the highest credit, because it is presumed to flow from the strongest sense of guilt . . . but a confession forced from the mind by the flattery of hope, or by the torture of fear, comes in so questionable a shape . . . that no credit ought to be given to it; and therefore it is rejected."

Dickerson, 530 U.S. at 433 (quoting King v. Warickshall, 1 Leach 262, 263-64, 168 Eng. Rep. 234, 235 (K.B. 1783)).  If the post-Miranda confession is otherwise knowing and voluntary, its trustworthiness is not in doubt.  See Elstad, 470 U.S. at 308.  The deterrence rationale likewise loses force when the officers acted in good faith compliance with Miranda.  See Elstad, 470 U.S. at 308 (citing Michigan v. Tucker, 417 U.S. 433, 447-48 (1974)).  Accordingly, the Supreme Court held that, once the Miranda warning is made, "the admissibility of any subsequent statement should turn . . . solely on whether it is knowingly and voluntarily made."  Elstad, 470 U.S. at 309. See Elstad, 470 U.S. at 318 ("The relevant inquiry is whether, in fact, the second statement was also voluntarily made.  As in any such inquiry, the finder of fact must examine the surrounding circumstances and the entire course of police conduct with respect to the suspect in evaluating the voluntariness of his statements.").

Extrapolating from that test, the Supreme Court concluded that Elstad's pre- and post-Miranda confessions were voluntary, and therefore admissible.  See Elstad, 470 U.S. at 314-15.  It

noted that, "[w]hen a prior statement is actually coerced, the time that passes between confessions, the change in place of interrogations, and the change in identity of the interrogators all bear on whether that coercion has carried over into the second confession."  Elstad, 470 U.S. at 310. However, where the initial confession is voluntary, "a break in the stream of events" is not needed for the second confession to be admissible.  Elstad, 470 U.S. at 310.  Rather, the Miranda warning "serves to cure the condition that rendered the unwarned statement inadmissible."  Elstad, 470 U.S. at 311.

In Elstad, the Supreme Court reasoned that the initial confession "took place at midday" in Elstad's living room with his mother "a few steps away," so it was voluntary.  Elstad, 470 U.S. at 315.  With no additional facts demonstrating that the second confession, post-Miranda was elicited under coercive conditions, the Supreme Court deemed it admissible.  See Elstad, 470 U.S. at 314. That Elstad had "'let the cat out of the bag by confessing,'" Elstad, 470 U.S. at 311 (quoting United States v. Bayer, 331 U.S. 532, 540 (1947)), with his first statement in no way created a "presumption of compulsion" for the second statement, Elstad, 470 U.S. at 314.   Dissenting justices noted that there may be a "'psychological impact of a *voluntary* disclosure of a guilty secret,'" but such disclosure, as a matter of law, does not qualify "'as state compulsion' nor 'compromises the voluntariness' of subsequent confessions."  Elstad, 470 U.S. at 312 (Brennan, J., dissenting, joined by Marshall, J.)(emphasis in Elstad)(quoting Elstad, 470 U.S. at 312, 326) .

The Supreme Court next considered midstream-Miranda warnings in Missouri v. Seibert, 542 U.S. 600 (2004)("Seibert"), and issued only a plurality opinion.  Seibert, 542 U.S. at 603-05.[11]

_____

[11]The Honorable David H. Souter, then-Associate Justice of the Supreme Court, announced the Court's judgment and delivered an opinion joined by the Honorable John Paul Stevens, the

In Seibert, a young boy with cerebral palsy died in his sleep, and his mother feared charges of neglect, because the boy's body was covered in bedsores. See Seibert, 542 U.S. at 604. The mother, along with two of her remaining sons and family friends, conspired to conceal the evidence of neglect by burning the family's mobile home with the boy's dead body in it. See Seibert, 542 U.S. at 604. To avoid the appearance that they had left the boy unattended, they arranged for Donald Rector, a mentally-ill teenager living with the family, to remain in the mobile home while they set fire to it. See Seibert, 542 U.S. at 604. The conspirators executed their plan, and Rector died in the fire. See Seibert, 542 U.S. at 604.

Missouri officers subsequently arrested the mother. See Seibert, 542 U.S. at 604. Officer Kevin Clinton refrained from issuing her a Miranda warning on instructions from police headquarters. See Seibert, 542 U.S. at 604. Another officer, Richard Hanrahan, questioned her at the police station for thirty-forty minutes without a Miranda warning, and she eventually admitted that Rector "was meant to die in the fire." Seibert, 542 U.S. at 605. After a twenty-minute break, Hanrahan issued a Miranda warning, obtained a signed waiver of rights and secured the same confession with a similar line of questioning. See Seibert, 542 U.S. at 605. According to Hanrahan, he consciously decided to withhold the Miranda warning in accordance with a sanctioned interrogation technique that he had been taught: "question first, then give the warnings, and then repeat the question until he got the answer previously given." Seibert, 542 U.S. at 600.

---

Honorable Ruth Bader Ginsburg, and the Honorable Stephen G. Breyer, Associate Justices of the Supreme Court. See Seibert, 542 U.S. at 603. Justice Breyer filed a concurrence, and Justice Kennedy concurred in the judgment. See Seibert, 542 U.S. at 617-18. Justice O'Connor, joined by then-Chief Justice Rehnquist and Justices Scalia and Thomas, dissented. See Seibert, 542 U.S. at 622.

On appeal, the Supreme Court noted that Hanrahan's tactic of question first, issue Miranda warnings later, was not confined to Missouri.  See Seibert, 542 U.S. at 609.  The Supreme Court further noted that such a tactic was at odds with Miranda's purpose; Miranda sought to ensure that individuals made a "'free and rational choice,'" Seibert, 542 U.S. at 601 (quoting Miranda, 384 U.S. at 464-65), with full knowledge of their constitutional rights before speaking with officers, whereas "[t]he object of question-first is to render *Miranda* warnings ineffective by waiting for a particularly opportune time to give them, after the suspect has already confessed," Seibert, 542 U.S. at 611.  The plurality continued:

> [I]t is likely that if the interrogators employ the technique of withholding warnings until after interrogation succeeds in eliciting a confession, the warnings will be ineffective in preparing the suspect for successive interrogation, close in time and similar in content. . . .  Upon hearing warnings only in the aftermath of interrogation and just after making a confession, a suspect would hardly think he had a genuine right to remain silent, let alone persist in so believing once the police began to lead him over the same ground again. . . .  What is worse, telling a suspect that "anything you say can and will be used against you," without expressly excepting the statement just given, could lead to an entirely reasonable inference that what he has just said will be used, with subsequent silent being of no avail.  Thus, when *Miranda* warnings are inserted in the midst of coordinated and continuing interrogation, they are likely to mislead and "depriv[e] a defendant of knowledge essential to his ability to understand the nature of his rights and the consequences of abandoning them."

Seibert, 542 U.S. at 613-14 (quoting Moran v. Burbine, 475 U.S. 412, 424 (1986)).  But see Seibert, 542 U.S. at 627 (O'Connor, J., dissenting)(critiquing these statements as adopting the "cat out of the bag" theory that the Supreme Court rejected in Elstad).  Accordingly, the plurality held that "[t]he threshold issue when interrogators question first and warn later is thus whether it would be reasonable to find that in these circumstances the warnings could function 'effectively' as *Miranda* requires."  Seibert, 542 U.S. at 611-12 (quoting Miranda, 384 U.S. at 467).

The plurality concluded that the following factors bear on whether a midstream <u>Miranda</u> warning can be effective:

> [(i)] the completeness and detail of the questions and answers in the first round of interrogation[; (ii)] the overlapping content of the two statements[; (iii)] the timing and setting of the first and the second[; (iv)] the continuity of police personnel, and [(v)] the degree to which the interrogator's questions treated the second round as continuous with the first.

<u>Seibert</u>, 542 U.S. at 615.  In its analysis, the plurality added another factor: whether officers advise the suspect that the pre-<u>Miranda</u> confession could not be used against him.  <u>See</u> <u>Seibert</u>, 542 U.S. at 616 n.7.  Conspicuously absent from those factors is the officer's intent, but the plurality noted that, "[b]ecause the intent of the officer will rarely be as candidly admitted as it was here (even as it is likely to determine the conduct of the interrogation), the focus is on facts apart from intent that show the question-first tactic at work."  542 U.S. at 616 n.6.  The plurality concludes that the midstream <u>Miranda</u> warning was ineffective, because the pre- and post-<u>Miranda</u> questioning occurred in the same location, the post-<u>Miranda</u> phase occurred only twenty minutes after the pre-<u>Miranda</u> phase, the officers treated the two phases of questioning as continuous, and the pre-<u>Miranda</u> phase left "little, if anything, of incriminating potential left unsaid."  <u>Seibert</u>, 542 U.S. at 616-17.

In so holding, the plurality contrasted <u>Seibert</u> with <u>Elstad,</u> and concludes that the officer's failure to warn in <u>Elstad</u> was a good faith <u>Miranda</u> mistake, and that "any causal connection between the first and second [admissions] to the police was 'speculative and attenuated.'"  <u>Seibert</u>, 542 U.S. at 615 (quoting <u>Elstad</u>, 470 U.S. at 313).  "In <i>Elstad</i>, it was not unreasonable to see the occasion for questioning at the station house as presenting a markedly different experience from the short conversation at home," because a reasonable person "could have seen the station house

questioning as a new and distinct experience."  Seibert, 542 U.S. at 615.  Moreover, the police

station interrogation went "well beyond the scope of the laconic prior admission" in the suspect's

living room.  542 U.S. at 614.  Justice Breyer concurred, noting that, "[i]n my view, the following

simple rule should apply to the two-stage interrogation technique: Courts should exclude the

'fruits' of the initial unwarned questioning unless the failure to warn was in good faith."  Seibert,

542 U.S. at 617 (Breyer, J., concurring).  He joined "the plurality's opinion in full," however,

because he believed that "the plurality's approach in practice will function as a 'fruits' test."

Seibert, 542 U.S. at 618 (Breyer, J., concurring)(quoting Wong Sun v. U.S., 371 U.S. at 477).

Justice Kennedy concurred in the judgment, but wrote separately and adopts a different

test.  Seibert, 542 U.S at 622 (Kennedy, J., concurring).  First, he extrapolated a general principle

from the Supreme Court's Miranda cases: "Evidence is admissible when the central concerns of

Miranda are not likely to be implicated and when other objectives of the criminal justice system

are best served by its introduction."  Seibert, 542 U.S. at 618-19 (Kennedy, J., concurring).  From

that general principle, he concluded that an officer's deliberate intent to withhold a Miranda

warning in an effort to obtain a confession without informing a suspect of his rights "distorts the

meaning of Miranda and furthers no legitimate countervailing interest."  Seibert, 542 U.S. at 621

(Kennedy, J., concurring).  He disagreed with the plurality, however, because the test the plurality

articulated "cuts too broadly."  Seibert, 542 U.S. at 622 (Kennedy, J., concurring).

> Miranda's clarity is one of its strengths, and a multifactor test that applies to every
> two-stage interrogation may serve to undermine that clarity.  Cf. Berkemer v.
> McCarty, 468 U.S. 420, 430 . . . (1984).  I would apply a narrower test applicable
> only in the infrequent case, such as we have here, in which the two-step
> interrogation technique was used in a calculated way to undermine the Miranda
> warning.

Seibert, 542 U.S. at 622 (Kennedy, J., concurring).  Accordingly, Justice Kennedy articulated the

following test:

> The admissibility of postwarning statements should continue to be governed by the principles of *Elstad* unless the deliberate two-step strategy was employed. If the deliberate two-step strategy has been used, postwarning statements that are related to the substance of prewarning statements must be excluded unless curative measures are taken before the postwarning statement is made.

