IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

    Plaintiff,

vs.                                                                                                  No. CR 21-0562 JB

JAIME VALDEZ,

    Defendant.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on Mr. Valdez's Motion to Dismiss Count 3 of the Indictment, filed June 5, 2024 (Doc. 161)("Motion to Dismiss"). The Court held a hearing on August 12, 2024. See Clerk's Minutes at 1, filed August 12, 2024 (Doc. 193). The primary issue is whether the Court should dismiss the United States' felon-in-possession charge, pursuant to 18 U.S.C. § 922(g)(1), against Defendant Jaime Valdez, where Valdez asserts that 18 U.S.C. § 922(g)(1) is unconstitutional on its face, because 18 U.S.C. §§ 922(g)(1) violates the Second Amendment to the Constitution of the United States. The Court will not dismiss the 18 U.S.C. § 922(g)(1) charge, because the United States Court of Appeals for the Tenth Circuit holds that 18 U.S.C. § 922(g)(1) is Constitutional.

On April 22, 2021, a federal grand jury indicts Valdez for: (i) possessing with an intent to distribute fifty grams or more of methamphetamine, in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(A); (ii) possessing a firearm in furtherance of a drug trafficking crime, in violation of 18 U.S.C. § 924(c)(1)(A)(i); and (iii) possessing a firearm while knowing that he had been convicted of at least one crime punishable by imprisonment for a term exceeding one year, in violation of 18 U.S.C. §§ 922(g)(1) and 924 ("Count 3"). See Indictment at 1-2, filed April 22,

2021 (Doc. 4)("Indictment").  On June 5, 2024, Valdez moves to dismiss Count 3, arguing that 18 U.S.C. §§ 922(g)(1) is unconstitutional on its face, because, applying the United States Supreme Court's approach in New York State Rifle & Pistol Ass'n, Inc. v. Bruen, 597 U.S. 1 (2022)(Thomas, J.)("Bruen"), 18 U.S.C. §§ 922(g)(1) violates the Second Amendment.  See Motion to Dismiss at 1-2.  Valdez acknowledges that the Tenth Circuit holds in Vincent v. Garland, 80 F.4th 1197 (10th Cir. 2023)("Vincent v. Garland"), that 18 U.S.C. §§ 922(g)(1) is not unconstitutional after Bruen.  See Motion to Dismiss at 1.  Valdez asserts, however, that he "disagrees with Vincent and files this motion to preserve the issues discussed below for appellate review."  Motion to Dismiss at 1.  In response, the United States argues that Vincent v. Garland controls here and, accordingly, that the Court should not dismiss Count 3.  See United States' Response to Defendant's Motion to Dismiss Count 3 of the Indictment at 15-16, filed June 25, 2024 (Doc. 170).

On August 12, 2024, the Court denies the Motion to Dismiss.  See Draft Transcript of August 12, 2024, Hearing at 51:13-15 (Court)(taken August 12, 2024)("August 12, 2024, Tr.").[1]  At the August 12, 2024, hearing, the Court acknowledges that the Supreme Court recently vacated Vincent v. Garland and remanded that case to the Tenth Circuit.  See August 12, 2024, Tr. at 73:8-22 (Court); Vincent v. Garland, 144 S. Ct. 2708 (Mem)(2024).  In response, the United States argues that, notwithstanding Vincent v. Garland's status, Vincent v. Garland's holding regarding 18 U.S.C. §§ 922(g)(1)'s Constitutionality is correct.  See August 12, 2024, Tr. at 74:9-18 (Wilson).

---

[1]The Court's citations to the transcript of the hearing refer to the court reporter's original, unedited version.  Any final transcript may contain slightly different page and/or line numbers.

On Vincent v. Garland's remand, the Tenth Circuit re-affirms its holding that 18 U.S.C. §§ 922(g)(1) is Constitutional.  See Vincent v. Bondi, 127 F.4th 1263, 1264-65 (10th Cir. 2025)("Vincent v. Bondi").  In the past month, the Tenth Circuit has held that Vincent v. Bondi remains good law:

> On appeal, Mr. Graves renews his argument that § 922(g)(1) is facially unconstitutional under the Second Amendment, citing New York State Rifle & Pistol Ass'n v. Bruen, 597 U.S. 1 (2022), and United States v. Rahimi, 602 U.S. 680 (2024).  Our precedent forecloses this argument. We rejected a constitutional challenge to § 922(g)(1) in United States v. McCane, 573 F.3d 1037 (10th Cir. 2009).  And while Mr. Graves's case was pending on appeal, we decided that McCane remains good law after Bruen and Rahimi.  See Vincent v. Bondi, 127 F.4th 1263, 1265-66 (10th Cir. 2025).