Seibert, 542 U.S at 622 (Kennedy, J., concurring).[12]

Justice O'Connor, joined by Chief Justice Rehnquist, and Justices Scalia and Thomas, dissented.  See Seibert, 542 U.S. at 622 (O'Connor, J., dissenting).   The dissenting justices concluded that Elstad's voluntariness inquiry should control, and not a multi-factor balancing test or a subjective-intent test.  See Seibert, 542 U.S. at 622-23, 628 (O'Connor, J., dissenting).  According to those justices, a test focusing on the officer's subjective intent missed the mark, because "[f]reedom from compulsion lies at the heart of the Fifth Amendment," so the officer's state of mind is irrelevant.  Seibert, 542 U.S. at 624-25 (O'Connor, J., dissenting)("Thoughts kept inside a police officer's head cannot affect [the suspect's] experience.").  The plurality's approach, on the other hand, was defective, because it adopted the "cat out of the bag theory" that the Supreme Court had rejected in Elstad.  542 U.S. at 627 (O'Connor, J., dissenting).  The dissent noted that there are psychological effects on a suspect who confesses pre-Miranda and then endures questioning on the same subjects post-Miranda, but the Supreme Court had "refused to endo[w] those psychological effects with constitutional implications" in Elstad.   542 U.S. at 627 (O'Connor, J., concurring)(alteration in original).   The dissent explained that to adopt that

---

[12]The Supreme Court later applied Seibert in a per curiam review of a habeas petition, but it did not resolve which test was controlling as it applied both the plurality's factors and factors which Justice Kennedy's concurrence articulated.  See Bobby v. Dixon, 565 U.S. 23, 30-32 (2011)(per curiam).

approach "would effectively immuniz[e] a suspect to pre-*Miranda* warning questions from the consequences of his subsequent informed waiver, an immunity that comes at a high cost to legitimate law enforcement activity."  542 U.S. at 627 (O'Connor, J. dissenting)(alteration in original).  Accordingly, the dissent would have ordered a remand for the state court to determine whether the statements were voluntarily made.  See 542 U.S. at 628 (O'Connor, J. dissenting).

        In United States v. Guillen, 995 F.3d 1095 (10th Cir. 2021), the Tenth Circuit held that "Justice Kennedy's concurrence is the binding opinion from Seibert."  995 F.3d at 1114.  The Tenth Circuit arrived at this holding by applying the rule that, "'[w]hen a fragmented Court decides a case and no single rationale explaining the result enjoys the assent of five Justices, "the holding of the Court may be viewed as that position taken by those Members who concurred in the judgment[] on the narrowest grounds."'"  United States v. Guillen, 995 F.3d at 1114 (quoting Marks v. United States, 430 U.S. 188, 193 (1977)(quoting Gregg v. Georgia, 428 U.S. 153, 169 n.15 (1976))).  The Tenth Circuit explains that Justice Kennedy concurred with the plurality on the narrowest grounds and is "'a logical subset'" of the plurality opinion.  United States v. Guillen, 995 F.3d at 1114 (quoting United States v. Carrizales-Toledo, 454 F.3d 1142, 1151 (10th Cir. 2006).  The Tenth Circuit joins the majority of Courts of Appeals in holding that "Justice Kennedy's Seibert opinion provides the controlling standard for assessing the admissibility of incriminating statements given subsequent to midstream *Miranda* warnings."  United States v. Guillen, 995 F.3d at 1116 (citing United States v. Capers, 627 F.3d 470, 476 (2d Cir. 2010); United States v. Ollie, 442 F.3d 1135, 1142 (8th Cir. 2006); United States v. Street, 472 F.3d 1298, 1313 (11th Cir. 2006); United States v. Courtney, 463 F.3d 333, 338 (5th Cir. 2006); United States v. Williams, 435 F.3d 1148, 1157-58 (9th Cir. 2006); United States v. Naranjo, 426 F.3d 221, 231-

32 (3d Cir. 2005)(Alito, J., on the panel); United States v. Mashburn, 406 F.3d 303, 308-09 (4th Cir. 2005)).

## RELEVANT LAW REGARDING VOLUNTARINESS OF STATEMENTS

The Fifth Amendment provides that "[n]o person shall be . . . deprived of life, liberty, or property, without due process of law." U.S. Const. amend. V. The Due Process Clause requires that, to be admissible, statements by a defendant must have been made voluntarily. See Dickerson, 530 U.S. at 433 ("Over time, our cases recognized two constitutional bases for the requirement that a confession be voluntary to be admitted into evidence: the Fifth Amendment right against self-incrimination and the Due Process Clause of the Fourteenth Amendment.")(citing Brown v. Mississippi, 297 U.S. 278 (1936), and Bram v. United States, 168 U.S. 532, 542 (1897)).

> It is now axiomatic that a defendant in a criminal case is deprived of due process of law if his conviction is founded, in whole or in part, upon an involuntary confession, without regard for the truth or falsity of the confession, and even though there is ample evidence aside from the confession to support the conviction.

Jackson v. Denno, 378 U.S. 368, 376 (1964)(citation omitted).

The Supreme Court has declared that a defendant has the constitutional right "at some stage in the proceedings to object to the use of the confession and to have a fair hearing and a reliable determination on the issue of voluntariness." Jackson v. Denno, 378 U.S. at 376-77 (citation omitted). The United States must show that the statement was voluntary by a preponderance of the evidence. See Missouri v. Seibert, 542 U.S. at 608 n.1; Lego v. Twomey, 404 U.S. 477, 489 (1972)("[T]he prosecution must prove at least by a preponderance of the evidence that the confession was voluntary."); United States v. McCullah, 76 F.3d 1087, 1100 (10th Cir. 1996)("The prosecution has the burden of proving by at least a preponderance of evidence that the confession was voluntary." (citation omitted)).

The due process voluntariness test examines "whether a defendant's will was overborne by the circumstances surrounding the giving of a confession." Dickerson, 530 U.S. at 434 (internal quotations omitted)(quoting Schneckloth v. Bustamonte, 412 U.S. 218, 226 (1973)). "The due process test takes into consideration the totality of all the surrounding circumstances -- both the characteristics of the accused and the details of the interrogation." Dickerson, 530 U.S. at 434 (internal quotations omitted)(citations omitted). The Court must weigh "the circumstances of pressure against the power of resistance of the person confessing." Dickerson, 530 U.S. at 434 (internal quotations omitted)(quoting Stein v. New York, 346 U.S. 156, 185 (1953)). The Supreme Court reaffirmed this analysis in 2000. See Dickerson, 530 U.S. at 434 ("We have never abandoned this due process jurisprudence, and thus continue to exclude confessions that were obtained involuntarily.").

The Supreme Court has instructed that, "[a]bsent police conduct causally related to the confession, there is simply no basis for concluding that any state actor has deprived a criminal defendant of due process of law." Colorado v. Connelly, 479 U.S. 157, 164 (1986). In reviewing its cases in which it suppressed evidence, the Supreme Court has recognized that "all have contained a substantial element of coercive police conduct." Colorado v. Connelly, 479 U.S. at 164.

The Court analyzed voluntariness in United States v. Martinez, No. CR 02-1055 JB, 2006 WL 4079686, at *13-14 (D.N.M. Nov. 21, 2006)(Browning, J.). There, it concluded that a defendant voluntarily confessed where he was in custody for five hours and interrogated for only about two hours. See 2006 WL 4079686, at *14. While the defendant argued that agents had made promises of leniency to him, the Court concluded that "the agents indicated to him that they

could not make him any promises," and that his fate was in the hands of the judge and prosecutors. 2006 WL 4079686, at *14. The defendant also signed a Miranda waiver and a statement that no promises had been made to him. 2006 WL 4079686, at *14.

## ANALYSIS

The Court will deny the Motion to Strike and consider the United States' Supplemental Notice and attached exhibits. Consequently, the Court will deny the Motion to Suppress. BCSO deputies had reasonable suspicion to stop and detain Valdez, because Valdez matched the description a resident gave of a young man who knocked on her door to retrieve a bag he threw into the resident's yard the prior night, and who, after retrieving it, loitered in the neighborhood for several hours, and seemed agitated. Considering Valdez' behavior as the deputies approached him, in addition to the totality of the circumstances, the deputies had reasonable suspicion that Valdez was armed and dangerous. McLeod and Denger's search of Valdez' duffel bag violated Valdez' Fourth Amendment right to be free from unreasonable searches, because McLeod and Denger did not have a warrant to search Valdez' bag, and because the search was not pursuant to an exception to the warrant requirement, such as a search incident to arrest or an inventory search. See U.S. Const. amend. IV. ("The right of the people to be secure in their persons, houses, papers and effects, against unreasonable searches and seizures, shall not be violated . . . ."). Nevertheless, the United States demonstrates, by a preponderance of the evidence, that the contents of Valdez' bag would have been inevitably discovered. Finally, Valdez is not entitled to suppression of his statements, because his Miranda waiver is valid, and his statements were voluntary.

I.    **THE COURT WILL DENY THE MOTION TO STRIKE**.

The Court will deny the Motion to Strike.  In the civil context, a motion to strike generally applies to a pleading or complaint.  See Fed. R. Civ. P. 12(f) ("The court may strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter.").  See Scherer v. U.S. Dep't of Educ., 78 F. App'x at 689 ("While motions to strike are generally disfavored, the decision to grant a motion to strike is within the discretion of the court."); Dubrovin v. Ball Corp. Consol. Welfare Ben. Plan for Emps., No. CIV 08-0563 WYD/KMT, 2009 WL 5210498, at *1 (D. Colo. Dec. 23, 2009)(Wiley, J.)("Only material included in a 'pleading' may be the subject of a motion to strike, and courts have been unwilling to construe the term broadly. Motions, briefs, . . . memoranda, objections, or affidavits may not be attacked by the motion to strike.").

Here, Valdez is not asking the Court to strike language from his Indictment.  Rather, Valdez asks the Court not to consider the United States' Supplemental Notice and attached exhibits in deciding the Motion to Suppress.  See Motion to Strike at 1.  Valdez argues that there is "no legal or procedural basis" that allows the United States to supplement the record after the February 4, 2022, Hearing.  Valdez asserts that the Court should "deny the government 'a second chance . . . to make its strongest case or to dress up arguments that previously failed.'"  Motion to Strike at 2 (quoting United States v. Huff, 782 F.3d at 1224).  Valdez states that "the government does not give any reasonable or valid explanation for why the court should consider these documents now," and argues that "each of these documents contains hearsay and none have been properly authenticated."  Motion to Strike at 2.  At the time of writing this Memorandum Opinion and Order, the United States has not responded to the Motion to Strike.

Although the United States did not file a motion to reconsider -- the Court had not yet issued its Memorandum Opinion and Order on the Motion to Suppress -- the United States filed the Supplemental Notice and exhibits in response to the April 25, 2022 Motion Hearing, at which the Court orally announced its ruling on the Motion to Suppress from the bench. See Supplemental Notice at 1; Apr. Tr. at 3:10-5:25 (Court). Although the United States does not ask explicitly the Court to reconsider its April 25, 2022, ruling, the Supplemental Notice and exhibits call the Court's oral ruling into question. Consequently, the Court construes it as a motion for reconsideration, and Valdez is correct to cite United States v. Huff, 782 F.3d 1221, which addresses when a court may consider the United States' motions for reconsideration of a court's suppression rulings.

The Tenth Circuit has held that motions for reconsideration in criminal cases are proper, even though the Federal Rules of Criminal Procedure do not authorize them explicitly:

> Although the Federal Rules of Criminal Procedure do not authorize a motion for reconsideration, "motions to reconsider in criminal prosecutions are proper." United States v. Rollins, 607 F.3d 500, 502 (7th Cir. 2010). The Supreme Court has recognized motions for reconsideration in criminal proceedings at least since United States v. Healy, 376 U.S. 75, 77-78 . . . (1964). The Court has subsequently noted the "wisdom of giving district courts the opportunity promptly to correct their own alleged errors." United States v. Dieter, 429 U.S. 6, 8 . . . (1976). Although the Supreme Court has only addressed motions to reconsider filed by the Government, we have recognized that criminal defendants may also move for reconsideration. See United States v. Miller, 869 F.2d 1418, 1421 (10th Cir. 1989).