United States v. Graves, No. 24-7051, 2025 WL 1096984, at *1 (10th Cir. April 14, 2025).

The Tenth Circuit's conclusion in Vincent v. Bondi is consistent with the Court's recent analysis in Ortega v. Lujan Grisham, 741 F. Supp. 3d 1027 (D.N.M. 2024)(Browning, J.), appeal docketed, No. 24-2121 (10th Cir. Aug. 22, 2024)("Ortega").  In Ortega, the Court denies a request for a temporary restraining order and a preliminary injunction enjoining Defendants Governor Michelle Lujan Grisham and Attorney General Raúl Torrez from enforcing N.M.S.A. § 30-7-7.3 ("Waiting Period Act"), where the plaintiffs allege that the Waiting Period Act violates the Second Amendment.  See Ortega, 741 F. Supp. 3d at 1037.  The Waiting Period Act requires firearms sellers to wait seven days and conduct a federal background check before transferring the firearm to the buyer.  See 741 F. Supp. 3d at 1038-39.  The Court explains the Bruen approach:

> In Bruen, the Supreme Court devised a two-part analytical approach for assessing Constitutional challenges to firearm regulations under the Second Amendment. 597 U.S. at 17-24.  At the test's first step, a court must determine whether "the Second Amendment's plain text covers an individual's conduct." Bruen, 597 U.S. at 24.  If the text applies to the conduct at issue, "the Constitution presumptively protects that conduct," and the court must proceed to Bruen's second step.  Bruen, 597 U.S. at 24.  If the Second Amendment's plain text does not cover the conduct, or the challenged regulation falls into one of the "presumptively lawful" categories of regulations the Supreme Court identified in Heller, see [D.C. v. ]Heller, 554 U.S. [570,] 626-27, 627 n.26 [(2008)], the challenged regulation is considered

> presumptively Constitutional, and the court need not engage in Bruen's step-two analysis, see, e.g., B & L Prods., Inc. [v. Newsom], 104 F.4th [108,] 117 [(9th Cir. 2024)].
>
> A court reaching Bruen's second step must determine whether the challenged regulation "is consistent with the Nation's historical tradition of firearm regulation." Bruen, 597 U.S. at 24. See [United States v. ]Rahimi, 144 S. Ct. at 1897-98 (clarifying Bruen's historical tradition inquiry). If the challenged regulation is consistent with the Nation's historical tradition of firearm regulation, the presumption made at Bruen's first step is overcome, and the regulation can stand. See Bruen, 597 U.S. at 24.

Ortega, 741 F. Supp. 3d at 1068. Using this approach, the Court concludes, at Bruen's first step, that the Waiting Period Act is presumptively Constitutional, because the Second Amendment's plain text does not cover the conduct of purchasing a firearm. See 741 F. Supp. 3d at 1069-76. The Court also concludes that, at Bruen's second step, "even if the Waiting Period Act implicated the Second Amendment's plain text," the Waiting Period Act "is consistent with the principles underpinning our Nation's historical tradition of prohibiting and restricting the sale of firearms to large swaths of the population out of a fear that some among these groups would use the purchased firearms to do harm." 741 F. Supp. 3d at 1086.[2]

---

[2]The Court states:

> "[C]olonial governments substantially controlled the firearms trade." Teixeira v. Cnty. of Alameda, 873 F.3d at 685. See FOF ¶ 45, at 9-10; United States v. Trujillo, 670 F. Supp. 3d 1235, 1242 (D.N.M. 2023)(Johnson, C.J.)(identifying "a variety of firearms regulations enacted during the colonial period before and after the Revolutionary War that . . . regulated the sale . . . of firearms"), appeal dismissed, No. 23-2080, 2023 WL 5093358 (10th Cir. August 9, 2023); United States v. Holton, 639 F. Supp. 3d 704, 711 (N.D. Tex. 2022)(Boyle, J.)("Several states restricted where and to whom individuals could sell guns."). Indeed, one of the very first laws adopted by colonists living in the region that would become the United States was a regulation on the sale of guns. In 1619, the "fir[s]t legislative body that ever met in America" was established in the Virginia Colony. See H.R. McIlwaine & John P. Kennedy, eds., Journals of the House of Burgesses of Virginia, 1619-1776 at xxvi (1905), https://hdl.handle.net/2027/uc2.ark:/13960/t4th8sj3p (last visited July 18, 2024). On August 4, 1619, the legislature pronounced "[t]hat no man do sell or give any Indians any piece, shot, or powder, or any other arms offensive or defensive, upon paine of being held a traitor to the colony and of being hanged." McIlwaine &