United States v. Randall, 666 F.3d 1238, 1241-42 (10th Cir. 2011). Normally, motions for reconsideration require a justification, such as "(1) an intervening change in the controlling law, (2) new evidence previously unavailable, [or] (3) the need to correct clear error or prevent manifest injustice." Servants of the Paraclete v. Does, 204 F.3d 1005, 1012 (10th Cir. 2000). In United States v. Huff, 782 F.3d 1221, the Tenth Circuit affirmed a district court's decision to grant the

United States' motion for reconsideration of the district court's grant of a motion to suppress, holding that "the district court may reconsider a motion to suppress without requiring the government to justify why it initially failed to set forth that legal basis for the seizure of evidence." United States v. Huff, 782 F.3d at 1222.  It explained its reasoning:

> [T]he district court granted the government's motion for reconsideration because in this case the government's mistake related to an omission of a legal argument, not the failure to present evidence on a particular issue.  The court therefore concluded there was no police misconduct to deter through suppression of evidence which was legally obtained.

United States v. Huff, 782 F.3d at 1224.  In United States v. Huff, "police officers lawfully seized evidence, but the government's attorneys failed to inform the district court of the legal justification for that seizure before the district court granted Mr. Huff's motion to suppress."  782 F.3d at 1225. "To categorically prohibit the district court from reconsidering that suppression of evidence under those circumstances serves merely to punish the government for its attorneys' oversight.  However, the exclusionary rule was not crafted to deter judicial or prosecutorial error or oversight, but to deter illegal police searches and seizures."  United States v. Huff, 782 F.3d at 1225.

Unlike United States v. Huff, here, the United States makes no new legal arguments, but offers more evidence and documentation for the Court's consideration.  The United States justifies its earlier omission by asserting that Valdez did not challenge these arguments in his Motion to Suppress, Reply, or at the Suppression Hearing.  See Supplemental Notice at 1.  McLeod and Denger's conduct did not cause, however, the United States to omit the MDC Inmate Property Inventory Policy, the Valdez Property List, or the Incident Report.  If the Court were to ignore these exhibits in ruling on the Motion to Suppress, it would "punish the government for its attorneys' oversight" and arguably reward Valdez' failure to challenge those arguments earlier.

United States v. Huff, 782 F.3d at 1225.  Because "the exclusionary rule was not crafted to deter judicial or prosecutorial error or oversight, but to deter illegal police searches and seizures," the Court sees no benefit in ignoring the United States' Supplemental Notice and attached exhibits. United States v. Huff, 782 F.3d at 1225.  Accordingly, the Court denies Valdez' Motion to Strike.

## II.    BCSO DEPUTIES HAD REASONABLE SUSPICION TO STOP AND DETAIN VALDEZ.

In light of the information that dispatch gave McLeod and Denger about the suspicious person call, McLeod and Denger had reasonable suspicion to stop and detain Valdez.  Investigative detentions must meet two distinct requirements to be "reasonable" under the Fourth Amendment. Dorato v. Smith, 108 F. Supp. 3d at 1118.  First, in order for a detention to be "justified at its inception," Terry v. Ohio, 392 U.S. at 20, the officer "'must have a particularized and objective basis for suspecting the particular person stopped of criminal activity,'" Oliver v. Woods, 209 F.3d at 1186 (quoting United States v. Cortez, 449 U.S. at 417-18).  Second, the investigative detention that follows the stop must be "reasonably related in scope to the circumstances" that justified the stop in the first place, Terry v. Ohio, 392 U.S. at 20, because the Fourth Amendment imposes "limitations on both the length of the detention and the manner in which it is carried out," United States v. Holt, 264 F.3d at 1229.  "At both stages, the reasonableness of the officer's suspicions is 'judged by an objective standard taking the totality of the circumstances and information available to the officers into account.'"  United States v. Johnson, 364 F.3d at 1189 (quoting United States v. Lang, 81 F.3d 955, 965 (10th Cir. 1996)).

Here, taking the circumstances' totality and the information available to McLeod and Denger into account, McLeod and Denger had a "particularized and objective basis" for suspecting Valdez of criminal activity.  Oliver v. Woods, 209 F.3d at 1186.  McLeod and Denger were

dispatched in response to a suspicious person call, and were looking for a man who rang a resident's doorbell asking if he could retrieve a bag he threw into the resident's yard the prior night and who then loitered in the neighborhood for several hours, seemingly agitated.  See Witness Statement at 1; Tr. at 6:8-7:13 (Wilson, McLeod).  Throwing a bag into a stranger's yard is suspicious activity in and of itself.  Then, when McLeod and Denger saw a man matching the description that the resident gave, the man was peering into the window of a car for sale and had a duffel bag with him.  See Tr. at 10:24-12:14 (Wilson, McLeod).  This activity caused McLeod concern, "because since he did have a duffel bag on his person we didn't know if there were burglary tools or anything like that."  Tr. at 11:11-13 (McLeod).  Furthermore, Denger testified that Valdez was looking over his shoulder nervously when he and McLeod approached Valdez. See Tr. at 46:25-47:1 (Denger); id. at 47:23-24 (Denger).  Although Valdez' activity at the moment he was detained -- looking into the window of a car for sale and reaching into a duffel bag -- is consistent with otherwise innocent conduct, "an officer 'need not rule out the possibility of innocent conduct'" for reasonable suspicion to exist.  United States v. Winder, 557 F.3d at 1134 (quoting United States v. Vercher, 358 F.3d at 1261).  When added to the resident's report of suspicious activity, however, Valdez' nervous appearance, his behavior peering into the window of an unoccupied car, and his reaching into the duffel bag give rise to reasonable suspicion.

Similar to the circumstances giving rise to reasonable suspicion in United States v. Johnson, here, McLeod and Denger responded to a call from a citizen who described Valdez and his suspicious activity in detail, the contact with Valdez occurred in a high-crime area of Albuquerque, and Valdez behaved nervously.  See 364 F.3d at 1194; Tr. at 10:3-5 (McLeod, Wilson); id. at 10:24-11:7 (McLeod).  Whereas the call in United States v. Johnson was an anonymous tip, see 364 F.3d

at 1190, here, the resident gave BCSO her name and address; therefore, the information she gave was more reliable, see Witness Statement at 1; United States v. Johnson, 364 F.3d at 1190-91 ("A tipster who refuses to identify himself may simply be making up the story, perhaps trying to use the police to harass another citizen.  This is why the Supreme Court . . . has required that anonymous tips be accompanied by corroboration and 'other indicia of reliability.'" (quoting Florida v. J.L., 529 U.S. 266, 270 (2000) and citing Alabama v. White, 496 U.S. 325, 328 (1990))). The Tenth Circuit in United States v. Johnson held that the district court erred in concluding that each factor taken in isolation -- for example, the suspect's nervousness, the anonymous tip, the suspect's location in a high-crime area -- was insufficient to give rise to reasonable suspicion, noting that "[a]ll of these factors, mitigating and aggravating, should have been analyzed as part of the totality of the circumstances faced by Officer Middleton at the inception of the detention." United States v. Johnson, 364 F.3d at 1193.

Valdez' argument that his behavior -- including throwing his bag into a stranger's yard, appearing agitated, being in the area for about two hours after ringing the resident's doorbell, and looking into the window of an unoccupied vehicle -- is "innocuous and not indicative of criminal behavior" is not persuasive.  Reply at 2.  That Valdez did not trespass on the resident's property and was polite when he asked for the return of his bag does not lessen the suspicion such conduct arouses.  See Reply at 2.  Valdez' assertion that being surrounded by law enforcement caused his nervousness and, therefore, should not give rise to reasonable suspicion under United States v. Fernandez, 18 F.3d at 879, does not take into account McLeod and Denger's knowledge of "other indicia of criminal activity," such as Valdez' conduct the prior night.  United States v. Fernandez, 18 F.3d at 879 ("In the absence of any other indicia of criminal activity, nervousness cannot be

used to support a finding of reasonable suspicion."). <u>See</u> Reply at 3. Because "'the likelihood of criminal activity need not rise to the level required for probable cause, and it falls considerably short of satisfying a preponderance of the evidence standard,'" <u>United States v. Johnson</u>, 364 F.3d at 1194 (quoting <u>United States v. Arvizu</u>, 534 U.S. 266, 274 (2002)), as long as an officer "has a particularized and objective basis for suspecting an individual may be involved in criminal activity, he may initiate an investigatory detention even if it is more likely than not that the individual is *not* involved in any illegality," <u>United States v. Johnson</u>, 364 F.3d at 1194 (emphasis in original).

Matching the analysis in <u>United States v. Johnson</u>, the combination of Valdez' conduct the prior night, his nervousness and agitation, the location of his activity in a high-crime area, and his conduct in peering into the parked car for sale supports a finding that McLeod and Denger had reasonable suspicion to stop and detain Valdez for an investigatory stop. <u>See</u> 364 F.3d at 1193. At the hearing, McLeod and Denger articulated particularized reasons for their decision to detain Valdez, and Valdez does not argue that McLeod and Denger's reasons were not objective. The Court concludes, therefore, that McLeod and Denger had reasonable suspicion to stop and detain Valdez.

### III. MCLEOD AND DENGER HAD REASONABLE SUSPICION THAT VALDEZ WAS ARMED AND DANGEROUS.

Reasonable suspicion justifies McLeod and Denger's pat-down of Valdez. A pat-down or "frisk" is "a protective search . . . which permits an officer, in the course of an investigative detention, to conduct a limited search for weapons for his or her own protection." <u>United States v. King</u>, 990 F.2d at 1557 (citing <u>Adams v. Williams</u>, 407 U.S. at 147-48)). An officer may "stop and frisk" an individual in accordance with the Fourth Amendment if a reasonably prudent person "in the circumstances would be warranted in the belief that his safety or that of others was in

danger." Terry v. Ohio, 392 U.S. at 27. "The officer need not be absolutely certain that the individual is armed; the issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger." Terry v. Ohio, 392 U.S. at 27. A frisk "must . . . be confined in scope to an intrusion reasonably designed to discover guns, knives, clubs, or other hidden instruments for the assault of the police officer." Terry v. Ohio, 392 U.S. at 29. In evaluating the stop-and-frisk's validity, a court should consider the circumstances' totality. See Florida v. Bostick, 501 U.S. 429, 436 (1991).

Valdez argues that "the pat-down was not justified because there was no objective indication that Mr. Valdez was armed *and* dangerous." Motion to Suppress at 7 (emphasis in original). Although "the 'armed and dangerous' test is conjunctive," Valdez' invitation to analyze "armed" and "dangerous" as "elements in isolation rather than as co-dependent" does not take into account "how an officer's suspicion that an individual is dangerous can affect that officer's suspicion that an individual is armed, and vice versa." United States v. Garcia, 751 F.3d 1139, 1150 n.7 (10th Cir. 2014)(quoting Terry v. Ohio, 392 U.S. at 27). In other words, McLeod and Denger's reasonable suspicion that Valdez was dangerous may inform their suspicion that he was armed.

Valdez implies that McLeod and Denger could not reasonably have believed Valdez was armed and dangerous, because

> Mr. Valdez had been engaged in nothing more menacing than walking on a public street during the middle of the day in an area with homes and commercial and retail businesses. The officers did not report seeing any bulges in his clothing. As they converged on him, Mr. Valdez did not run away. When he was told to stop reaching into the bag, he did and put it on the ground. When he was told to take his hands out of his pockets, he did.