Kennedy, supra, at 13.  Not all commercial regulations on the sale of firearms to Native Americans were complete bans, however.  See Spitzer Report ¶¶ 95-96, at 35 (highlighting found-era laws "licensing the sale of weapons to Indigenous people"); United States v. Duarte, 101 F.4th at 686 (highlighting laws establishing "licensing requirements" that "implied that those with proper credentials could still trade arms with Indians").  In 1784, for example, Georgia outlawed selling arms to Native Americans, but only at any "place . . . [other] than at stores or houses licensed for that purpose."  Act of Feb. 1784, Digest of Laws of the State of Georgia 288-89 (Watkins ed. 1800).  See 1763 Pa. Laws 319, § 1 (prohibiting sale to "any Indian or Indians . . . any guns . . . or other warlike stores without license").  In 1669, the Connecticut assembly "allowed each town to appoint one person who could sell firearms to the Indians but under the strictest regulation."  Michael A. Bellesiles, Gun Laws in Early America: The Regulation of Firearms Ownership, 1607-1794, 16 Law & Hist. Rev. 567, 585 (1998).  Connecticut returned to a complete ban in 1708, however, when it passed a restriction, "forbidding selling, lending, or giving 'to any of our friend Indian or Indians, any gun, for any time.'"  Bellesiles, supra, at 585-86 (quoting J. H. Turnbull et al., eds., The Public Records of the Colony of Connecticut (1850-90)).  See 1639 N.J. Laws 18 (prohibiting the sale of firearms to Indians); 1645 N.Y. Laws 47 (same); 1723 Conn. Acts 292 (same).  Such prohibitions on the sale of firearms to Native Americans "'prevailed up to the period immediately before and after the framing of the Constitution.'"  Bruen, 597 U.S. at 35 (quoting Sprint Communications Co. v. APCC Services, Inc., 554 U.S. 269, 311 (2008)(Roberts, C.J., dissenting)).  See 1763 Pa. Laws 319; An Act Concerning the Kaskaskia Indians, in Nathaniel Pope, Laws of the Territory of Illinois (1815); 1853 Or. Rev. Stat. 257.

While "[b]ans on selling arms to Indians were a matter of course in the early American colonies," United States v. Duarte, 101 F.4th at 679, laws restricting firearm commerce were not limited to preventing the sale of arms to Native Americans.  For example, at least one colony enacted a law preventing those who expressed or seditious opinions from purchasing firearms.  See Robert J. Spitzer, Gun Law History in the United States and Second Amendment Rights, 80 Law & Contemp. Probs. 55, 72 (2017)("The Massachusetts colony enacted a law in 1637 that required named individuals who expressed 'opinions & revelations that 'seduced & led into dangerous errors many of the people' of New England to turn in all 'guns, pistols, swords, powder, shot, & match,' and it further barred them from 'buy[ing] or borrow[ing]' any of the same until such time as the local court said otherwise." (quoting Records of the Governor and Company of the Massachusetts Bay in New England 211-12 (Nathaniel B. Shurtleff ed., 1853))).  Notably, this regulation implemented only a temporary bar on the purchase of firearms, because "[i]f those disarmed admitted to their 'seditious libel,' they could have their weapons restored."  Spitzer, supra, at 72 (quoting Records of the Governor at 212).  Closer to the founding, Pennsylvania enacted a similar law stripping those who "'refuse[d] or neglect[ed] to take the oath or affirmation' of allegiance to the state" and preventing the individual from "borrow[ing] or even us[ing] another person's firearms."  Saul Cornell & Nathan DeDino, A Well

- 5 -

Regulated Right: The Early American Origins of Gun Control, 73 Fordham L. Rev. 487, 506-07 (2004).  See also Teixeira v. Cnty. of Alameda, 873 F.3d at 685 ("Connecticut banned the sale of firearms by its residents outside the colony." (citing 1 Trumbull, Public Records of the Colony of Connecticut, 138-39, 145-46)).