Motion to Suppress at 8.  Even though Valdez' behavior peering into the window of a parked car for sale, and his nervousness upon McLeod's and Denger's approach, alone, would not give rise to reasonable suspicion that Valdez was armed and dangerous, here, where McLeod already knew about Valdez' activity from the prior night, the circumstances' totality gives rise to reasonable suspicion that Valdez was armed and dangerous.[13]  A reasonably prudent police officer in McLeod and Denger's position reasonably could suspect that a person who threw a bag into a stranger's yard at nighttime while running from someone may be armed and dangerous while in possession of that bag, because the bag contains something the person wishes to hide from others, such as drugs, weapons, or other contraband.

As McLeod got out of his vehicle and started to approach Valdez, Valdez was bent over and reaching into his bag.  See McLeod Body Camera Footage at 00:30.  After asking Valdez to stop reaching in the bag the first time, Valdez picked up his bag.  See McLeod Body Camera Footage at 00:32-00:33.  After McLeod got closer and repeated his order to stop reaching in the bag, Valdez dropped the bag.  See McLeod Body Camera Footage at 00:34.  It is possible that Valdez did not comply with McLeod's command to put up his hands, because McLeod's command to "[k]eep your hands . . ." was missing the key word "up," and the meaning of McLeod's hand gestures may not have been sufficiently clear to Valdez.  McLeod Body Camera Footage at 00:36-00:37.  Nevertheless, even without considering Valdez' failure to comply with this particular

---

[13]The McLeod Body Camera Footage and McLeod's testimony indicate that McLeod decided to perform a pat-down as he was approaching Valdez.  See McLeod Body Camera Footage at 00:38-00:39; Tr. at 31:15-17 (Fooks, McLeod).  While, under other circumstances, such a determination that a suspect is armed and dangerous may be premature, here, given the information that McLeod and Denger already knew, this decision was not premature.

command, McLeod and Denger could reasonably suspect that Valdez was armed and dangerous in light of the information from the resident's call and what they observed of Valdez up until that point, including Valdez' efforts to reach into his pockets.  See Denger Body Camera Footage at 00:46-00:47; Tr. at 30:14 (McLeod); id. at 12:3-4 (McLeod); id. at 47:23-24 (Denger); id. at 51:5-7 (Denger).  That Valdez pulled a cellular telephone -- and not a weapon -- from his left pocket and gestured towards the parked car with it, see Denger Body Camera Footage at 00:48-00:50, does not contradict McLeod and Denger's suspicion that Valdez was armed and dangerous, because it was reasonable to suspect that Valdez' pockets contained more than just his cell phone.

The United States also argues that discovery of Valdez' firearm was inevitable, because Valdez had active arrest warrants: "Even if the deputies had not performed a pat-down at that time, deputies would still have discovered the felony warrants for Defendant's arrest when they ran his name and identifiers through law enforcement databases.  At that point, Defendant would have been arrested and searched incident to arrest," so that "[t]he magazine, firearm, and cash that were in Defendant's pockets would have been discovered before Defendant was booked into jail."  Response at 11.  The Court concludes, therefore, that McLeod and Denger had reasonable suspicion to justify a pat-down of Valdez.

## IV.  MCLEOD AND DENGER HAD LEGITIMATE CUSTODY OF VALDEZ' BAG, BECAUSE VALDEZ' ARREST WAS LAWFUL, AND THERE WERE NO ALTERNATIVES TO IMPOUNDMENT.

Before deciding the issue whether the search of Valdez' bag was valid, a threshold question is whether McLeod and Denger had legitimate custody of the bag -- in other words, whether the deputies seized or impounded the bag lawfully.  See United States v. Sanders, 769 F.3d at 1244 n.1 ("Whether an item was properly seized or impounded by police is a consideration separate and

apart from whether the item was properly subject to an inventory search."); United States v. Knapp, No. CR 17-0207 SWS, 2019 U.S. Dist. LEXIS 236043, at *7 (D. Wyo. June 13, 2019)("The Government 'bears the burden of proving that its impoundment' of the arrestee's property 'satisfies the Fourth Amendment.'" (quoting United States v. Sanders, 796 F.3d at 1244)).   If a vehicle's impoundment violates the Fourth Amendment as an unreasonable seizure, then evidence seized as a result of a search of that vehicle must be suppressed.   See United States v. Sanders, 796 F.3d at 1242-43.

In United States v. Sanders, 796 F.3d 1241 (10th Cir. 2015)("Sanders"), the Tenth Circuit examined whether a defendant's Fourth Amendment rights were violated when "police, for reasons not articulated in any policy, impounded a vehicle lawfully parked in a private lot after arresting its driver as she exited a store" and when police "made no meaningful attempt to allow the driver, her companion, or the owner of the parking lot to make alternative arrangements."   Sanders, 796 F.3d at 1242.   The Tenth Circuit held that "impoundment of a vehicle located on private property that is neither obstructing traffic nor creating an imminent threat to public safety is constitutional only if justified by both a standardized policy and a reasonable, non-pretextual community-caretaking rationale." [14]   Sanders, 796 F.3d at 1248.   The Tenth Circuit notes several factors which

---

[14] See United States v. Venezia, 995 F.3d 1170, 1177 (10th Cir. 2021)("[W]arrantless impoundments may be constitutional when 'required by the community-caretaking functions of protecting public safety and promoting the efficient movement of traffic.'" (quoting United States v. Sanders, 796 F.3d at 1245)).

courts use to "[a]scertain[] whether an impoundment is justified by a reasonable and legitimate, non-pretextual community-caretaking rationale . . .":

> (1) whether the vehicle is on public or private property; (2) if on private property, whether the property owner has been consulted; (3) whether an alternative to impoundment exists (especially another person capable of driving the vehicle); (4) whether the vehicle is implicated in a crime; and (5) whether the vehicle's owner and/or driver have consented to the impoundment.

Sanders, 796 F.3d at 1250.

When McLeod and Denger discovered that Valdez had "three confirmed felony warrants," they had a right to arrest Valdez. Tr. at 53:19-20 (Denger). See Utah v. Strieff, 579 U.S. 232, 240 (2016)("'A warrant is a judicial mandate to an officer to conduct a search or make an arrest, and the officer has a sworn duty to carry out its provisions.'" (quoting United States v. Leon, 468 U. S. 897, 920, n. 21 (1984))). Abandoning an arrestee's bag on public property would render that bag at least as likely a target as an abandoned vehicle. A bag with unknown contents could also become a danger to the public if left unattended. The United States Courts of Appeals for the Second and Fourth Circuits have held that, "[w]hen a person is arrested in a place other than his home, the arresting officers may 'impound the personal effects that are with him at the time to ensure the safety of those effects or to remove nuisances from the area.'" United States v. Perea, 986 F.2d 633, 643 (2d Cir. 1993)(quoting Cabbler v. Superintendent, Va. State Penitentiary, 528 F.2d 1142, 1146 (4th Cir. 1975), cert. denied, 429 U.S. 817 (1976)). See United States v. O'Neil, No. CR 19-1832 JCH, 2021 U.S. Dist. LEXIS 35424, at *22 (D.N.M. February 24, 2021)(Herrera, J.)("Furthermore, '[w]hen a person is arrested in a place other than his home, the arresting officers may impound the personal effects that are with him at the time to ensure the safety of those effects or to remove nuisances from the area.'" (quoting United States v. Perea, 986 F.2d 633, 643 (2d

Cir. 1993)); United States v. Kimball, 842 F. Supp. 462, 466 (D. Kan. January 14, 1994)(Belot, J.)("When a person is arrested in a place other than his home, the arresting officers may 'impound the personal effects that are with him at the time to ensure the safety of those effects or to remove nuisances from the area.'" (quoting Cabbler v. Superintendent, Virginia State Penitentiary, 528 F.2d 1142, 1146 (4th Cir. 1975))).

In United States v. Knapp, 2019 U.S. Dist. LEXIS 236043, the Honorable Scott W. Skavdahl, United States District Judge for the United States District Court for the District of Wyoming, applied the Tenth Circuit's reasoning in Sanders to assess whether officers violated the Fourth Amendment when they impounded the defendant's purse. See United States v. Knapp, 2019 U.S. Dist. LEXIS 236043.  As a general matter, Judge Skavdahl held that the government "has not carried its burden of establishing the legality of the seizure/impoundment of Ms. Knapp's purse," because "the Government has not spoken to this issue, instead focusing its argument on the subsequent issue -- the inventory search."  United States v. Knapp, 2019 U.S. Dist. LEXIS 236043, at *8-9.  Judge Skavdahl also held that  "the facts of this case do not warrant seizure/impoundment," because "[t]here is no evidence to suggest the officers seized or impounded Ms. Knapp's purse 'according to standard criteria and on the basis of something other than suspicion of evidence of criminal activity.'"  United States v. Knapp, 2019 U.S. Dist. LEXIS 236043, at *9 (quoting Colorado v. Bertine, 479 U.S. 367, 375 (1987)).  Applying the most relevant Sanders factors to the purse's impoundment, Judge Skavdahl explained that "alternatives to seizure/impoundment existed," such as Knapp's request to give her purse to a friend, or to lock it in the trunk of her car, "but officers cut off the alternatives," because of their suspicions that her purse contained evidence of a crime. United States v. Knapp, 2019 U.S. Dist. LEXIS 236043, at

*9 -10.  Next, although Knapp's purse contained a firearm and Knapp was a felon, see United States v. Knapp, 2019 U.S. Dist. LEXIS 236043, at *2, Judge Skavdahl reasoned that "the purse was not implicated in a crime," because "Ms. Knapp was arrested on a simple bench warrant from the local municipal court, which had nothing to do with her purse," United States v. Knapp, 2019 U.S. Dist. LEXIS 236043, at *10.  Finally, Knapp "did not consent to the seizure/impound of her purse."  United States v. Knapp, 2019 U.S. Dist. LEXIS 236043, at *10.  Weighing the circumstances' totality, Judge Skavdahl held that "the warrantless seizure/impoundment of Ms. Knapp's purse was 'a pretext for criminal investigation [and] not exercised according to standardized criteria.'"  United States v. Knapp, 2019 U.S. Dist. LEXIS 236043, at *10 (quoting United States v. Sanders, 796 F.3d at 1245).

The Court concludes that Judge Skavdahl's application of the Sanders factors is persuasive and applies them here.  As a threshold matter, like the United States in United States v. Knapp, the United States here does not address the constitutionality of the seizure or impoundment of Valdez' bag, but, "instead[,] focus[es] its argument on the subsequent issue -- the inventory search." United States v. Knapp, 2019 U.S. Dist. LEXIS 236043, at *8-9.  See Response at 13-16.  On balance, the Sanders factors weigh in favor of finding that the seizure of Valdez' bag was reasonable.  First, Valdez was arrested in a parking lot on public property, which weighs in favor of finding the bag's impoundment reasonable.  See Sanders, 796 F.3d at 1250; United States v. Perea, 986 F.2d at 643.  Next, unlike the defendant in United States v. Knapp, Valdez did not ask to give the bag to a friend, or request that the officers do anything else with the bag, other than bring it with them to the substation: there were no obvious alternatives to impoundment or seizure at the time of Valdez' arrest.  See Knapp, 2019 U.S. Dist. LEXIS 236043, at *9-10.  This factor also weighs in favor of

- 142 -

finding the bag's impoundment reasonable.  As in <u>Knapp</u>, however, Valdez was arrested on felony warrants that had nothing to do with the duffel bag: the United States does not argue or demonstrate that Valdez' duffel bag contained evidence connected to the crimes for which Valdez had outstanding warrants.  This factor weighs against finding that the bag's impoundment is reasonable.  Finally, unlike the defendant in <u>Knapp</u>, Valdez did not ask McLeod and Denger not to seize his bag; however, Valdez asked McLeod to tell Denger not to search his bag.  <u>See</u> McLeod Body Camera Footage at 14:45-14:50.  On balance, the relevant <u>Sanders</u> factors weigh in favor of finding the bag's impoundment reasonable, even though the United States does not argue or demonstrate that the bag's impoundment was reasonable.  Because McLeod and Denger had no other viable choice but to seize Valdez' bag and bring it with them to the substation, their seizure of Valdez' bag was reasonable.  McLeod and Denger would not have served the public or properly taken care of Valdez by just leaving his personal belongings at the scene.