Finally, numerous post-ratification commercial firearm regulations restricted the sale of arms to slaves, despite that slaves were often authorized "to possess firearms for some limited purpose."  United States v. Duarte, 101 F.4th at 687.  See Robert J. Cottrol Raymond T. Diamond, The Second Amendment: Toward an Afro-Americanist Reconsideration, 80 Geo. L.J. 309, 336 n.129 (1991)("Sale or other delivery of firearms to slaves was forbidden by several states.").  For example, an 1836 Tennessee law provided: "Any free person who, without the consent of the owner, shall sell, loan or give to any slave, any gun, pistol, sword, or dirk, shall be guilty of a misdemeanor . . . ."  1835-36 Tenn. Pub. Acts 168.  A nearly identical provision in New Mexico prohibited the sale "to any slave any . . . gun, pistol or other fire arms, or any other kind of deadly weapon of offence, or any ammunition of any kind suitable for fire arms."  1858 N.M. Laws 68.  See also Spitzer Report ¶¶ 97, at 35-36 (listing licensing regimes aimed at restricting "enslaved persons or free persons of color" access to firearms); Cornel & DeDino, supra, at 516 ("Virginia passed a law in 1806 that required every 'free negro or mulatto' to first obtain a license before carrying or keeping 'any fire-lock of any kind, any military weapon, or any powder or lead.'" (quoting Act of Feb. 4, 1806, 1805-1806 Va. Acts ch. XCIV, at 51)).

Taken together, these regulations demonstrate a deeply rooted historical tradition of restricting and even outright prohibiting the sale of firearms to large groups out of a fear that some among those groups might use those firearms to do harm in society.  See FOF ¶ 47, at 10.  During the colonial era, "fearing the consequences of unregulated access to firearms and munitions," "American governments sought to regulate the . . . sale . . . of firearms and munitions."  Bellesiles, supra, at 576.  Typically, these restrictions were motivated by a desire to keep firearms out of the hands of "blacks, slave and free; Indians; propertyless whites; non-Protestants or potentially unruly Protestants."  Bellesiles, supra at 576.  For example, early commercial firearm regulations restricting the sale of arms to Native Americans sought "to limit Indian access to firearms" as "the Indians resisted the conquest of their lands," Bellesiles, supra, at 574, 581, by engaging in attacks on white settlers using firearms which they had previously purchased or for which they traded, see Teixeira v. Cnty. of Alameda, 873 F.3d at 685 (describing how, "[i]n response to the threat posed by Indian tribes," colonies made "it a crime to sell, give, or otherwise deliver firearms or ammunition to Indians"); Robert J. Spitzer, Guns Across America 52 (2015)("Gun laws aimed at barring [those] deemed dangerous to society from possessing firearms focused early in the country's history on Native Americans . . . ."); David J. Silverman, Thundersticks: Firearms and the Violent Transformation of Native America 13-15 (2016).  Similar fears justified laws restricting the sale of firearms to slaves.  Following South Carolina's 1740 Stono Rebellion, a slave revolt in which armed slaves killed over two dozen colonists, "slave uprisings -- real and imagined -- persuaded colonial

- 6 -

Here, the Court reaches the same conclusion regarding 18 U.S.C. § 922(g)(1). At Bruen's first step, the Second Amendment's plain text covers 18 U.S.C. § 922(g)(1), because 18 U.S.C. § 922(g)(1) regulates an individual's ability to possess a firearm. See United States v. Rahimi, 602 U.S. at 690-702 (proceeding to Bruen's second step to evaluate whether 18 U.S.C. § 922(g)(8), which prohibits an individual subject to domestic violence restraining order from possessing a firearm, violates the Second Amendment); United States v. Rahimi, 602 U.S. at 752 (2024)(Thomas, J., dissenting)(noting explicitly that the Second Amendment's plain text covers 18 U.S.C. § 922(g)(8)). The Court also concludes, like it does in Ortega,[3] that