## V.      MCLEOD AND DENGER'S SEARCH OF VALDEZ' BAG IS NOT A LAWFUL SEARCH INCIDENT TO ARREST, BECAUSE VALDEZ COULD NOT REACH HIS BAG AT THE TIME OF THE SEARCH.

McLeod and Denger's search of Valdez' bag is not lawful as a search incident to arrest. The Supreme Court has held that "a search incident to arrest may only include 'the arrestee's person and the area "within his immediate control" -- construing that phrase to mean the area from within which he might gain possession of a weapon or destructible evidence.'"  <u>Arizona v. Gant</u>, 556 U.S. 332, 339 (2009)(quoting <u>Chimel v. California</u>, 395 U.S. 752, 763 (1969)(no citation for quotation)).  Limiting the search to the area within an arrestee's immediate control ensures the "scope of a search incident to arrest is commensurate with its purposes of protecting arresting officers and safeguarding any evidence of the offense of arrest that an arrestee might conceal or

destroy." Arizona v. Gant, 556 U.S. at 339.  "If there is no possibility that an arrestee could reach into the area that law enforcement officers seek to search, both justifications for the search-incident-to-arrest exception are absent and the rule does not apply."  Arizona v. Gant, 556 U.S. at 339.

The Tenth Circuit interprets Arizona v. Gant, 556 U.S. at 339, "as focusing attention on the arrestee's ability to access weapons or destroy evidence at the time of the search, rather than the time of the arrest, regardless of whether the search involved a vehicle." United States v. Knapp, 917 F.3d 1161, 1168 (10th Cir. 2019).  The Tenth Circuit

> [l]ook[s] to the following factors to determine whether an area searched is within an arrestee's grab area under Chimel: (1) whether the arrestee is handcuffed; (2) the relative number of arrestees and officers present; (3) the relative positions of the arrestees, officers, and the place to be searched; and (4) the ease or difficulty with which the arrestee could gain access to the searched area.

United States v. Knapp, 917 F.3d at 1168-69 (citing United States v. Parra, 2 F.3d 1058, 1066 (10th Cir. 1993)).  In United States v. Knapp, the Tenth Circuit reversed the district court's denial of the defendant's motion to suppress, because the defendant's purse was not "of her person" at the time of her arrest, pursuant to United States v. Robinson, 414 U.S. 218 (1973), and, at the time of the search, the purse was not under her control, pursuant to Chimel v. California, 395 U.S. 752 (1969).  United States v. Knapp, 917 F.3d at 1166.  See United States v. Knapp, 917 F.3d at 1164, 1168-70.  Applying the four factors, the Tenth Circuit explains: "Here, not only were Ms. Knapp's hands cuffed behind her back, Officer Foutch was next to her, and two other officers were nearby. Moreover, the purse was closed and three to four feet behind her, and officers had maintained exclusive possession of it since placing her in handcuffs."  United States v. Knapp, 917 F.3d at 1169.

Here, the United States concedes that McLeod and Denger's search of Valdez' bag was not a search incident to arrest.  See Response at 14 ("The issue here is not whether the search of the duffel bag was a search incident to arrest.  The duffel bag had been removed from Defendant's reach and was not accessible to Defendant at the time Deputy Denger searched it.").  Similar to the circumstances in United States v. Knapp, at the time of the deputies' search of Valdez' duffel bag, Valdez was handcuffed and in the back of McLeod's patrol vehicle, while his duffel bag was on the hood of Denger's patrol vehicle, out of Valdez' reach.  See McLeod Body Camera Footage at 04:00-14:48; Denger Body Camera Footage at 14:06-15:46.  Valdez' duffel bag was not in his custody or control, and Valdez could not have reached in his bag for a weapon or to destroy evidence once he was handcuffed and separated from his bag.  That Valdez was holding his duffel bag at the time McLeod and Denger approached -- or that the bag was at his feet at the time he was detained -- is not relevant to the question whether his bag was subject to Valdez' control or within his reach at the time of the search.  See United States v. Knapp, 917 F.3d at 1168 ("This question depends on whether the purse was within the area the arresting officers could 'reasonably have believed . . . [the arrestee] could have accessed . . . at the time of the search.'")(quoting Arizona v. Gant, 556 U.S. at 344 (emphasis in United States v. Knapp)).  In conclusion, the evidence shows -- and the United States concedes -- that McLeod and Denger did not search Valdez' bag incident to his arrest.

## VI.   MCLEOD AND DENGER DID NOT PERFORM AN INVENTORY SEARCH.

The United States argues that Denger's search of Valdez' bag was a lawful inventory search and, therefore, that the Court should not suppress its contents.  See Response at 13-16.  An inventory search is "a well-defined exception to the warrant requirement of the Fourth

Amendment."  Colorado v. Bertine, 479 U.S. 367, 371 (1987).  An inventory search is "an administrative procedure designed to produce an inventory" of an arrestee's personal belongings. United States v. Haro-Salcedo, 107 F.3d 769, 772 (10th Cir. 1997)("Haro-Salcedo").  To be lawful, an inventory search must be "reasonable," meaning that it must be "conducted according to standardized procedures" and "must not be a ruse for general rummaging in order to discovery incriminating evidence."  Haro-Salcedo, 107 F.3d 769 at 772-73.  See United States v. Kendall, 14 F.4th 1116, 1124 (10th Cir. 2021).

According to the United States, Denger's search of Valdez' bag on the hood of Denger's patrol car is a lawful inventory search, because: (i) "[t]he law is clear that law enforcement is permitted to inventory an arrestee's property before the arrestee is taken to jail," Response at 14; (ii) BSCO procedures state that deputies must document an arrestee's property, because MDC does not permit knives, guns, ammunition, or chemical agents see Response at 14-15; and (iii) the "duffle bag was in [Valdez'] possession," Response at 15.  The United States supports its position by relying on the exhibits it filed on April 26, 2021 -- the MDC Inmate Property Inventory Policy, Valdez Property List, and the Incident Report.  See United States' Notice of Supplemental Exhibits at 1-3; May 2 Tr. at 15:24-18:6 (Wilson, Court).  The United States notes that Denger searched Valdez' duffle bag, because Valdez "had already been arrested on his multiple felony warrants and was going to be booked into the Metropolitan Detention Center."  Response at 14-15.

Denger's search of Valdez' bag was not a lawful inventory search.  An inventory search is lawful only if it "made pursuant to 'standard police procedures' and for the purpose of 'protecting'" the property.  United States v. Kendall, 14 F.4th at 1124 (quoting United States v. Lugo, 978 F.2d 631, 636 (10th Cir. 1992)).  According to the United States, McLeod's testimony

demonstrates that there are standard police procedures in place that BCSO follows to conduct inventory searches.  See Tr. at 21:14-22:12.  McLeod stated that when he arrests somebody, he "tag[s]" their "property" into "APD evidence" and "notate[s]" what he finds, but "tag[s]" items "of a criminal evidence nature" into "evidence, instead of return to person, or return to owner."  Tr. at 21:14:22:12 (Wilson, McLeod).  Although oral evidence of a police procedure can be sufficient to satisfy the inventory-search exception, McLeod's testimony does not suffice.  See United States v. Lugo, 978 F.2d 631, 636 (10th Cir. 1992).  First, McLeod does not explain the policy, or its application, scope, or limitations.  Second, even if McLeod's testimony laid out BCSO's standard procedures for inventory searches of property, the Court has no sound way to assess whether Denger's search accords with that policy.  By contrast, BCSO has robust procedures in place for an inventory search of a vehicle.  See BCSO Rules and Regulations § 321-8(B)(4).  BCSO Rules and Regulations state that an inventory search of a vehicle includes

> the entire passenger compartment, glove box, trunk and containers without damaging the property, at or near the time the vehicle was lawfully placed within police custody.  Containers found during an inventory search of a vehicle can be opened if accomplished without damage to the container and the search is conducted in accordance with the Department SOP.

BCSO Rules and Regulations § 321-8(B)(4).

BCSO Rules and Regulations also state that an inventory search of a vehicle "will be documented and become part of the original Offense/Incident Report."  BCSO Rules and Regulations § 321-8(B)(4).  The United States points to no analogous procedures or policies that govern Denger's search of Valdez' bag.  In other words, there is no sound way for the Court to assess whether Denger's search of Valdez' bag was "conducted according to standardized procedures" rather than just "a ruse for general rummaging in order to discovery incriminating

evidence." Haro-Salcedo, 107 F.3d 769 at 772-73.  See United States v. Matthews, 532 F. App'x 211, 220 (3d Cir. 2013)(agreeing with the government's argument that an inventory search is lawful as long as a standardized procedure does not permit the officer latitude to search indiscriminately for evidence).

The United States' other arguments are similarly unavailing.  First, although the law is clear that law enforcement can search and perform an inventory search, this observation offers no guidance on whether Denger's search in this case was, in fact, a lawful inventory search.  Second, the United States' reliance on MDC policy is misplaced.  MDC has a standardized set of procedures in place to perform inventory searches.  See MDC Inmate Property Inventory Policy at 1-3.  The MDC Inmate Property Inventory Policy states, however, that its purpose is to "have a documented process for receiving individual's property during the admission phase *when being accepted into the Metropolitan Detention Center*."  MDC Inmate Property Inventory Policy at 1 (emphasis added).  Denger's search occurred on his car's hood, well before Valdez went to MDC.  Further, McLeod testified that BCSO officers create an inventory of "personal items, like cigarettes, wallet, that kind of thing," even though MDC has "their own separate inventory," but the list the United States produced from the search on the hood of Denger's car does include the items listed on MDC's inventory sheet, including a wallet, cellular telephone, keys, and credit card.  Tr. at 22:11-12 (McLeod).  Compare Incident Report at 1-6 with Valdez Property List at 1.  MDC's inventory search policies, therefore, do not bear on whether Denger's search, which did not occur at MDC, was a lawful inventory search.  Third, whether the duffle bag was in Valdez' possession has no bearing on whether Denger's search was a lawful inventory search.  Neither the

Supreme Court nor the Tenth Circuit requires that inventory searches be performed only on items in a defendant's possession.

Moreover, the deputies' own testimony undercuts the United States' assertion that Denger's search is a lawful inventory search.  According to the United States, "[t]he issue here is not whether the search of the duffle bag was a search incident to arrest."  Response at 14. Denger testified to the contrary, however, stating that their search of Valdez was a search incident to arrest. See Tr. at 25 (Denger).  The Incident Report confirms Denger's statement: "The Duffle Bag was searched incident to arrest . . . ."  Incident Report at 6.