---

legislatures that blacks as a group, slave or free, should not be allowed to own firearms." Bellesiles, supra, at 576. See Adam Winkler, Gunfight 115-16 (2011)(explaining that certain racial groups were disarmed "out of fear that these groups would use guns to revolt against slave masters," even if they "were completely law-abiding"); McDonald, 561 U.S. at 845 (Thomas, J., concurring in part)("The fear generated by these and other rebellions led Southern legislatures to take particularly vicious aim at the rights of free blacks and slaves to speak or to keep and bear arms for their defense."). Finally, founding-era laws prohibiting individuals who expressed seditious opinions, see Spitzer, supra, at 72, or refused to swear an oath of allegiance to their State, see Cornell & DeDino, supra, at 506, from buying or even borrowing firearms, were passed because it was feared that these individuals "posed a potential danger," Nat'l Rifle Ass'n of Am., Inc. v. Bureau of Alcohol, Tobacco, Firearms, & Explosives, 700 F.3d at 200. See United States v. Duarte, 101 F.4th at 681 (explaining that non-associators' access to firearms were restricted because it was feared they would "take up arms against America"). By limiting the commercial sale of firearms in an effort to keep firearms out of the hands of individuals who may commit impulsive acts of violence against the populace, the Waiting Period Act fits within this regulatory tradition.

Ortega, 741 F. Supp. 3d at 1086-89.

[3]In Ortega, the Court describes in detail how the Supreme Court, the Tenth Circuit, and other Courts of Appeals hold, in Bruen's wake, that felon-in-possession statutes remain presumptively Constitutional:

In Heller, the Supreme Court states that, "[l]ike most rights, the right secured by the Second Amendment is not unlimited." 554 U.S. at 626. The Second Amendment is "not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." Heller, 554 U.S. at 626. Accordingly, "laws imposing conditions and qualifications on the commercial sale of arms,"

Heller, 554 U.S. at 626-27, are "presumptively constitutional," Heller, 554 U.S. at 627 n.26. "Bruen did nothing to disturb that part of Heller." McRorey, 99 F.4th at 836. See United States v. McNulty, 684 F. Supp. 3d 14, 20 (D. Mass. 2023)(Young, J.)("[I]t is incorrect to posit that Bruen has upended the presumptive constitutionality of measures seeking to regulate firearms commerce."); United States v. Roberts, No. CR 23-0057, 2024 WL 50889, at *5 (D. Alaska January 4, 2024)(Burgess, J.)("[T]he Bruen court did not repudiate -- and indeed preserved -- Heller's list of presumptively lawful firearm regulations."). Indeed, the Supreme Court in Bruen, in both the majority and concurring opinions, emphasizes the continued vitality of Heller's non-exhaustive list of categories of presumptively Constitutional regulations. See Bruen, 597 U.S. at 38 n.9 ("To be clear, nothing in our analysis should be interpreted to suggest the unconstitutionality of the 43 States' 'shall-issue' licensing regimes."); id. at 72 (Alito, J., concurring)("Our holding decides nothing about . . . the requirements that must be met to buy a gun. . . . Nor have we disturbed anything that we said in Heller or McDonald . . . about restrictions that may be imposed on the possession or carrying of guns."); id. at 80 (Kavanaugh, J., concurring)("Properly interpreted, the Second Amendment allows a 'variety' of gun regulations." (quoting Heller, 554 U.S. at 636)).

. . . .

In rejecting the argument that Heller "established a categorical rule that the Constitution prohibits regulations that forbid firearm possession in the home," the Supreme Court in Rahimi reaffirmed "that many such prohibitions, like those on the possession of firearms by 'felons and the mentally ill,' are 'presumptively lawful.'" Rahimi, 144 S. Ct. at 1902. This suggestion from the Supreme Court that Heller's presumptively lawful categories remain intact accord with the majority of Courts of Appeals that have concluded that Heller's exception for modern felon disarmament laws retains its vitality. See United States v. Gay, 98 F.4th 843, 846 (7th Cir. 2024)(recognizing that the Supreme Court continues to maintain that "'longstanding prohibitions on the possession of firearms by felons' are valid" (quoting Heller, 554 U.S. at 626)); United States v. Cunningham, 70 F.4th 502, 506 (8th Cir. 2023)("The longstanding prohibition on possession of firearms by felons is constitutional . . . ."); United States v. Dubois, 94 F.4th 1284, 1293 (11th Cir. 2024)("Because the Supreme Court 'made it clear in Heller that [its] holding did not cast doubt' on felon-in-possession prohibitions, and because the Court made it clear in Bruen that its holding was '[i]n keeping with Heller,' Bruen could not have clearly abrogated our precedent upholding section 922(g)(1)." (quoting McDonald, 561 U.S. at 786, and then Bruen, 597 U.S. at 17)).