Although the deputies' testimony does not help the United States, an officer's subjective belief about a search does not control.  See United State v. Rochin, 662 F.3d 1272, 1274 (10th Cir. 2011)("Here, as is typically the case in the Fourth Amendment context, the subject beliefs and knowledge of the officer are legally irrelevant").  See also United States v. Snoddy, 976 F.3d 630, 636 (6th Cir. 2020)(stating that an inventory search can be lawful "'regardless of an officer's subjective intent'")(quoting United States v. Kimes, 246 F.3d 800, 805 (6th Cir. 2001));  United States v. McKinnon, 681 F.3d 203, 210 (5th Cir. 2012)(noting that a Fourth Amendment reasonableness inquiry is an objective one, "'wholly divorced from the subjective beliefs of police officers'")(citing United States v. Castro, 166 F.3d 728, 734 (5th Cir. 1999)).  But see United States v. Johnson, 889 F.3d 1120 (9th Cir. 2018)("Thus, an administrative search may be invalid where the officer's 'subjective purpose was to find evidence of a crime.'")(quoting United States v. Orozco, 858 F.3d 1204, 1213 (9th Cir. 2017)).  Regardless whether Denger and McLeod believed they were conducting a search incident to arrest, they may still satisfy the inventory search exception.  To support this conclusion, the United States stresses that Denger and McLeod

produced an inventory from their search of Valdez' bag.   See United States' Notice of Supplemental Exhibits at 1-3; May 2 Tr. at 20:9-21:16 (Court, Wilson).   After Denger searched Valdez' bag, McLeod recorded some of the items they found in the bag.   See Incident Report at 2-6.   While creating an inventory is a necessary element of an inventory search, a list of items does not turn any search into an inventory search.   If law enforcement produced a list of items after every search they did, then any unlawful search could later be converted into a lawful inventory search with a pen and a sheet of paper.   That conclusion would swallow the need for other exceptions to the Fourth Amendment's warrant requirement.   Further, that analysis is not consistent with an inventory search's purposes as the Supreme Court defines them in Illinois v. Lafeyette, 462 U.S. at 640.   See Haro-Salcedo, 107 F.3d 769 at 772.

Further, the United States does not explain how the Court can conclude that this search is an inventory search and not a search incident to arrest.   Given what Denger and McLeod produced, there is no indication that BCSO would not have produced the same report with the same list of items if the search were, as Denger and McLeod state, a search incident to arrest.   In other words, the United States offers no reason to doubt that Denger and McLeod -- or any other BCSO officers -- would produce the same list of materials and create all the same records no matter what search they conducted.   Additionally, because, given what was available at each search, the list that Denger and McLeod produced is less thorough and complete than the Valdez Property List from MDC, there is no sound reason to conclude that what Denger and McLeod did here was an inventory search pursuant to standardized procedures rather than a list of evidence found during a search incident to arrest.   The creation of a list and an assertion that a search is an inventory search together do not indicate that there are "standardized procedures" that distinguish "a ruse for general

rummaging" from a lawful inventory search. Haro-Salcedo, 107 F.3d 769 at 772-73. Deputy

Denger and Deputy McLeod, therefore, did not conduct a lawful inventory search.

## VII. THE UNITED STATES DEMONSTRATES, BY A PREPONDERANCE OF THE EVIDENCE, THAT THE CONTENTS OF VALDEZ' BAG INEVITABLY WOULD HAVE BEEN DISCOVERED IN A HYPOTHETICAL, VALID INVENTORY SEARCH.

The United States meets its burden to demonstrate, by a preponderance of the evidence,

that the contents of Valdez' bag inevitably would have been discovered during a hypothetical,

valid inventory search. See United States v. Cunningham, 413 F.3d at 1203 ("The government

possesses the burden of proving by a preponderance of the evidence that the evidence at issue

would have been discovered without the Fourth Amendment violation."); United States v.

Killblane, 662 F. App'x at 619 ("[T]he Government can rely on a hypothetical, proper inventory

search to prove seized evidence would have been inevitably discovered."). Under the inevitable-

discovery exception, "illegally obtained evidence may be admitted if it 'ultimately or inevitably

would have been discovered by lawful means.'" United States v. Christy, 739 F.3d at 540 (quoting

Nix v. Williams, 467 U.S. at 444). While the exclusionary rule exists to deter police misconduct,

so that "the prosecution is not . . . put in a better position than it would have been in if no illegality

had transpired," the inevitable-discovery doctrine serves the opposite purpose, ensuring that the

prosecution is not put "in a worse position, because the police would have obtained that evidence

if no misconduct had taken place." Nix v. Williams, 467 U.S. at 444. Although the primary

rationale behind the exclusionary rule is to deter police misconduct, "[i]f the prosecution can

establish by a preponderance of the evidence that the information ultimately or inevitably would

have been discovered by lawful means[,] . . . then the deterrence rationale has so little basis that

the evidence should be received.  Anything less would reject logic, experience, and common

sense." Nix v. Williams, 467 U.S. at 444.

"An inventory search is a well-defined exception to the warrant requirement of the Fourth

Amendment." Haro-Salcedo, 107 F.3d at 772.  The Supreme Court discussed the rationale behind

station-house inventory searches at length in Illinois v. Lafayette, 462 U.S. 640 (1983).

> At the station house, it is entirely proper for police to remove and list or inventory
> property found on the person or in the possession of an arrested person who is to
> be jailed.  A range of governmental interests supports an inventory process.  It is
> not unheard of for persons employed in police activities to steal property taken from
> arrested persons; similarly, arrested persons have been known to make false claims
> regarding what was taken from their possession at the station house.  A standardized
> procedure for making a list or inventory as soon as reasonable after reaching the
> station house not only deters false claims but also inhibits theft or careless handling
> of articles taken from the arrested person.  Arrested persons have also been known
> to injure themselves -- or others -- with belts, knives, drugs, or other items on their
> person while being detained.  Dangerous instrumentalities -- such as razor blades,
> bombs, or weapons -- can be concealed in innocent-looking articles taken from the
> arrestee's possession.   The bare recital of these mundane realities justifies
> reasonable measures by police to limit these risks -- either while the items are in
> police possession or at the time they are returned to the arrestee upon his release.
> Examining all the items removed from the arrestee's person or possession and
> listing or inventorying them is an entirely reasonable administrative procedure.  It
> is immaterial whether the police actually fear any particular package or container;
> the need to protect against such risks arises independently of a particular officer's
> subjective concerns. See United States v. Robinson, [414 U.S. 218, 235 (1973)].
> Finally, inspection of an arrestee's personal property may assist the police in
> ascertaining or verifying his identity. See 2 W. LaFave, Search and Seizure § 5.3,
> pp. 306-307 (1978).  In short, every consideration of orderly police administration
> benefiting both police and the public points toward the appropriateness of the
> examination of respondent's shoulder bag prior to his incarceration.

Illinois v. Lafayette, 462 U.S. at 646-47.  Although inventory searches "often happen at police

stations," United States v. Forget, No. CR 18-0188 FTM-38UAM, 2019 U.S. Dist. LEXIS 138634,

at *12 (M.D. Fla. August 16, 2019)(Chappell, J.), the Fourth Amendment does not require that an

inventory search take place in a station-house, see Colorado v. Bertine, 479 U.S. 367, 373 (1987)("Our opinion in Lafayette, however, did not suggest that the station-house setting of the inventory search was critical to our holding in that case."); United States v. Mendez, 315 F.3d 132, 137 n.3 (2d Cir. 2002)("Although inventory searches typically occur at a police station or an impoundment facility, rather than at the time of the arrest, . . . the Fourth Amendment does not require that police conduct inventory searches at any particular location.").

The Supreme Court has held that "[t]he policy or practice governing inventory searches should be designed to produce an inventory." Florida v. Wells, 495 U.S. 1, 4 (1990). See United States v. Matthews, 532 F. App'x 211, 220 (3d Cir. 2013)(agreeing with the government's argument that "'all that's needed to pass constitutional muster is a standardized procedure that is designed to produce an inventory that doesn't allow the officers latitude to search indiscriminately for evidence.'" (quoting record)). To be valid or lawful, "an inventory search must be reasonable, which means it must be 'conducted according to standardized procedures' and 'must not be a ruse for a general rummaging in order to discover incriminating evidence.'" United States v. Killblane, 662 F. App'x 615, 617 (10th Cir. 2016)(quoting Haro-Salcedo, 107 F.3d at 772).

The rationale supporting the need for standardized procedures stems from the Supreme Court's recognition of the dangers inherent in giving police officers too much discretion in conducting a search, particularly regarding an officer's decision whether to open closed containers. See Colorado v. Bertine, 479 U.S. 367, 376 (1987)(Blackmun, J., concurring)("I . . . write separately to underscore the importance of having such inventories conducted only pursuant to standardized police procedures.").

The underlying rationale for allowing an inventory exception to the Fourth Amendment warrant rule is that police officers are not vested with discretion to determine the scope of the inventory search.  See South Dakota v. Opperman, 428 U.S. 364, 382-383 (1976)(Powell, J., concurring). This absence of discretion ensures that inventory searches will not be used as a purposeful and general means of discovering evidence of crime.  Thus, it is permissible for police officers to open closed containers in an inventory search only if they are following standard police procedures that mandate the opening of such containers in every impounded vehicle.

Colorado v. Bertine, 479 U.S. at 376-77 (Blackmun, J., concurring)(concluding that a police officer's search of a closed container within a backpack in a vehicle was proper, because the police had standard procedures that mandated closed containers be searched in the course of a vehicle inventory).  The Supreme Court has held that, where a law enforcement department had "no policy whatsoever with respect to the opening of closed containers encountered during an inventory search," the search "was not sufficiently regulated to satisfy the Fourth Amendment."  Florida v. Wells, 495 U.S. 1, 5 (1990).

On several occasions, the Tenth Circuit has considered whether evidence inevitably would be discovered in an inventory search pursuant to lawful impoundment.  In Haro-Salcedo, 107 F.3d at 774, the Tenth Circuit concluded:

Here, police officers lawfully impounded Mr. Haro-Salcedo's vehicle after his arrest. Salt Lake City police department procedures mandate an inventory search to secure personal items found in a defendant's seized vehicle. SLPD Impound Policy, 4-08-16.04(B).  Mr. Haro-Salcedo does not dispute that a proper inventory search would have uncovered the cocaine in the trunk of his vehicle.

Haro-Salcedo, 107 F.3d at 773-74.  Further, the Tenth Circuit concluded, in an unpublished case, that "the Government can rely on a hypothetical, proper inventory search to prove seized evidence would have been inevitably discovered."  United States v. Killblane, 662 F. App'x at 619.  See United States v. Sitlington, 527 F. App'x 788, 792-93 (10th Cir. 2013)(unpublished)("'[E]ven

- 154 -

assuming arguendo that the post-arrest search . . . was improper and should have been conducted in a different manner, had the search been conducted in the manner defendant suggests is proper, it was inevitable that the weapons would have been discovered.'" (quoting Haro-Salcedo, 107 F.3d at 774)).  In United States v. Killblane, the defendant sought to suppress evidence of firearms that officers found in his vehicle during an inventory search, where an officer impounded and inventoried the defendant's truck, but filled out the inventory sheet from memory and did not list items worth less than $25.00, despite the policy department's policy requiring officers to list all personal property found in any vehicle compartment.  See 662 F. App'x at 616-17.  The Tenth Circuit affirmed the trial court's decision to deny the defendant's motion to suppress, in part, because the defendant did not dispute the "district court's conclusion that the firearms would have been inevitably discovered in a properly conducted inventory search."  662 F. App'x at 619.  Moreover, the Tenth Circuit noted that its precedent has held consistently that "seized evidence was admissible because law enforcement would have inevitably discovered it even in the absence of a proper initial inventory search" of a properly impounded vehicle.  662 F. App'x at 619.

Similarly, in United States v. Sitlington, 527 F. App'x 788, officers failed to provide a detailed inventory of the defendant's truck's contents pursuant to department policy, and instead made "general notations" on the inventory form that were "incomplete and inaccurate."  527 F. App'x at 792.  The Tenth Circuit affirmed the district court's denial of the defendant's motion to suppress, because the officers lawfully impounded the defendant's truck, and because a properly conducted inventory search would have inevitably discovered the defendant's firearm.  See 527 F. App'x at 789, 793.  Moreover, the Tenth Circuit noted that "Sitlington does not dispute that a properly-conducted inventory search would have uncovered the firearm in the truck."  527 F.

App'x at 793.  Taken together, the Court reads United States v. Killblane and United States v. Sitlington to establish that it is proper for a court to apply the inevitable discovery doctrine where a proper inventory search pursuant to standard policies would uncover the evidence that the defendant seeks to suppress.