Furthermore, in a now-vacated opinion, the Tenth Circuit reaffirmed that the presumptively Constitutional categories that Heller identifies survive Bruen and do not require a separate Bruen step-two analysis. Before Bruen, in United States v. McCane, 573 F.3d 1037, the Tenth Circuit rejected a Second Amendment challenge to 18 U.S.C. § 922(g), the federal felon firearm possession ban, because

18 U.S.C. § 922(g)(1) is presumptively Constitutional, because it "falls into one of the 'presumptively lawful' categories of regulations the Supreme Court identified in Heller." Ortega, 741 F. Supp. 3d at 1068 (quoting Heller, 554 U.S. at 626-27). See Rocky Mountain Gun Owners v. Polis, 121 F.4th 96, 119 (10th Cir. 2024)(identifying Heller's "safe harbor list" of presumptively lawful firearm regulations, which includes "'prohibitions on the possession of firearms by felons and the mentally ill'")(quoting Heller, 554 U.S. at 626). Because 18 U.S.C. § 922(g)(1) is presumptively Constitutional, the Court "need not engage in Bruen's step-two analysis." Ortega, 741 F. Supp. 3d at 1068. Even if 18 U.S.C. § 922(g)(1) is not presumptively Constitutional -- and thus Bruen's step-two analysis is required -- the Court concludes, however, that 18 U.S.C. § 922(g)(1)'s prohibition on convicted felons possessing firearms is consistent with our Nation's historical tradition of preventing dangerous individuals from obtaining firearms. See Ortega, 741 F. Supp. 3d at 1086-89. This conclusion is consistent with United States v. Rahimi, where the Supreme Court holds that 18 U.S.C. § 922(g)(8) "fits within our regulatory tradition," which "allows the Government to disarm individuals who present a credible threat to the physical safety of others." United States v. Rahimi, 602 U.S. at 699-700. This conclusion is also consistent

---

"[t]he Supreme Court . . . explicitly stated in Heller that 'nothing in our opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons.'" 573 F.3d at 1047 (quoting Heller, 554 U.S. at 626). After Bruen, in Vincent v. Garland, 80 F.4th 1197, the Tenth Circuit addressed a renewed challenge to § 992(g) and considered whether Bruen altered its conclusion in United States v. McCane. 80 F.4th at 1199-1202. The Tenth Circuit declined to revisit its holding in United States v. McCane, and concluded that, "[t]hough Bruen created a new test for determining the scope of the Second Amendment, the Court didn't appear to question the constitutionality of longstanding prohibitions on possession of firearms by convicted felons." Vincent v. Garland, 80 F.4th at 1201. See Rocky Mountain Gun Owners v. Polis, 2023 WL 8446495, at *11 ("The Tenth Circuit's recent opinion in Vincent v. Garland, 80 F.4th 1197 (10th Cir. 2023), also lends support for the conclusion that Heller's presumptively lawful measures withstood Bruen.").

Ortega, 741 F. Supp. 3d 1076-83.

with <u>United States v. Williams</u>, where the United States Court of Appeals for the Sixth Circuit holds that 18 U.S.C. § 922(g)(1) is Constitutional, because "our nation's history and tradition demonstrate that Congress may disarm individuals they believe are dangerous." <u>United States v. Williams</u>, 113 F.4th 637, 657 (6th Cir. 2024)(Thapar, J.). Because the Tenth Circuit holds that 18 U.S.C. §§ 922(g)(1) is Constitutional, and the Court agrees with that conclusion on a clean slate, the Court denies the Motion to Dismiss.

**IT IS ORDERED** that Mr. Valdez's Motion to Dismiss Count 3 of the Indictment, filed June 5, 2024 (Doc. 161), is denied.

                                                                                _____
                                                                               UNITED STATES DISTRICT JUDGE

*Counsel*:

Ryan Ellison
  United States Attorney
Nora M. Wilson
Joseph M. Spindle
  Assistant United States Attorneys
United States Attorney's Office
Albuquerque, New Mexico

      *Attorneys for the Plaintiff*

Margaret Katze
  Federal Public Defender
Devon Fooks
Martin Juarez
  Assistant Public Defenders
Office of the Federal Public Defender
Albuquerque, New Mexico

      *Attorneys for the Defendant*