Consequently, the Court's task here is to decide whether the United States has proven by a preponderance of the evidence that McLeod and Denger -- or someone down the road -- inevitably would have discovered the methamphetamine in Valdez' duffel bag pursuant to an inventory search.  BCSO Rules and Regulations define an inventory search in general as "[a] search conducted to protect and safeguard an individual's property, provide for the safety of the deputy and others, as well as protect the Department against claims or lawsuits for loss or destruction of private property."  BCSO Rules and Regulations § 321-8 (October 19, 2021), https://public.powerdms.com/BCS/tree/documents/170767.  BCSO Rules and Regulations state that, for a valid vehicle inventory search, the vehicle "must be in lawful custody," the search "[m]ust be reasonable and conducted in good faith," and the search "[w]ill be conducted by the deputies, or public safety aides in accordance with their training and Department standard operating procedures."  BCSO Rules and Regulations § 321-8(B)(4).  Section 321-8(B)(4) details what may be searched and opened in a vehicle inventory search:

> Inventory searches will include the entire passenger compartment, glove box, trunk and containers without damaging the property, at or near the time the vehicle was lawfully placed within police custody.  Containers found during an inventory search of a vehicle can be opened if accomplished without damage to the container and the search is conducted in accordance with the Department SOP.

BCSO Rules and Regulations § 321-8(B)(4).  The BCSO Rules and also state that "[t]he inventory search will be documented and become part of the original Offense/Incident Report."  BCSO Rules

and Regulations § 321-8(B)(4).  The United States does not argue, and the officers did not testify, that BCSO deputies follow the same inventory procedures for the inventory of personal property as they do for vehicles.  The United States does not offer into evidence, and neither could the Court find, written policies and procedures in BCSO Rules and Regulations governing the inventory search of an arrestee's personal property.  The United States refers the Court instead to policies and procedures governing Booking Procedures.  See Response at 14; Inmate Property Inventory Policy at 1-3; BCSO Booking Procedures, § 316-1.  BCSO Booking Procedures state:

> Absolutely no knives, guns, ammunition or chemical agents will be accepted by MDC, JDC, or PTC personnel to be placed in the prisoner's property. These items may be tagged into evidence for safekeeping in accordance with evidence guidelines.  Deputies will review and sign the arrestee's property inventory forms prior to leaving the facility.

BCSO Booking Procedures § 316.1(B).[15]  Additionally, the MDC Inmate Property Inventory Policy states, in part:

1.   All property accepted by Law Enforcement/Remands or Turn Ins that are brought to MDC MUST FIT INTO A 9x12 PLASTIC/PROPERTY BAG.

2.   The arresting officer will be responsible for submitting the arrestees' property to the property intake corrections technician, prior to pat search and acceptance into MDC custody.

3.   Items that do not fit into the outlined bag in this policy will be refused and the arresting agency/officer will be responsible for the property not accepted.

4.   Unauthorized items: The following items are considered contraband and are not accepted into the facility for storage:

_____

[15]Bernalillo County operates MDC, and therefore, the Court notes that it would be BCSO deputies who would accompany an arrestee to MDC and review and sign the proper inventory forms.  See Metropolitan Detention Center, The Official Site for Bernalillo County, https://www.berncо.gov/metropolitan-detention-center/ (last visited May 3, 2020).

    a.      No alcoholic beverages

    b.      No ammunition (no bullets of any kind Live or not)

    c.      No chemical agents, mace, pepper spray, etc.

    d.      No knives or sharp objects of any kind.

    e.      No bedrolls

    f.      No cigarettes, any type of tobacco products lighters, or matches

    g.      No items including, tote bags or hats larger than 9x12 inches

MDC Inmate Property Inventory Policy at 1. While neither the BSCO procedures nor the MDC procedures explicitly state that an officer must conduct an inventory search of personal property, nor do they state how an officer must conduct that inventory search, the Court concludes that these procedures demonstrate that, at some point before Valdez' booking at MDC, the officers would have conducted an inventory search of Valdez' bag. Indeed, the BSCO procedures state that "[a]bsolutely no knives, guns, ammunition or chemical agents will be accepted by MDC, JDC, or PTC personnel to be placed in the prisoner's property," and the MDC inventory procedures similarly state that "[n]o ammunition," "[n]o chemical agents, mace, pepper spray," and "[n]o knives or sharp objects of any kind" are accepted into MDC as someone's personal property. If officers were not permitted or expected to search an arrestee's personal effects before booking, it would be impossible for officers to ensure that these prohibited items do not enter in the arrestee's personal property. Consequently, the Court concludes that the officers would have conducted an inventory search of Valdez' bag before booking at MDC, in accordance with standardized procedures, and that, in the course of such an inventory search, the officers inevitably would have

discovered the methamphetamine inside Valdez' duffel bag.  See, e.g., United States v. Peterson, 902 F.3d 1016, 1019 n.1 (9th Cir. 2018)(noting that, although not in dispute, "officers testified that Peterson's backpack would have been searched during the booking process, written policies supported their testimony, and the policies were sufficiently detailed regarding the situation at hand"); United States v. Almeida, 748 F.3d 41, 49 (1st Cir. 2014)(affirming district court's denial of defendant's motion to suppress, because "the contents of the wallet inevitably would have been discovered and seized by an independent, lawful means when Almeida was processed at the Jail."); United States v. Pardue, 385 F.3d 101, 107-08 (1st Cir. 2004)(upholding validity of inevitable discovery exception based on testimony about inventory searches by a staff sergeant performing intake at a county jail and based on the arresting officer's testimony about his separate inventory); United States v. Andrade, 784 F.2d 1431, 1433 (9th Cir. 1986)(holding that the defendant's "transfer to the DEA's holding facility at Sea-Tac for processing was inevitable, as was the search of his belongings, including the garment bag," and that "[t]he routine booking procedure and inventory would have inevitably resulted in discovery of the cocaine");  State v. Pearson, 2011 MT 55, ¶ 34, 359 Mont. 427, 435, 251 P.3d 152, 158 (concluding that officers inevitably would have discovered contraband in the defendant's fanny pack, because the defendant "would have been subjected . . . to a routine inventory search at the detention center"); State v. Stowell, 286 Kan. 163, 168, 182 P.3d 1214, 1217 (2008)(reversing district court's denial of the defendant's motion to suppress where "the State did not present any evidence that Stowell would have been booked into jail or present any evidence of jail procedures," and, therefore, "did not establish that Stowell's possessions would have been searched and the key-ring pouch of methamphetamine inevitably discovered as part of the jail's inventory search procedure").

Moreover, while the Court concludes that BSCO and MDC polices imply that officers would have conducted an inventory search, the Court also notes that the United States has not provided specific written BSCO or MDC procedures outlining the steps or procedures that a deputy must take in conducting an inventory search of an arrestee's personal property, and that written procedures detailing the steps of an inventory search of personal property may not exist.[16]  The Court need not rely, however, exclusively on written procedures.  The Court has held that, "[a]lthough there may not be a written policy concerning inventory searches, including inventory searches of unlocked containers, an oral policy is sufficient."  United States v. Reyes-Vencomo, 866 F. Supp. 2d at 1331 (citing United States v. Jacquez, 409 F. Supp. 2d at 1298).  See United States v. Lugo, 978 F.2d 631, 636 (10th Cir. 1992)(relying on oral testimony from an officer to determine standard procedures for an inventory search).  Here, the United States questioned McLeod:

> Q.    Okay.  And when you arrest somebody, whether it's on felony warrants or something else, what is the procedure with what you do with all their property?
>
> A.    We tag it into APD[17] evidence.

---

[16]In contrast, BSCO policies do provide specific procedures for an inventory search of a vehicle.  See BCSO Rules and Regulations § 321-8(B)(4).

[17]Although McLeod and Denger are BCSO deputies, they testified to tagging items into Albuquerque Police Department ("APD") evidence.  At the May 2, 2022, Pre-Trial Conference, the Court questioned the United States about McLeod's statement.  The United States responded that, at least in Albuquerque, BCSO evidence and APD evidence share the same building.  See May 2 Tr. at 16-19 (Wilson).  The Court asked the United States whether "APD officer[s] log in evidence that BCSO officers bring to them," May 2 Tr. at 13:20-22 (Court), and the United States responded that "[t]hey have people that work at the front desk that are, you know, a receptionist and people that can enter information for, I believe, either agency."  May 2 Tr. at 13:23-14:1 (Wilson).  The United States asserted that the terms "might be basically interchangeable . . . . But I think that it's referring to the building where they have it.  I know that they have their own system

Q.     And when you tag something, do you have to notate which items and what they were?

A.     Yes.

Q.     And what do you do if you locate something that is of a criminal evidence nature?

A.     It gets tagged under evidence, instead of return to person, or return to owner.

Q.     So even if someone just has personal items, like cigarettes, wallet, that kind of thing, do you still need to make sure that you document each of those items before they're booked into custody?

A.     Yes, a lot of our personal property, such as wallets, can actually go with them to MDC, so that usually gets taken with them.  And then they have their own separate inventory.

Q.     Okay.  So it's your job to separate out, basically, between personal items and potential items of evidence?

A.     Correct.

Tr. at 21:14-22:12 (Wilson, McLeod).  The United States then questioned Denger:

Q.     Okay.  So why did you end up looking in the bag?

A.     Because the individual was under arrest, and it was a search incident to arrest of his property.

Q.     So there is particular language legally, so I'd like to be clear as far as the timeframe.  So had Deputy McLeod or had you already learned that there were active felony warrants before you searched the bag?

A.     Yes, ma'am.

Q.     And is that standard procedure, you have to search people's property before they're booked?

A.     To inventory their property, yes, ma'am.

Tr. at 56:22-57:10 (Wilson, Denger).  The Court notes that both McLeod's and Denger's testimony

support the Court's conclusion that it is standard procedure for officers to conduct an inventory

---

with bar codes for their case numbers and everything, so they're not combined with APD cases. But they're in the same facility."   May 2 Tr. at 14:9-15 (Wilson).

search of an arrestee's property before they are booked.  Consequently, the Court concludes that the United States has proved by a preponderance of the evidence that officers would have performed an inventory search of Valdez' bag before his booking, and that officers would have discovered the methamphetamine in Valdez' duffel bag in the course of that inventory search.  The Court will, therefore, deny Valdez' Motion to Suppress.

## VIII.   VALDEZ IS NOT ENTITLED TO SUPPRESSION OF THE STATEMENTS THAT HE MADE TO MCLEOD, BECAUSE HIS ARREST IS LAWFUL, AND BECAUSE HIS STATEMENTS WERE VOLUNTARY.

Valdez is not entitled to suppression of his statements, because his arrest is lawful, and because Valdez' waiver of his Miranda rights was voluntary, knowing, and intelligent -- notwithstanding that Valdez was possibly under the influence of drugs at the time of his arrest, and notwithstanding the pain he experienced from being handcuffed with pins in his hand.  As discussed above, McLeod and Denger had reasonable suspicion to detain and pat down Valdez, and they lawfully arrested Valdez on his outstanding warrants.  See Analysis §§ I-III, at 115-126. Given the Court's conclusion that Valdez' detention and arrest are lawful, Valdez' argument that the Court should suppress his statements, because there was not "'a sufficient attenuation or break in the causal connection between the illegal detention and the statements,'" is not convincing. Motion to Suppress at 11 (quoting United States v. Fox, 600 F.3d 1253, 1259 (10th Cir. 2010)). Valdez does not argue that McLeod's Miranda warnings were insufficient; indeed, McLeod read the Miranda warnings from a card.[18]  Nor does Valdez argue that the Miranda warnings were

---

[18]McLeod read the Miranda warning from a card that McLeod keeps inside his vest pocket. See Tr. at 18:4-11 (Wilson, McLeod).

> You have the right to remain silent -- Ok, I need you to pay attention -- You have the right to remain silent.  Anything you say can and will be used against you

untimely; McLeod read Valdez his <u>Miranda</u> rights once Valdez was seated in the back of McLeod's vehicle, and before McLeod started to question Valdez. <u>See</u> Tr. at 18:4-11 (Wilson, McLeod); McLeod Body Camera Footage at 04:59.

Valdez argues, however, that his waiver of his <u>Miranda</u> rights was invalid, because he was in pain and distress when McLeod handcuffed him, which "affected [his] mental and emotional state." Motion to Suppress at 15. Valdez argues that he was not capable of making a voluntary statement, because of the amount of pain he was suffering. <u>See</u> Reply at 8. Valdez asserts that he "continued to complain about the pain until he was on the verge of tears" and that his "facial expression, position in the car and[] movements while in the car indicate that he was still in distress when law enforcement gave him the *Miranda* advisement." Reply at 8. Valdez argues also that he "did not have a full awareness of the nature of the rights abandoned and the consequences of the decision to abandon them," and that "[w]hen the officer asked if he understood his rights he said no." Motion to Suppress at 15. Valdez contends that, "[w]hen asked again, Mr. Valdez was silent," but that "the officer launched into his interrogation," Motion to Suppress at 15, and, "[w]ith a look of agony and distress on his face," Valdez simply "nods his head," Reply at 8. The United States does not address Valdez' pain levels as they relate to the validity of his <u>Miranda</u> waiver, but instead, argues:

in a court of law. You have the right to talk to a lawyer and have them present with you while you are being questioned. If you cannot afford to hire a lawyer, one will be appointed to represent you before any questioning if you wish. You can decide at any time to exercise these rights and not answer any questions or make any statements. Do you understand each of these rights I've explained to you?

McLeod Body Camera Footage at 04:59-05:28 (McLeod).

Deputy McLeod did not in any way coerce Defendant into giving a statement. He merely read him his rights, asked if he understood, and asked if he wanted to talk to him. He spoke in a normal tone. He did not have his weapon drawn. He did not threaten Defendant.

Response at 18-19.

Waiver of a person's Fifth Amendment privilege against self-incrimination must be made "'voluntarily, knowingly and intelligently.'" United States v. Minard, 208 F. App'x 657, 660 (10th Cir. 2006)(unpublished)(quoting Miranda v. Arizona, 384 U.S. at 444). An express statement is not required; the waiver can be inferred from the defendant's actions and words. See United States v. Nelson, 450 F.3d at 1211 (citing United States v. Toro-Pelaez, 107 F.3d at 825). "Whether this standard is met 'depends in each case upon the particular facts and circumstances surrounding that case, including the background, experience, and conduct of the accused.'" United States v. Burson, 531 F.3d at 1256 (quoting Maynard v. Boone, 468 F.3d at 676). The government generally bears the burden of proving, by a preponderance of the evidence, that a valid waiver occurred. See United States v. Burson, 531 F.3d at 1256; United States v. Nelson, 450 F.3d at 1210-11. The Tenth Circuit has noted that this standard incorporates two distinct requirements:

"First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception. Second, the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it. Only if the totality of the circumstances surrounding the interrogation reveal both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the Miranda rights have been waived."

United States v. Morris, 287 F.3d 985, 988 (10th Cir. 2002)(quoting Colorado v. Spring, 479 U.S. 564, 573 (1987)). In determining whether a waiver of rights is knowing and intelligent, the Tenth Circuit employs a totality-of-the-circumstances approach. See United States v. Burson, 531 F.3d

- 164 -

at 1256-57 (citing Colorado v. Spring, 479 U.S. at 573).  "In determining whether rights were voluntarily waived, we consider: the suspect's age, intelligence, and education; whether the suspect was informed of his or her rights; the length and nature of the suspect's detention and interrogation; and the use or threat of physical force against the suspect."  United States v. Smith, 606 F.3d at 1276 (citing Smith v. Mullin, 379 F.3d at 934; United States v. Minjares-Alvarez, 264 F.3d at 985).  A "state of intoxication does not automatically render a statement involuntary." United States v. Muniz, 1 F.3d 1018, 1022 (10th Cir. 1993).  "Rather the test is 'whether a [suspect's] will was overborne by the circumstances surrounding the giving of a confession.'" United States v. Smith, 606 F.3d at 1276-77 (quoting Dickerson, 530 U.S. at 434 (alterations in United States v. Smith)).  "Hospitalization and pain alone are not enough to create any sort of presumption of coercion or involuntariness."  United States v. Minard, 208 F. App'x at 661 (citing United States v. Morris, 287 F.3d 985, 989 (10th Cir. 2002)(rejecting gunshot victim's claim of FBI coercion where FBI took care in determining whether victim's medical condition would impair his ability to answer questions); United States v. Hack, 782 F.2d 862, 866 (10th Cir. 1986)(concluding statements made two days after gunshot wound to defendant's mouth while defendant was still in pain were voluntary)).  In United States v. Minard, the Tenth Circuit affirmed the district court's denial of Minard's suppression motion, because, even though Minard was in pain and in an intensive care unit when police questioned him,

> Minard's interrogation took place three days after being shot; Minard signed a waiver and indicated great willingness to speak with Detective Park; Minard did not complain of pain to Park; Minard had a chest tube and IV inserted at the time of the interview but was not otherwise encumbered by medical apparatus; Minard had not received painkillers or other mind-altering drugs in the eighteen hours prior to the interview; Minard did not indicate confusion about any subject on which Park questioned him.  There are no indicia of police coercion in this encounter.

United States v. Minard, 208 F. App'x at 661.

Here, Valdez was in a lot of pain when McLeod was handling Valdez' hands and wrists to put handcuffs on him: Valdez cried out in pain throughout that process. See McLeod Body Camera Footage at 01:14-01:46. His cries of pain moved Denger, who, looking concerned, stepped forward, put his hand on Valdez' arm, and said to McLeod: "He's got something in his hand." McLeod Body Camera Footage at 01:39-01:40. Once the handcuffs were on his wrists, and once McLeod stopped handling Valdez' hands and wrists, however, Valdez' pain level appears to have abated; Valdez calmed down and stopped crying out. See McLeod Body Camera Footage at 02:00. Although Valdez was upset about being arrested, he was not crying out in pain when he was taken to McLeod's vehicle or when McLeod read him the Miranda warning. See McLeod Body Camera Footage at 04:00-04:06. McLeod's demeanor and tone of voice was not threatening, and McLeod did not have a weapon drawn. See McLeod Body Camera Footage at 04:00-04:06. Given the apparent abatement of Valdez' pain, and McLeod's non-threatening demeanor and tone of voice, McLeod did not use Valdez' pain to coerce him into waiving his Miranda rights. See United States v. Madden, No. CR-12-0201 CVE, 2013 U.S. Dist. LEXIS 19100, at *17-18 (N.D. Okla. Feb. 13, 2013)(Eagan, J.)(holding that a defendant's statements were voluntary even though the "defendant was in pain after he was run over by the Challenger" where the questioning was "not lengthy," the defendant understood the officer's questions, and the interrogating police officers "were not attempting to use defendant's pain as a means to coerce him into making a voluntary statement," because they ended the interrogation "when it became apparent that defendant was in too much pain to continue").

At first, Valdez' response appears to misapprehend McLeod's question, "Do you understand the rights I've explained to you?"  McLeod Body Camera Footage at 05:30, because Valdez responded, "No, because it's not right, I wasn't doing nothing wrong," McLeod Body Camera Footage at 05:27-05:28.  When McLeod repeated the question, however, Valdez nodded his head.  See McLeod Body Camera Footage at 05:30-05:32; Tr. at 18:14 (McLeod).  McLeod asked: "Having these rights in mind, do you wish to talk to us?"  McLeod Body Camera Footage at 05:35 (McLeod).  Valdez said: "I will talk to you."  McLeod Body Camera Footage at 05:36. See Tr. at 18:14-15 (McLeod).  McLeod correctly interpreted Valdez nodding his head and stating affirmatively that he would talk to McLeod as a waiver of Valdez' Miranda rights.  See United States v. Nelson, 450 F.3d at 1211.

The next issue is whether Valdez' waiver of his Miranda rights was knowing and intelligent.  The United States asserts that "Deputy Denger described Defendant's behavior as consistent with someone under the influence of drugs," Response at 5, and that, once at the South Valley substation,

> Defendant appeared to be under the influence of drugs as he was having a hard time keeping his eyes open.  His speech was slurred and he appeared to be falling asleep as he talked to [Task Force Officer ("TFO")] Castaneda. TFO Castaneda asked Defendant about the methamphetamine in his duffle bag and he stated he has had it for approximately two months.  When asked where he got it from he stated he got it in Arizona.  Defendant was not able to provide any other information.  Defendant was booked at the Metropolitan Detention Center for his state court warrants.

Response at 7.  The United States did not, however, present any evidence in the Hearing that Valdez was under the influence of drugs at the time he waived his Miranda rights.  Valdez does not argue in the Motion to Suppress, the Reply, or in the Hearing, that he was under the influence of drugs such that his waiver was invalid or that his statements were involuntary.  See Motion to

Suppress at 1-16; Reply at 1-10.  Valdez contends that, "[b]esides the pain the officer inflicted, something else may have affected Mr. Valdez's mental and emotional state.  The officer never asked him about it," but Valdez does not elaborate and state what this "something else" is.  Motion to Suppress at 15.  Even if Valdez was intoxicated or under the influence of drugs, however, this state of being "does not automatically render a statement involuntary."  United States v. Muniz, 1 F.3d at 1022.  Although Valdez argues that, when he agreed to answer questions, "he [was] simply submitting to the will of law enforcement," Reply at 8, Valdez does not suggest -- nor can the Court find evidence that -- Valdez' "will was overcome."  United States v. Muniz, 1 F.3d at 1022.  Rather, Valdez was able to answer questions and remained lucid while McLeod interrogated him in the patrol vehicle.  See McLeod Body Camera Footage at 05:30-14:50.

Finally, the totality of the circumstances surrounding the interrogation demonstrate that Valdez understood the rights that he waived: Valdez has prior experience with the criminal justice system, see Bail Report at 4-10, Valdez asked to be questioned away from the camera, see McLeod Body Camera Footage at 10:09-10:10, and Valdez asked to meet with a detective, see McLeod Body Camera Footage at 13:53-14:27.  See United States v. Morris, 287 F.3d at 988 (quoting Colorado v. Spring, 479 U.S. at 573)("'Only if the totality of the circumstances surrounding the interrogation reveal both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the Miranda rights have been waived.'").  McLeod did not intimidate Valdez or threaten force if he did not answer McLeod's questions.  Although McLeod's use of handcuffs on Valdez caused Valdez pain, the pain abated once McLeod stopped touching Valdez' hands and wrists, and it was not so severe that it affected Valdez' ability to understand his Miranda rights or respond to McLeod's questions.  See United States v. Smith, 606 F.3d at 1276.  In

conclusion, therefore, the Court finds that Valdez' statements were voluntary and denies Valdez' motion to suppress his post-<u>Miranda</u> statements.

**IT IS ORDERED** that: (i) the Defendant's Motion to Suppress Evidence and Statements, filed September 10, 2021 (Doc. 22), is denied; and (ii) the Defendant's Motion to Strike, filed April 28, 2022 (Doc. 84), is denied.


UNITED STATES DISTRICT JUDGE

*Counsel*:

Fred J. Federici
   United States Attorney
Nora Wilson
Joseph M. Spindle
   Assistant United States Attorneys
United States Attorney's Office
Albuquerque, New Mexico

   *Attorneys for the Plaintiff*

Margaret Katze
   Federal Public Defender
Devon Fooks
   Assistant Public Defender
Office of the Federal Public Defender
Albuquerque, New Mexico

   *Attorneys for the Defendant*